IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| RED SONJA LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C. A. No. 06-270 (SLR) |
| | ) | |
| PARADOX ENTERTAINMENT, INC., | ) | **REDACTED -** |
| | ) | **PUBLIC VERSION** |
| Defendant. | ) | |

## DEFENDANT PARADOX ENTERTAINMENT INC.'S BRIEF IN SUPPORT OF ITS MOTION TO STRIKE THE REPORT OF FRED B. TARTER AND TO PRECLUDE PLAINTIFF FROM OFFERRING ANY EVIDENCE OF DAMAGES

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Richard J. Bauer (#4828)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200
*Attorneys for Defendant*
 *Paradox Entertainment, Inc.*

OF COUNSEL:

Frederick U. Fierst
Fierst, Pucci & Kane LLP
64 Gothic Street
Northampton, MA 01060
(413) 584-8067

Original Filing Date: May 23, 2007
Redacted Filing Date: May 31, 2007

## TABLE OF CONTENTS

Page(s)

TABLE OF CITATIONS ................................................................................................ ii

SUMMARY OF ARGUMENT ....................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 3

      I.      THE PARTIES .......................................................................................... 3

             A.     PARADOX ENTERTAINMENT INC. ............................................. 3

             B.     RED SONJA LLC. ........................................................................... 4

      II.     THE DISPUTE .......................................................................................... 6

      III.    THE TARTER REPORT ......................................................................... 10

             A.     Mr. Tarter's Corrective Advertising Opinions ............................... 11

             B.     Mr. Tarter's "Opportunity Cost" Opinions. ................................... 13

ARGUMENT .................................................................................................................. 14

      I.     THE LEGAL STANDARD FOR ADMISSIBILITY OF
             EXPERT TESTIMONY. ......................................................................... 14

      II.     THE DAMAGES OPINIONS IN THE TARTER REPORT
             DO NOT MEET THE STANDARDS FOR
             ADMISSIBILITY. .................................................................................... 15

             A.     Mr. Tarter's Damages Opinions Are Not Causally
                     Linked To The Complained Of Conduct. ....................................... 15

             B.     Mr. Tarter's Damages Opinions Consist
                     Of Unsupported Speculation And Are Unreliable. ........................ 17

             C.     Mr. Tarter Is Unqualified To Render Any Opinion
                     With Respect to Opportunity Costs. ............................................... 20

CONCLUSION ............................................................................................................... 22

## TABLE OF CITATIONS

Page(s)

**CASES**

*A & H Sportswear Co. v. Victoria's Secret Stores, Inc.*,
   166 F.3d 197 (3d Cir. 1999).................................................................15

*Accu Pers. v. Accustaff, Inc.*,
   846 F. Supp. 1191 (D. Del. 1994)...........................................................16

*Advanced Med. Optics, Inc. v. Alcon Inc.*,
   No. 03-1095-KAJ, 2005 U.S. Dist. LEXIS 5803 (D. Del. Apr. 7, 2005)..............17, 21

*AstraZeneca LP v. Tap Pharm. Prods.*,
   No. 04-1332-KAJ, 2006 U.S. Dist. LEXIS 40620 (D. Del. May 18, 2006)........ Passim

*Augustine Med., Inc. v. Mallinckrodt, Inc.*,
   No. 01-387-SLR, 2003 U.S. Dist. LEXIS 6079 (D. Del. Apr. 9, 2003).....................18

*Benjamin v. Peter's Farm Condo. Owners Ass'n.*,
   820 F.2d 640 (3d Cir. 1987)..................................................................18

*Calhoun v. Yamaha Motor Corp., U.S.A.*,
   350 F.3d 316 (3d Cir. 2003)..................................................................21

*Callaway Golf Co. v. Dunlop Slazenger*,
   384 F.Supp.2d 735 (D. Del. 2005)...........................................................16

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993).................................................................... 14-15

*Elcock v. Kmart Corp.*,
   233 F.3d 734 (3d Cir. 2000)........................................................ 14, 17-18

*Gen Elec. v. Joiner*,
   522 U.S. 136 (1997)..........................................................................19

*Go Med. Indus. Pty, Ltd. v. Inmed Corp.*,
   471 F.3d 1264 (Fed. Cir. 2006)..............................................................20

*Gumbs v. Int'l Harvester, Inc.*,
   718 F.2d 88 (3d Cir. 1983)...................................................................18

*Heller v. Shaw Indus.*,
   167 F.3d 146 (3d Cir. 1997)..................................................................17

*In re Paoli R.R. Yard PCB Litig.*,
  35 F.3d 717 (3d Cir. 1994)....................................................................................14, 20

*In re TMI Litig.*,
  193 F.3d 613 (3d Cir. 1999)...........................................................................................20

*Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*,
  315 F. Supp. 2d 589 (D. Del. 2004)......................................................................... 18-19

*Joint Stock Soc. v. UDV N. Am., Inc.*,
  266 F.3d 164 (3d Cir. 2001)...........................................................................................15

*Kumho Tire Co., Ltd. v. Carmichael*,
  526 U.S. 137 (1999).......................................................................................................14

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir.), *cert. denied,* 510 U.S. 815 (1993)......................................15

*Oddi v. Ford Motor Co.*,
  234 F.3d 136 (3d Cir. 2000)...........................................................................................17

*PBM Prods., Inc. v. Mead Johnson & Co.*,
  174 F. Supp. 2d 417 (E.D. Va. 2001) ...........................................................................16

*Waldorf v. Shuta*,
  142 F.3d 601 (3d Cir. 1998)...........................................................................................21

*Xoom, Inc. v. Imageline, Inc.*,
  323 F.3d 279 (4th Cir. 2003), *cert denied*, 2003 U.S. LEXIS 6260 (2003) ...............16

*Zazu Designs v. L'Oreal, S.A.*,
  979 F.2d 499 (7th Cir.1992) ..........................................................................................16

**STATUTES**

15 U.S.C. § 1117..................................................................................................................15

**OTHER AUTHORITIES**

Fed. R. Civ. Proc. Rule 26 ...................................................................................................20

Fed. R. Evid. 702 ............................................................................................................14, 20

## SUMMARY OF ARGUMENT

Defendant, Paradox Entertainment, Inc. ("Paradox") manages various literary rights and character-based properties owned by it or its wholly-owned subsidiaries. Since 2003, one of those properties has been Conan (aka "Conan the Barbarian"), a character created by renowned fiction author Robert E. Howard. On February 6, 2006, Paradox announced it acquired the remaining literary works and characters in the Robert E. Howard library (the "REH Library"), including the character Red Sonya, which first appeared in 1934. Plaintiff, Red Sonja LLC, has certain rights to Red Sonja, a character first introduced by Roy Thomas in the mid 1970's, and that is loosely based on the Robert E. Howard Red Sonya character.

Far from being "one of the more insidious cases of unfair competition and trademark infringement ever knowingly advanced by a competitor," this case boils down to Paradox's issuance of two press releases (*i.e.*, its acquisition of the REH Library and its development of a movie based on Howard's western "Vultures of Wahpeton"), its posting of an errant article written by a third party about the REH Library acquisition, and its inclusion of a two sentence statement on its website noting that Paradox "builds brands" and referring to Red Sonya and other characters as "successful brands."[1] Paradox has never sold or offered for sale any products based on the Red Sonya

---

[1]    In its Complaint, plaintiff also alleged unfair competition relating to Paradox's purported efforts to obtain trademark protection on the word "HYBORIA" and purported attempts to interfere with plaintiff's contracts in connection with developing a movie feature Red Sonja. Plaintiff has not, however, asserted any damages in connection with those claims.

character.  Nor has Paradox ever licensed or offered anyone a license to use the Red Sonya character for any purpose.

From Paradox's February 6, 2006 initial press release announcing its acquisition of the REH Library until the filing of this lawsuit on April 25, 2006, plaintiff never alerted Paradox to any possible confusion involving the Robert E. Howard Red Sonya character owned by Paradox and plaintiff's Red Sonja character and never asked Paradox to take any action to avoid potential confusion.  Nor did plaintiff take any corrective action to mitigate purported confusion.  It simply filed this suit.

Immediately upon hearing of the suit on April 27, 2006, Paradox issued a statement clarifying that "Red Sonja® (with a 'j') is owned by Red Sonja LLC" and that Paradox had no intent of commercially exploiting its Red Sonya.  Although admitting that Paradox's statements that it did not intend to exploit Red Sonya "*cut off the claim to future damages*," plaintiff has submitted a report from Fred B. Tarter seeking between $417,240 and $442,240 in damages for *future* corrective advertising and "opportunity costs" that plaintiff has purportedly incurred since it announced its Red Sonja movie on May 2, 2006 (after Paradox's unambiguous April 27, 2006 clarification).

The opinions in Mr. Tarter's report (Ex. 1) are speculative, conclusory and unsupported.  Mr. Tarter does not assess any confusion purportedly caused by Paradox or tie such confusion to any damage.  He instead simply assumes "market confusion" without citation to any surveys or research or facts.  Mr. Tarter opines that the total costs of corrective advertising over a three to six week period "would be $192,240" but offers no support for his opinion of the amount of advertising needed or his final calculation. He "*estimates*" the cost of a "good advertising agency" at between "25,000 - $50,000"

but does not substantiate that claim or explain what it is that such an agency would have to do in the instant case. He then speculates that plaintiff lost licensing opportunities because confusion "***frequently results*** in potential licensees not willing to enter a licensing arrangement" but he identifies no licensees who have been confused and no particular lost licensing opportunities. Instead, he simply assumes (without any stated basis or rationale) that Red Sonja "would generate ***approximately*** 1/3" of what Conan generated in advances and notes that he "would set the loss ***approximately*** at $200,000."

During discovery, Red Sonja refused to articulate how it had been damaged, instead leaving that for its expert, Mr. Tarter, to show "the impact of confusion and how long it lasts, what its remedy impact is, and what the costs are." But Mr. Tarter's approximations, unsupported opinions and speculations are unfounded and unreliable. They can not form the basis of admissible testimony at trial. Mr. Tarter's expert report should be stricken, and plaintiff should be precluded from offering evidence of damages at trial.

<u>STATEMENT OF FACTS</u>

**I.     THE PARTIES**

    A.    <u>Paradox Entertainment Inc.</u>

Defendant Paradox manages character-based properties owned by it or its wholly-owned subsidiaries. Those properties include more than 1,000 fantasy, horror, science fiction, and western stories and characters. One of those is the fictional barbarian, Conan (aka "Conan the Barbarian"). Originally created in 1932 by author Robert E. Howard, known as the father of the "sword and sorcery" genre, Conan has since appeared in numerous books, comics, television programs, and video games, as

4.

well as two successful movies, both starring Arnold Schwarzenegger. (Ex. 2 (A. Lieberman Dep) at 267-68). In February 2006, Paradox AB purchased the remaining stories and characters in the REH Library, including Red Sonya, who first appeared in the 1934 short story "Shadow of the Vulture." (Ex. 3 at 100-01).

Defendant Paradox manages its wholly owned subsidiaries' character based properties. (*Id.* at 51) Neither Paradox nor or any of its related entities have ever sold or offered for sale any products, comic books, magazine, novels or other publications based on the Red Sonya character. (*Id.* at 187; Ex. 4 (L. Lieberman Dep.) at 122-23). Nor has Paradox ever licensed or offered a license to use the Red Sonya character for any purpose. (Ex. 3 at 172). Paradox Entertainment AB, the Swedish parent company of Paradox, has a website but does not sell anything on that site. (*Id.* at 60).

### B.     Red Sonja LLC.

Plaintiff Red Sonja LLC has certain rights in *one* property – the fantasy genre character RED SONJA. (D.I. 1). RED SONJA, a "warrior woman out of majestic Hyrkania," was first created by comic book writer Roy Thomas in the early 1970's as a supporting character in the "Conan the Barbarian" comic book series. (Ex. 5; *see also* D.I. 1 at Ex. A). Although she is loosely based on the Red Sonya character from Robert E. Howard, Roy Thomas reinvented his RED SONJA into a "fiery red-haired warrior woman." (Ex. 4 at 39-40; 138-39; Ex. 2 at 174). He transformed her from a limited, supporting character into a heroine in a fantasy a pre-tech never-land full of monsters and wizards. (Ex. 4 (L. Lieberman Dep.) at 138-39). He also replaced her guns with a sword, changed the spelling of her name, and gave her what she is known for today – her skimpy

5.

silver "metal bikini."  (Ex. 5).  As explained by Roy Thomas, it was "best to make [RED SONJA] a bit more of a '*new*' character" so that "***Red Sonya-with-a-'y' would continue to exist, pristine and untouched*** . . . while Sonja-with-a 'j' was a blank slate, on which [he] could write and Barry [Smith] could draw whatever we would."[2]  (*Id.*).

In 1977, RED SONJA was first featured in her own comic book series, entitled RED SONJA.  (D.I 1 ¶ 20; *see also* Ex. 6 (Pl.'s Resp. to Def.'s Interrog. #3)).   In 1985, RED SONJA was made into an unsuccessful movie, which has ███████████ ██████████████  and which has resulted in ████████  royalties. (Ex. 2 at 207-09). Throughout the 1990's, RED SONJA appeared as a feature comic in only three publications, the last of which was in 1999.  (Ex. 6 (Pl.'s Resp. to Def.'s Interrog. #3)).

In 2005, after nearly six years of hibernation, RED SONJA returned to the retail market when Dynamic Forces (a.k.a Dynamite Entertainment), ████████████ ████████████████  began publishing a monthly RED SONJA comic book series. (Ex. 4 at 64; 74; Ex. 6 (Pl.'s Resp. to Def.'s Interrog. #1)).  In December 2005, Red Sonja also sold an option to Emmett/Furla Films for a second RED SONJA movie.  (Ex. 7 (G. Furla Dep.) at 22).  That movie option was assigned to Nu Image Films for production and development, and announced on May 2, 2006.  (Ex. 4 at 99; Ex. 8 at 68-69).

RED SONJA is registered under U.S. Trademark 1,397,608 for "publications, namely comic books, magazines and novels."  (*See* D.I. 1 at Ex. R).

---

[2]    Emphasis added unless otherwise noted.

## II.    THE DISPUTE

Upon finalizing its purchase of the REH Library, on February 6, 2006, Paradox issued a press release, announcing that it had successfully acquired the remaining characters and stories in the REH Library. (Ex. 9). That announcement focused entirely on Robert E. Howard and his career. Consisting of more than 400 words, it provided a brief biography of Howard, quotes from Paradox executives, and names of authors who have been inspired by Howard's stories, including a testimonial from author Stephen King. The text of the release makes no mention of Red Sonya. The only mention of that character was in the corporate information paragraph describing Paradox's Swedish parent company, Paradox Entertainment AB ("Paradox AB"), which stated: "The company owns *all stories and characters created by pulp author Robert E. Howard*, among others, Conan, Kull, Bran Mak Morn, Solomon Kane, and Red Sonya. Paradox also owns the self-developed Mutant Chronicles. . . ." (*Id.*).

The next day, the press reported on REH Library acquisition. (Ex. 10; *see also*, D.I. 1, at Ex. T). An article in *Variety*, correctly stated that Paradox, "which owns literary rights to Robert E. Howard's Conan character, has purchased the rest of the pulp fiction scribe's library, some 800 other literary properties." (*Id.*). That article also correctly noted that Red Sonya was one of the characters controlled by Paradox. (*Id.*). *The Hollywood Reporter*, also discussed Paradox acquisition of "the rights to the library of author Robert E. Howard, the creator of 'Conan Barbarian,'" but mistakenly noted that "[t]he [REH] library includes female sword-wielder Red Sonja." (*Id.*). The *Variety* and

*Hollywood Reporter* articles were posted for a short time on Paradox's website.[3]  (Ex. 3 at 189-90).

Other articles, including those in *Newsarama* and *ICV2.com* (cited in Red Sonja's Complaint), correctly reported on Paradox's acquisition of the REH library, and explained the differences between Howard's "Red Sonya" and Plaintiff's RED SONJA. (D.I. 1 at Exs. V; W).  For instance, the February 7, 2006 *Newsarama* article, quoted in Red Sonja's Complaint as evidence of "confusion," (*id.* at ¶ 46), repeatedly explains:

- "As for how [Paradox's acquisition of the REH Library] impacts the Howard properties most relevant to comic fans, namely, Dark Horse's Conan and Dynamite Entertainment's Red Sonja series, ***the short version is, it doesn't***."

- "Paradox does on [sic] the rights to Red Sonya, while the ***Red Sonja Corporation retains the rights to Red Sonja***."

- "As explained previously, ***Red Sonja is controlled by the Red Sonja Corporation***, a wholly separate company, distinct from the REH Estate."

- "[Paradox] controls not only Conan, but all associated characters from the Hyborian world. ***Except Red Sonja***."

(Ex. 11).

On April 21, 2006, Paradox issued another press release, which focused on Paradox's development of movie based on a Robert E. Howard western, "Vultures of Wahpeton." (Ex. 12; *see also* D.I. 1 at Ex. Z).  As in the previous release, the text of the "Vultures of Wahpeton" release never mentioned Red Sonja, but listed it in the corporate information paragraph about Paradox AB.  (*Id.*).  In the April 21 release, however, Red

---

[3]     The website also included a two sentence snippet under the title "WE BUILD BRANDS," which noted that Paradox's "portfolio consists of such successful brands as Conan, Solomon Kane, Kull, Mutant Chronicles, Bran Mak Morn, Red Sonya etc." (*Id.* at Ex. Y).

Sonya was erroneously listed as "Red Sonya®," even though it is not a trademark and Paradox has never sold products or licensed any use of Red Sonya. (*Id.*; Ex. 13 at 165).

Four days later, without ever having contacted Paradox to advise it of purported "confusion" caused by the February 6 and April 21 press releases or the posting of the erroneous Hollywood Reporter article,[4] Red Sonya sued Paradox asserting this to be "one of the more insidious cases of unfair competition and trademark infringement ever knowingly advanced." (D.I. 1 at 1). The Complaint, replete with conclusory, unsupported allegations of misconduct by Paradox, ignores the fact that Paradox has never used, licensed, or sold Red Sonya in connection with any product or service. Instead, it claims that, by announcing the purchase of the REH Library on February 6, 2006, Paradox "intentionally" caused confusion in the marketplace, (*id.* ¶41), and "sat complicit" as that announcement "was misinterpreted by various newspaper, magazine and online sources" (*id.* at 4). It further alleges that Paradox "intentionally and purposefully caused confusion" by "actual and intended promotion, advertising, marketing and sale of their [**nonexistent**] products using" Red Sonya. (*Id.* ¶ 74).

Immediately upon learning of the lawsuit on April 27, 2006, Paradox set out to avoid any possible confusion, by issuing a release that remains on the Paradox website to this day. (Ex. 14 (DEF230); Ex. 3 at 188-90). That release stated, that while Paradox did not "believe that there should be any such confusion," it "would like to do all that [it] can to clear up any that might exist." To that end, it explained (Ex. 14):

---

[4]     Arthur Lieberman, president of Red Sonja never contacted ████████████ Peter Sederowsky, the CEO of Paradox's CEO at the time this suit was filed (Ex. 2 at 345).

The Red Sonya (with a "y") character was created in 1934 by Robert E. Howard. Howard's Red Sonya of Rogatino first appeared in the Howard story The Shadow of the Vulture. She was a 16th century Russian woman fighter who participated in the battle against the Turks in Vienna. She had absolutely nothing to do with Conan, or the Conan world of Hyboria.

\* \* \*

The Red Sonja (with a "j") character was created by Roy Thomas in 1974 and was set in Conan's Hyborian Age. This Red Sonja was the heroine of the 1985 Film entitled Red Sonja and is featured in the current Dynamite Comic books.

\* \* \*

**Red Sonja® (with a "j") is owned by Red Sonja LLC which is not affiliated with either Paradox Entertainment, Inc., or Conan Properties International LLC.**

\* \* \*

**At the moment neither Paradox Entertainment, Inc., nor Conan Properties International, LLC has any intention of using the Red Sonya (with a "y") character in any stories set in Hyboria, or otherwise, nor has it granted any of its licensees permission to use the Red Sonya character**.

Thus, no later than April 27, 2006, Paradox made clear the relationship between the Robert E. Howard character Red Sonya and the later developed Roy Thomas Red Sonja character of plaintiff, and stated that it did not intend to use the Red Sonya character. Arthur Lieberman, president of plaintiff, has acknowledged that, Paradox's statement that it did ███████████████████████████████ (Ex. 2 at 356:14-20).  On May 2, 2006, five days later, the development of the second RED SONJA movie was announced.  (Ex. 15).

### III.     THE TARTER REPORT

During discovery, Paradox sought to uncover the bases of plaintiff's damages claim.  It served an interrogatory (no. 19) asking Red Sonja to "[i]dentify in detail the factual basis for [its] contention in the Complaint that Plaintiff has been damaged in the amount of at least $5,000,000 through Defendants actions, and identify all documents substantiating the same."  (Ex. 6 (Pl.'s Interrog. #19)).  Plaintiff responded "that to answer such question now is premature as it needs to await expert discovery." (Ex. 6 (Pl.'s Resp. to Def.'s Interrog. #19)).

Thereafter, Paradox asked plaintiff's president about any damages suffered by Red Sonya as a result of the allegations in the Complaint.   He testified that he wanted ████████████████████████████ but that he had ██████ ████████████ (Ex. 2 at 348; 351).  He further testified that Paradox would ██ ████████████████████████████████████████ (*id*. at 351), and that ██ ████████████████████████████████████████ ████████ (*Id*. at 382).  Similarly, Red Sonja's vice president, Luke Lieberman, testified he ██████████████████████████████████████ ████████ (Ex. 4 at 121).

On April 2, 2007, Red Sonja submitted a report from Fred. B. Tarter relating to damages.  (Ex. 1).[5]  According to his report, Mr. Tarter made little effort to

---

[5]     Mr. Tarter's purported background is in "the purchase, sale and barter of advertising and media time" (*id* at 4).  That includes experiences in promotional mail advertising, publishing a newspaper in Puerto Rico, broadcasting radio "in Europe, Asia, the former Soviet Union, and the Middle East," "book-packaging," and publishing a children's magazine for "Burger King Kid's Club." (*Id*. at 2-3).

(continued . . .)

gather facts or data in forming his opinions.  Instead, he "reviewed the complaint . . .,
along with each of its exhibits," reviewed unspecified "'Red Sonja' and 'Red Sonya'
internet searches" and "interviewed Arthur Lieberman." (*Id*. at 4).   Mr. Tarter also
apparently read four pages of Arthur Lieberman's deposition, which he quotes in his
report. (*Id*. 4-6).   Nowhere in his report, does Mr. Tarter refer to any independent
investigation, survey, or examination as to whether there is confusion in the marketplace
or if any alleged confusion was caused by Paradox.  Mr. Tarter simply assumes confusion
and that any confusion is due to Paradox.  Mr. Tarter then offers his unsupported
"***estimate[s]***" for costs of corrective advertising and "set[s] the loss" for unspecified
missed opportunities "***approximately*** at $200,000." (*Id*. at 8-10).

A.    Mr. Tarter's Corrective Advertising Opinions.

Mr. Tarter first measures damages based on the purported cost of
corrective advertising "to correct the impression that the industry has as to who owns the
title to the intellectual property 'Red Sonja.'" (*Id*. at 7).  Mr. Tarter's speculations as to
future corrective advertising are not based on any actual corrective advertising efforts by
Red Sonja.  Plaintiff has never made any efforts at "corrective advertising" or even issued
any press release in an attempt to correct purported confusion.  (Ex. 2 at 351).

Moreover, Mr. Tarter fails to identify what the stated "industry" consists
of, what impression those in the unknown "industry" have concerning the ownership of
Red Sonja or whether any such impression was caused by Paradox.  Mr. Tarter notes that

---

(. . . continued)

None of those experiences, however, have involved commercializing character
based properties, licensing activities, or valuing harm caused by "use" of a
trademark.

he came up with his conclusion by "review[ing] the various ways in which one could approach this, and based *on [his] experience, [he] believe[s] the issues* are rather clear cut." (*Id.* at 7).  He never, however, identifies the "various ways" considered nor what "issues" are clear cut.

Mr. Tarter then speculates that *Variety*, *Hollywood Reporter*, *Daily Variety* and *Publisher Weekly* are the magazines that "can best be used" to reach *unidentified* "decision makers" in the entertainment and publishing industries. (*Id.*).  He then offers his "beliefs" as to how those publications could be used (*id.* at 8):

> I believe the most effective approach would be to run a full page advertisement on both Monday and Friday for *a three week period.*  Monday, because that is the day when weekend box offices are released, and Friday, because that is a heavy weekend 'issue.'  This approach must be fine-tuned for Variety Magazine and Publisher's Weekly as they are published weekly; however, it is possible to simply take out six consecutive ads.  Therefore, if one were to run ad advertisement six times per magazine (two each for three weeks and six consecutive ads in Variety and in Publisher's Weekly), *the total cost would be $192,240*.

Mr. Tarter, however, nowhere offers any factual support for his "beliefs" as to the amount of advertising needed or the purported cost of that advertising.  Indeed, there is not a single fact presented to support his conclusion that six ads is the magic number to "correct" any confusion or that the costs of such advertising "would be $192,240." (*Id.* at 8).  Nor is there a shred of support for his assertion that in addition "[a] good advertising agency must be used . . . at an *estimated* cost of $25,000 - $50,000." (*Id.* at 9).  And though he notes that "obviously the message is of equal importance and careful and thoughtful consideration must be given to the 'editorial' content of the message," he does not provide any clue as to what the ads should say or what the advertising agency would be called on to do for the "estimated" cost. (*Id.*)

B.    Mr. Tarter's "Opportunity Cost" Opinions.

Mr. Tarter's second measure of damages is lost "opportunity cost," or the "loss of money due to . . . market confusion" and "uncertainty as to ownership."  (*Id*. at 9).  Mr. Tarter notes (*id.*):

> Such word travels quickly in the entertainment and publishing industry and confusion as to ownership, ***frequently results*** in potential licensees not willing to enter in a licensing arrangement due to concern of then having to compete with another entity claiming to also have the right to licensee [sic] such property and that the licensee may be the subject of litigation.

Mr. Tarter does not identify any "potential licensee" who was concerned about the ownership of the Red Sonja character, nor does he identify any "potential licensee" who was unwilling to enter into a licensing arrangement due to potential litigation over claims of ownership.  Instead, he simply offers the conclusory opinion that the public announcement "of a 'Red Sonja' movie would, in [his] experience, have at least generated some licensing interest."  (*Id*. at 10).  That fact that it did not, in this cases, is in Mr. Tarter's unexplained and unsupported ***belief*** "not due to the lack of popularity of the 'Red Sonja' character."  (*Id*.).

Mr. Tarter then caps off his opinion with the conclusion (*id.*):

> ***Assuming*** an 18 month delay and ***assuming*** that the property – Red Sonja – would generate ***approximately*** 1/3 (conservatively) that the Conan the Barbarian property generates in advances (Red Sonja's audience is similar, but not as well known), I would set the loss ***approximately*** at $200,000.

The bases for the two assumptions used to "approximate" damages are left wholly unexplained and unsupported.

<u>ARGUMENT</u>

Plaintiff's damages case is based upon the Tarter Report. The opinions offered in that report, however, do not meet the standards for admissibility under the Federal Rules of Evidence as set forth by the Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993). The opinions lack reliability and consists solely of unsupported conclusory opinions, speculation and conjecture as to damages.

**I.     THE LEGAL STANDARD FOR ADMISSIBILITY OF EXPERT TESTIMONY.**

The admissibility of scientific expert testimony is governed by the Federal Rules of Evidence, and in particular Fed. R. Evid. 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

The Supreme Court in *Daubert v. Merrell Dow Pharms., Inc.*, held that a trial judge must act as a "gatekeeper," assuring that all proffered expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 509 U.S. 579, 589 (1993). This gatekeeping role applies to all expert testimony, including damages experts. *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148-49 (1999); *Elcock v. Kmart Corp.*, 233 F.3d 734, 745 (3d Cir. 2000).

The Third Circuit has construed the Federal Rules as embodying "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock*, 233 F.3d at 741; *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d

717, 741-43 (3d Cir. 1994). Ultimately, "[t]he party offering the expert testimony has the burden of proving admissibility." *AstraZeneca LP v. Tap Pharm. Prods.*, No. 04-1332-KAJ, 2006 U.S. Dist. LEXIS 40620, at *14 (D. Del. May 18, 2006) (citing *Daubert*, 509 U.S. at 592 n.10).

## II. THE DAMAGES OPINIONS IN THE TARTER REPORT DO NOT MEET THE STANDARDS FOR ADMISSIBILITY.

### A. Mr. Tarter's Damages Opinions Are Not Causally Linked To The Complained Of Conduct.

Monetary recovery for violations of both registered and unregistered trademarks is governed by § 35 of the Lanham Act. 15 U.S.C. § 1117; *A & H Sportswear Co. v. Victoria's Secret Stores, Inc*., 166 F.3d 197, 209 (3d Cir. 1999). Trademark damages cannot be based on speculation or conjecture, but "must be established with reasonable certainty." *Lindy Pen Co., Inc. v. Bic Pen Corp*., 982 F.2d 1400, 1407 (9th Cir.), *cert. denied,* 510 U.S. 815 (1993) ("Many courts have denied a monetary award in infringement cases when damages are remote and speculative."); *see also Joint Stock Soc. v. UDV N. Am., Inc*., 266 F.3d 164, 184 (3d Cir. 2001) (damages claim based on the profits plaintiff "would have made . . . if it had not faced the defendants' allegedly false designation of origin and false advertising" was "extremely speculative").

To recover damages under the Lanham Act, a plaintiff must prove the fact and the extent of damages. *A & H Sportswear,* 166 F.3d at 209 (noting "absent proof of actual harm, injunction adequate remedy"). That is, a plaintiff must first establish that there has been a Lanham Act violation, and then must prove actual harm and a ***causal link*** between it harms and the actionable conduct. *A & H Sportswear*, 166 F.3d at 209 (denying damages because plaintiffs did not prove any "lost profits or other pecuniary

harm **proximately caused** by Defendants' use [registered mark]"); *Astrazeneca*, 2006 U.S. Dist. LEXIS 40620, at *15 ("[T]o recover damages for false advertising under the Lanham Act, a plaintiff must show that there is a **causal link** between the actionable conduct and the damages."); *Accu Pers. v. Accustaff, Inc.*, 846 F. Supp. 1191, 1215-16 (D. Del. 1994) (holding plaintiff was not entitled damages because it did not prove the "the actual harm it suffered as a result of the alleged infringing acts by defendant"); *see also Xoom, Inc. v. Imageline, Inc.*, 323 F.3d 279, 286 (4th Cir. 2003), *cert denied*, 2003 U.S. LEXIS 6260 (2003) (denying plaintiff damages under the Lanham Act because "there [wa]s no evidence of actual damages or a causal link between actual damages and [Defendant's] actions").

Similarly, although prospective corrective advertising damages may be awarded, "there must be an economic rationale" to grant such relief. *Callaway Golf Co. v. Dunlop Slazenger*, 384 F.Supp.2d 735, 740 (D. Del. 2005). To justify damages for prospective corrective advertising, besides showing that the defendant caused the confusion that injured its mark, a plaintiff must also demonstrate that corrective advertising is justifiable "as a surrogate for plaintiff's damages" and "is the least expensive way to proceed." *Id*. at 741 (citing *Zazu Designs v. L'Oreal, S.A*., 979 F.2d 499, 506, 509 (7th Cir.1992); *PBM Prods., Inc. v. Mead Johnson & Co*., 174 F. Supp. 2d 417, 420 (E.D. Va. 2001)).

Here, Mr. Tarter offers no causal link whatsoever between any alleged "use" by Paradox and his damages calculations. He does not attempt to analyze: (1) whether there is "market confusion;" (2) whether Red Sonja was actually harmed by any alleged "confusion;" and if so, (3) to what extent any injury is attributable to Paradox's

alleged "use" of the Red Sonya name.    Instead, Mr. Tarter simply notes the "inevitability" of confusion and assumes that "[s]ignificant confusion has been created … in the minds of the decision makers in Hollywood and the [unspecified] related industries." (Ex. 1 at 7, 9).    Nor does Mr. Tarter offer any "economic rationale" to support an award of prospective corrective advertising or any opinions that his prospective corrective advertising "is the least expensive way to proceed."

B.    Mr. Tarter's Damages Opinions Consist Of Unsupported Speculation And Are Unreliable.

An expert's opinion is reliable only "if it is based on the methods and procedures of science rather than on subjective belief or unsupported speculation; the expert must have good grounds for his or her belief." *Elcock*, 233 F.3d at 745 (citation omitted); *see also Advanced Med. Optics, Inc. v. Alcon Inc*., No. 03-1095-KAJ, 2005 U.S. Dist. LEXIS 5803, *4 (D. Del. Apr. 7, 2005) (expert testimony must be "***based on more than a subjective belief or speculation***").    To assess reliability, a court "must examine the expert's conclusions in order to determine whether they could reliably flow from the facts known to the expert and the methodology used." *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir. 2000) (citation omitted).    That requires an expert to "explain how and why he . . . has reached the conclusion being proffered and [] have as a basis more than a subjective belief or speculation." *AstraZeneca*, 2006 U.S. Dist. LEXIS 40620, at *14.    This "analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion" *Heller v. Shaw Indus.,* 167 F.3d 146, 155 (3d Cir. 1997).

The Third Circuit has not hesitated to exclude a damages expert where, as here, the expert's opinion is not supported by a sufficient factual foundation or rests on

18.

faulty assumptions.  *See*, *e.g*., *Elcock,* 233 F.3d at 754-57; *Benjamin v. Peter's Farm Condo. Owners Ass'n*., 820 F.2d 640, 642 (3d Cir. 1987); *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983) (finding trial court erred "in permitting plaintiff's expert to testify as to plaintiff's future earnings loss without first requiring plaintiff to establish a factual basis for this testimony").   For example, in *Benjamin*, the Third Circuit held that the expert's damages opinion, based solely on the "***personal belief of the plaintiff***," should have been excluded because, absent "sufficient factual predicates," the expert's assumption was nothing more than "a castle made of sand."  820 F.2d at 643.  In *Elcock*, the Third Circuit similarly held that expert testimony on "lost economic opportunities" was fatally flawed because it was based on assumptions that lacked foundation.  233 F.3d at 754-56.

So too, this Court in *Augustine Med., Inc. v. Mallinckrodt, Inc*., No. 01-387-SLR, 2003 U.S. Dist. LEXIS 6079, at *21-27 (D. Del. Apr. 9, 2003), excluded a damages expert who, like Mr. Tarter, "failed to gather facts and data sufficient to form a reliable opinion," and "[i]nstead of facts, stack[ed] assumption upon assumption to come to his conclusion."  *See also Astrazeneca,* 2006 U.S. Dist. LEXIS 40620 (excluding plaintiff's damages expert in a false advertising case because he failed to take into account and correct "for enough variables to allow a rational cause-and-effect conclusion to be drawn"); *Izumi Prods. Co. v. Koninklijke Philips Elecs. N.V.*, 315 F. Supp. 2d 589, 602 (D. Del. 2004) (excluding as unreliable patent infringement expert's opinion "based solely on his subjective belief" and "void of good grounds absent some form of support").

19.

Here, Mr. Tarter opines that $192,240 (plus an "estimated" $25,000-$50,000 for unknown services from an unnamed "good advertising agency") is necessary "to correct the impression that the industry has as to who owns the title to the intellectual property 'Red Sonja.'" (Ex. 1 at 7-9). There is, however, no methodology or support for that conclusion. He simply offers his subjective "belief" that six full page ads in each of four trade papers would be "the most effective approach." (*Id*. at 8). How Mr. Tarter arrived at this approach is unstated. Why six ads is the correct number is unknown. What such ads would say is unstated. How much each ad would cost is also a mystery. Whether there is a less expensive alternative is left unaddressed.

Indeed, Mr. Tarter's opinions are built solely on his unsupported assumptions, estimations and beliefs. Mr. Tarter did not conduct ***any*** independent research or investigation whatsoever. He cites to no surveys, never contacted any "decision maker[] in the entertainment and publishing industries" – who he assumes is confused – never reviewed Paradox's April 27, 2006 clarifying press release, and does not rely on any cognizable facts or documents in reaching his conclusions. *Gen Elec. v. Joiner,* 522 U.S. 136, 144 (1997) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion.").

Mr. Tarter's opinions regarding "opportunity cost" are similarly deficient. Mr. Tarter's "opportunity cost" damages consist of his unsupported "belief" on top of two "assumptions" and an approximation to "set" the damages at "approximately" $200,000." There is no factual or legal support for Mr. Tarter's opinions or his

assumptions.[6] Why Mr. Tater "assume[es] and 18 month delay is unstated. What caused that "delay" is unknown. Why he "assume[es] that the property – Red Sonja – would generate approximately 1/3 (conservatively) that the Conan the Barbarian property" generated is wholly unexplained. *See Go Med. Indus. Pty, Ltd. v. Inmed Corp*., 471 F.3d 1264, 1274 (Fed. Cir. 2006) (affirming JMOL reducing jury's damages award for trademark infringement because it "was based on a wholly speculative royalty rate that *plaintiff's expert 'arbitrarily pulled out of the air*'").

By basing his opinions on unsupportable assumptions, lacking any factual support, Mr. Tarter has left an analytical void between the facts of this case and his conclusions – gaps he simply cannot fill.

## C.    Mr. Tarter Is Unqualified To Render Any Opinion With Respect to Opportunity Costs.

To provide an expert opinion under Rule 702, a witness must possess "knowledge, skill, experience, or training or education" sufficient to qualify him as an expert in the relevant field. *Paoli.*, 35 F.3d at 742; *see also In re TMI Litig.*, 193 F.3d 613, 680 (3d Cir. 1999) (despite being a "respected scientist," proffered witness did not meet the "Qualifications" requirement of Rule 702 with respect to the subject matter about which he planned to testify). "Expert testimony can only be received from

---

[6]    Indeed, the facts contradict Mr. Tarter's opinions.  Red Sonja's movie was not announced until May 2, 2006, (Ex. 15; Ex. 8 at 68-69), *five days after* Paradox issued its April 27, 2006 clarifying press release, which Arthur Lieberman has acknowledged, ████████████████████ (Ex. 2 at 356).  Based on the information in his report, Mr. Tarter reviewed neither of those press releases. *See Astrazeneca*, 2006 U.S. Dist. LEXIS 40620, at *19 n.7 (plaintiff's expert did not disclose his reason for not considering information failed to comply with Fed. R. Civ. Proc. Rule 26, "and, for that additional reason alone, it is subject to exclusion").

someone who has specialized knowledge or training sufficient to qualify him to opine on an issue within his field of expertise, and that expert's opinion must be confined to that field." *Advanced Med*, 2005 U.S. Dist. LEXIS 5803, at *5.

Mr. Tarter's expertise does not extend to the area of lost "opportunity costs," which for this case includes the licensing of character-based properties. Instead, for "forty years" he has been "involved in the purchase, sale and barter of advertising and media time." (Ex. 1 at 4). Nowhere in his report does Mr. Tarter indicate that he possesses any expertise in commercializing or licensing character-based properties – much less any licensing activities. Because nothing qualifies Mr. Tarter as an expert on this subject, he should be precluded from offering such an opinion. *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 322 (3d Cir. 2003) ("An expert may be generally qualified but may lack qualifications to testify outside his area of expertise."); *Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir. 1998) ("Even though we apply Rule 702 liberally, we have not pursued a policy of qualifying any proffered witness as an expert.").

## CONCLUSION

For the foregoing reasons, Paradox respectfully submits that the Tarter Report should be stricken, and that the Plaintiff Red Sonja should be precluded from offering any evidence of damages at trial.

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

*/s/ Richard J. Bauer (#4828)*
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Richard J. Bauer (#4828)
1201 N. Market Street
P.O. Box 1347
Wilmington, DE 19899-1347
(302) 658-9200

*Attorneys for Defendant*
 *Paradox Entertainment, Inc.*

*Of Counsel*:

Frederick U. Fierst
Fierst, Pucci & Kane LLP
64 Gothic Street
Northampton, MA 01060
(413) 584-8067

Dated: May 23, 2007

828291

## CERTIFICATE OF SERVICE

I hereby certify that on May 31, 2007 I electronically filed the foregoing

with the Clerk of the Court using CM/ECF, which will send notification of such filing to:.

Richard K. Herrmann, Esquire
Morris James LLP

I further certify that I caused to be served copies of the foregoing

document on May 31, 2007 upon the following in the manner indicated:

Richard K. Herrmann, Esquire                    *VIA ELECTRONIC MAIL*
Morris James LLP                                   *and HAND DELIVERY*
500 Delaware Avenue
15th Floor
Wilmington, DE  19801

Mark A. Berman, Esquire                         *VIA ELECTRONIC MAIL*
Thomas J. Curran, Esquire                        *and FIRST CLASS MAIL*
Ira B. Matetsky, Esquire
Ganfer & Shore, LLP
360 Lexington Avenue
New York, NY  10017

*/s/ Richard J. Bauer (#4828)*
Richard J. Bauer (#4828)

EXHIBIT 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RED SONJA LLC,                                    )
                                                 )
                    Plaintiff,                    )
                                                 )
v.                                               )        Civil Action No.:
                                                 )        06-CV-00270 (SLR)
PARADOX ENTERTAINMENT, INC.,                      )
                                                 )
                    Defendant.                    )
                                                 )

## PLAINTIFF'S EXPERT REPORT OF FRED B. TARTER

Richard K. Herrmann, Esquire
MORRIS, JAMES, HITCHENS &
    WILLIAMS LLP
222 Delaware Avenue, 10th Floor
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: (302) 888 6816
Facsimile: (302) 571 1750
rherrmann@morrisjames.com

Mark A. Berman, Esquire
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
Telephone: (212) 922-9250
Facsimile (212) 922-9335
mberman@ganshore.com

Dated: April 1, 2007        Attorneys for Plaintiff Red Sonja LLC

I am a member of the Board Money Mailer, L.L.C., the second largest shared mail advertising company in the United States, reaching 180 million households in 31 states on behalf of 30,000 advertisers annually.[1]

In May 2002, I was elected Chairman of Freedom Broadcasting Foundation (formerly Radio Free Europe/Radio Liberty Foundation), a position that I still hold. Radio Free Europe, founded in 1945, today broadcasts in 31 languages across 13 time zones to countries in Europe, Asia, the former Soviet Union, and the Middle East.

In 1984, I became a shareholder and Board Member of Caribbean News Services, Inc., owner and operator of *EL VOCERO*, the popular newspaper serving the island of Puerto Rico. Currently celebrating its 30th year of publication, *EL VOCERO* circulation approaches 200,000 per day.

In the 1980s and 1990s, I served as executive producer of several made-for-television movies, including the award-wining Spenser movie series for ABC/Lifetime starring Robert Urich and Avery Brooks. During this period, I was also the producer of over 500 half-hour programs for television, including Mantrap with Dick Clark and Alan Hamel, and Joanne Carson's VIP's, which played on over 1,000 television stations in America and Canada.

From 1979-2000, I served as Chairman of Screenvision Cinema Network. In 1979 revenues were less than $1 million. At this time, I purchased controlling interest from Capcities Broadcasting, and together with two French media companies, Havas and Mediavision, built Screenvision over the next 20 years. In 1999, revenues topped

---

[1]    I copy of my *curriculum vitae* is annexed hereto as Exhibit "A.". I have not authored any publication within the past ten years nor have I testified as an expert at trial or by deposition within the past four years.

$50 million and in 2000 Screenvision was on track to top $65 million. In May of 2000, Screenvision Cinema Network was sold to Technicolor Inc., a subsidiary of Carlton Communications, for $93 million (more than 14 multiple EBITDA). I provided oversight for all marketing, sales, recruitment of new CEO's (more than 3 times in 20 years), and served as Managing Partner. The Screenvision Cinema Network was the market leader in the category of advertising and promotion in U.S. movie theatres. The company had the ability to place advertising in over 13,000 theaters up from a base of less than 1,000 at inception, having created from scratch a medium that was recognized for its inherent benefits of delivering high message recall to a captive audience.

From 1995–1998, I also was the Founder and Chairman of Affinity Communications Corp., the publisher of the largest circulation children's magazine, which was created for the Burger King Kids' Club. I subsequently sold the magazine to Burger King. I built Affinity to be one of the largest West Coast-based book-packaging companies, creating several New York Times Best Seller self-help books, including "The Arthritis Cure".

My work has been published in many trade magazines. I have been recognized in Who's Who in America, Who's Who in the East and Who's Who in Entertainment. I have lectured at trade conventions and universities. I was the winner of the Advertising Club of New York Man of the Year, 1972. Feature articles discussing my work have appeared in Forbes, Inc., The New York Times and other prestigious publications. I have been recognized as an expert in the area of media advertising and barter worldwide. Clients have included Colgate, General Motors, Mattel, National Semiconductor, Winstar Communications and other global marketing companies.

Thus, for forty years, I have been involved in the purchase, sale and barter of advertising and media time for a host of corporations from the nation's largest to small boutique companies. Based on those experiences and my experience in the entertainment field, I have been asked to evaluate the damages caused by Defendant Paradox Entertainment, Inc.'s use of the "Red Sonya" name vis-à-vis Plaintiff's established use of the "Red Sonja" name.

In that connection, I have reviewed the complaint in this action, along with each of its exhibits. I have also reviewed "Red Sonja" and "Red Sonya" internet searches and interviewed Arthur Lieberman, President of Plaintiff.

I am also advised that the "Red Sonja" character is the only character derived from the library of Robert E. Howard library of fantasy characters that Paradox does not own.

I am also advised that two days after Plaintiff commenced this action Paradox issued a press release on or about April 27, 2006 presumptively in an attempt to mitigate its damages. I am also advised that approximately four months after this litigation was commenced, Paradox, as of August 2006, Paradox took the position in the litigation that it never intends to commercially exploit "Red Sonya."

In addition, I set forth herein a portion of Mr. Lieberman's deposition testimony, which, based on my experience, I in sum and substance agree with:

Q.    What damages are Red Sonja, LLC, claiming in this action?

A.    **The damages as best I can ascertain them now from speaking to any number of people are somewhere between 750 and a million something. And where it comes from is straightening the record in the marketplace.**

When Conan was announced as a movie, I must have gotten 150

- 4 -

calls because it was being announced as a movie and because people wanted to know what the licensing opportunities were. As I said to you earlier in our conversation, as oft times happens in this particular field, and being involved with licensing companies for at least 20 years, maybe --as a matter of fact, I've been involved in licensing companies now for 30 years, and I sat on the board of one of the largest of licensing is, you approach prospective licensees and attempt to sell them. Tough job.

The second is you raise the profile of your character sufficiently so that the licensees approach you. The second works better. The negotiating posture is different. They're coming to you desiring a license. If you can be standoff-ish with respect to it, it negotiates your rates better.

With Conan, that's exactly what happened. We pushed and pushed and pushed Conan. But before Conan was announced as a movie, there was very little movement in Conan licenses.

In Red Sonja, Red Sonja was announced as a movie very close in time to your announcement that you owned Red Sonya with a Y, the consequence of which we got no calls, not some, not diminimus, zero calls looking for a license. That surprised me. That surprised people that I knew in the industry and that know me in the industry.

The problem say I, acting as the party that feels that they've been wronged, is how much is it going to take to advertise to the trade and let them know that you're the only Red Sonja out there. And it's been stated to me that that cost will be somewhere in the numbers I told you. We're working with experts now. I've not finalized anything with them, but when I do, according to our responsibilities, and I think that the expert report is due in March, you'll be getting an expert report which delineates chapter and verse as to how those damages are calculated by people who have done just this type of work.

Q.    So you're not suggesting that Red Sonja has suffered any out-of-pocket current monetary damages?

A.    Every time you sell a license, you get an advance. Why isn't that current out-of-pocket damages?

Do you mean did we physically take money out of our pocket other than -- otherwise than in this suit with you? No, of course not. We sued you. That's out of pocket.

Did we have missed opportunity costs? The missed opportunity costs is what's going to be the testimony in the case,

**and that's what the experts will be testifying to.**

Q.     What's your sense of, as the plaintiff here, your missed opportunity costs? I don't want you to —

A.     Well, the experts will explain it.

Q.     But you don't have a sense of what that is?

A.     I explained to you, somewhere between 750 and a million and a quarter. I'm sure that you'll have your expert saying you missed no opportunity costs. That's up to you. You and I have been in too many cases when they're experts. When there's a battle of experts, the believable expert carries the day.

(Deposition of Arthur Lieberman at pp 348-52) (emphasis added).

## ANALYSIS

It is most telling, as I have been informed, that Paradox's website has never sought to correct the various media articles published that confuse Plaintiff's "Red Sonja" character with the name "Red Sonya" (which articles I have been informed were immediately republished by Paradox on its own website, which in my view could only been done to toute the "Red Sonya" name at the expense of Plaintiff's "Red Sonja" name), has never publicly, expressly sought to dispel its public announcement that licensees for it "successful brand" "Red Sonya" were for sale by it, and has not publicly taken the position that it does not intend in the future of commercializing the "Red Sonya" name. Paradox's has effectively stood mute publicly in the face of the above.

Although Paradox has taken steps to cease its usage of the "Red Sonya" name, in my opinion, such steps fall far short of eliminating the damage it has caused.

I have been advised that Paradox has long known of the existence of the "Red Sonja" character. I have also been advised that Paradox was long aware that Plaintiff and/or its successor owned such character, and that Plaintiff and Defendant's

representatives have spoken about Plaintiff's ownership of such character on many occasions.

The challenge is to correct the impression that the industry has as to who owns the title to the intellectual property "Red Sonja." It is manifestly observed in the "character" entertainment and publishing field that there can be only one Tarzan, Superman, Conan and "Red Sonja." Single letter changes will lead, not only to the likelihood of confusion, but its inevitability as seen here. I have reviewed the various ways in which one could approach this, and based on my experience, I believe the issues are rather clear cut. First, one has to determine what media can best be used to reach the decision makers in the entertainment and publishing industries and their ancillary markets of merchandising. There are three publications in the entertainment industry that reach all of these executive decision makers who rely upon Variety, Hollywood Reporter and Daily Variety for high profile icons and convey sales, and there is one publication in the publishers industry, Publishers Weekly, which reaches that audience.

For many years, these trade publications have been considered the back bone of any advertising or marketing schedule designed to reach the entertainment and publishing industry and their ancillary markets of merchandising.

It is commonly accepted that the components used to determine how best to get a message across are the reach, i.e., the number of people your advertising is read by, and the frequency with which you reach them.

Where there is confusion in the market as to the current status of this well known character, frequency of the same message to the same audience is important.

Circulation for the four major trade papers is as follows:

- Hollywood Reporter: 26,000 daily

- Variety: 36,000 weekly

- Daily Variety: 35,000 daily

- Publisher's Weekly: 24,000 weekly

It is accepted knowledge that there is a large amount of duplication in this circulation since most of the people in the industry read one, two or even three of the daily or weekly trades. Therefore, it is my estimation that there are approximately 45,000 different readers within this universe. The question then becomes how often does one want to reach them?

I believe the most effective approach would be to run a full page advertisement on both Monday and Friday for a three week period. Monday, because that is the day when the weekend box offices are released, and Friday, because that is a heavy weekend "issue." This approach must be fine-tuned for Variety Magazine and Publisher's Weekly as they are published weekly; however, it is possible to simply take out six consecutive ads. Therefore, if one were to run an advertisement six times per magazine (two each for three weeks and six consecutive ads in Variety and in Publisher's Weekly), the total cost would be $192,240.

One could go further and see if there were additional media available that could broaden the reach. The Internet is playing a more important role in reaching influential decision makers. I am enclosing a copy of a report from 2003 by Doubleclick and Nielsen. They suggested an enhanced reach in frequency utilizing various Internet websites.

-8-

Nielsen.  They suggested an enhanced reach in frequency utilizing various Internet websites.

The utilization of the Internet to reach this demographic, in my opinion, would not be as productive because this is a very complex message to get across and a banner ad or even a click through ad is not going to deliver that message in a sufficient manner.

The complexity of the issue is the challenge.  Significant confusion has been created in the marketplace, and to develop a clear pattern of ownership in the minds of the decision makers in Hollywood and the related industries is going to require a consistent, substantial and informative advertisement.

I have limited the scope of my opinion to reach, frequency and cost, obviously the message is of equal importance and careful and thoughtful consideration must be given to the "editorial" content of the message.  A good advertising agency must be used to develop the ad at an estimated cost of $25,000 - $50,000.

There is another area of damage that must be recognized: "opportunity cost." This represents the loss of money due to Paradox's creation of market confusion and the creation of uncertainty as to ownership of the well-known "Red Sonja" character. Such word travels quickly in the entertainment and publishing industry and confusion as to ownership, frequently results in potential licensees not willing to enter into a licensing arrangement due to concern of then having to compete with another entity claiming to also have the right to licensee such property and that the licensee may be the subject of litigation.  Until the foregoing corrective advertising steps are taken, merchandising and licensing will remain at a standstill until the publishing and media industry feel comfortable as to who owns the subject property.  Regardless of the fact the it has not

yet come out, the public announcement of the development of a "Red Sonja" movie would, in my experience, have at least generated some licensing interest in the "Red Sonja" property. However, I have been informed it did not, and in my belief, that is not due to the lack of popularity of the "Red Sonja" character, where the "Red Sonja" character is selling as many comic books as is Paradox's "Conan the Barbarian" character.

Assuming an 18 month delay and assuming that the property -- Red Sonja -- would generate approximately 1/3 (conservatively) that the Conan the Barbarian property[2] generates in advances (Red Sonja's audience is similar, but not as well known), I would set the loss approximately at $200,000.

The compensation paid to me to render the above opinion was $5,000, and I charge $300.00 per hour for preparation and to testify at a deposition or at trial.

_FRED B. TARTER_

---

[2]    I am advised there Conan the Barbarian advances were approximately $600,000 for 18 months in 2005 – 2006.

REDACTED

# EXHIBIT A

# Fred B. Tarter

Highlights of a 40-year career in Communications,

Publishing, Media, Barter, Finance and International Trade

### Focus on Finance

*Current:* Since 2001, Mr. Tarter's focus has been on the development of several unique financial structures utilizing Insurance and Annuity products and the capital markets through his company, **Epic Associates, LLC**. He is the recipient of two patents for his innovative work. Epic Associates is recognized as a leader in the development of original financial structures.

*Current:* Additionally, Mr. Tarter is a current member of the board of **Asset Marketing Systems, LLC**. Asset Marketing Systems is the world's largest direct distributor of fixed and equity indexed annuities and is one of the fastest growing Field-Marketing Organizations in the financial services industry today.

Mr. Tarter is also a member of the Board of **Money Mailer, L.L.C.**, the second largest shared mail advertising company in the U.S., reaching 180 million households in 31 states on behalf of 30,000 advertisers annually.

Mr. Tarter is also a member of the Board of Managers of **Ace Holding Company, LLC**, a financial services holding company. Subsidiaries include Ace Mortgage Funding, LLC, Ace Imaging, LLC, Millennium Funding Group, and Archer Land Title, LLC. In 2006, Ace originated over 3 billion dollars in sub-prime mortgage loans.

*1993-1998:* In 1993 Mr. Tarter began **The Pharmacy Fund, Inc.**, a securitized asset-backed healthcare financing company of which he was the Founder, Chairman and CEO. PFI, using its own proprietary network and patented processing system, intercepted third party pharmacy claims which were credit evaluated in real time and "purchased" more than $2 billion of receivables from both independent and chain store pharmacies throughout the U.S. The purchased receivables were used to back a $500 million, first-ever pharmacy securitized asset debenture. A major international investment group acquired the company in 1998. PFI was recognized as one of the top *100 Inc Magazine* privately held companies. This makes Mr. Tarter one of the few serial entrepreneurs to have built two companies both recognized in the *Inc 500* (also Deerfield Communications).

**Focus on Communications, Publishing & Media**

*Current:* In May 2002, Mr. Tarter was elected Chairman of **Freedom Broadcasting Foundation** (formerly **Radio Free Europe/Radio Liberty Foundation),** a position that he still holds. Radio Free Europe, founded in 1945, today broadcasts in 32 languages across 13 time zones to countries in Europe, Asia, the former Soviet Union, and the Middle East.

*Current:* In 1984 Mr. Tarter became a Shareholder and Board Member of **Caribbean News Services, Inc.**, owner and operator of *EL VOCERO*, the popular newspaper serving the island of Puerto Rico. Currently celebrating its 30th year of publication, *EL VOCERO* circulation approaches 200,000 per day.

*1980-2000:* In the 1980s and 1990s Mr. Tarter served as executive producer of several made-for-television movies, including the award-winning *Spenser* movie series for ABC/Lifetime starring Robert Urich and Avery Brooks.

*1980-2000:* During this period he was also the producer of over 500 half-hour programs for television, including **Mantrap** with Dick Clark and Alan Hamel, and **Joanne Carson's VIP's**, which played on over 1,000 television stations in America and Canada.

*1979-2000:* Mr. Tarter served as Chairman of **Screenvision Cinema Network** . In 1979 revenues were less than $1 million. At this time Mr. Tarter purchased controlling interest from **Capcities Broadcasting**, and, together with two French media companies, **Havas** and **Mediavision**, built Screenvision over the next 20 years. In 1999 revenues topped $50 million and in 2000 Screenvision was on track to top $65 million. In May of 2000, Screenvision Cinema Network was sold to **Technicolor Inc.**, a subsidiary of Carlton Communications, for $93 million (more than a 14 multiple of EBITDA). Mr. Tarter provided oversight for all marketing, sales, recruitment of new CEO's (more than 3 times in 20 years), and served as the Managing Partner. The Screenvision Cinema Network was the market leader in the category of advertising and promotion in U.S. movie

theaters. The company had the ability to place advertising in over 13,000 theaters up from a base of less than 1,000 at inception, having created from scratch a medium that was recognized for its inherent benefits of delivering high message recall to a captive audience.

*1995-1998*: Mr. Tarter was the Founder and Chairman of **Affinity Communications Corp.**, the publisher of the largest circulation children's magazine, which was created for the **Burger King Kids' Club**. Mr. Tarter subsequently sold the magazine to Burger King. Mr. Tarter built Affinity to be one of the largest West Coast-based book-packaging companies, creating several New York Times Best Seller self-help books including "<u>The Arthritis Cure</u>".


**Focus on Barter**

*1974-1992*: From 1974-1992, Mr. Tarter headed **Deerfield Communications**, which achieved *Inc 100* status on the *Inc 500* in 1988, sold to **Integrated Barter Corporation** for consideration in excess of $12 million.

*1968-1973*: Just prior to that, Mr. Tarter organized, founded, developed and sold several Trading Enterprises including **Universal Communications**, the first-ever publicly owned company specializing in barter transactions.

**Other Achievements**

Mr. Tarter's work has been published in many trade magazines; he has been recognized in Who's Who in America, Who's Who in the East, Who's Who in Entertainment; he has lectured at trade conventions and universities; he was the winner of the Advertising Club of New York Man of the Year, 1972. Feature articles discussing his work have appeared in Forbes, Inc., The New York Times, and other prestigious publications. Mr. Tarter has been recognized as an expert in the area of media barter worldwide. He is particularly noted for one-of-a-kind offset and bilateral trade agreements. Clients have included Colgate, General Motors, Mattel, National Semiconductor, Winstar Communications, and other global marketing companies.

# EXHIBIT 2

REDACTED

# EXHIBIT 3

REDACTED

# EXHIBIT 4

REDACTED

# EXHIBIT 5

# A FOND LOOK BACK AT BIG RED

## by Roy Thomas

Leave it to "Big Red," as I often affectionally called her, to have two origins—with two different spellings of her name.

As many Robert E. Howard and comic book aficionados know well, the first of her pair of debuts came in the pages of the pulp magazine Magic Carpet for January 1934. Magic Carpet was given over to stories of derring-do from the days of the Arabian Nights and the Crusades, give or take a century or three. Robert E. Howard, who created his best-known character Conan the Cimmerian in 1932 and is the major founder of the school of fiction now often called "sword and sorcery," sold several short stories to that magazine. These stories were heavy on the sword, but there was no sorcery at all. One of these tales was called "The Shadow of the Vulture."

And it's in "Shadow" that you'll find Red Sonya of Rogatine, a tall Russian warrior woman who sports a sabre, a dagger, and two pistols. You'll also find the Turks besieging the city of Vienna in the 16th century, a German knight as principal hero named von Kalmbach (though Sonya has to rescue him a time or two), and even a twin sister of Sonya's named Sofia, who apparently was a real-life historical character, and the mistress to one of the higher-ups of the Saracens who were the story's bad-guys—of which the "Vulture" of the title was chief.

So how did I find out about her, and transmogrify her into Red Sonja, She-Devil with a Sword?

Well, by 1973, Conan the Barbarian was (finally) selling fairly well, after a somewhat shaky start, so I felt the time was finally right to introduce a roughly equivalent female hero into the series, with an eye toward "expanding the franchise," as they'd say nowadays. At that point I didn't have a name, or even a specific concept, for her...yet I knew what color I wanted her hair to be: red.

The reason? Conan's life, at least in its broad outlines, had pretty well been mapped out by REH himself, posthumous collaborator L. Sprague de Camp, and a couple of Howard fans in between, and it included liaisons with two sword-wielding lasses. Yes, that's right—not the hordes of blade-wielding hellions that seemed to pop up all over

the place later, but just two, in a life as recorded by Howard that spanned several decades. One of these was Belit, the pirate "Queen of the Black Coast" he met in the tale of that name, and with whom he sailed the seas for maybe three years (but only the single story)—the other was Valeria, a blonde fellow mercenary with whom he invaded the a lost city in the novella Red Nails, but whom Conan wasn't fated to meet till he was well into his 30s, at least...while in the comic, he was still around 20.

So I decided I needed a new heroine—one I could do anything with, because there were no prose stories in the Conan paperbacks that would conflict with what I might have her do—and I wanted her to be a redhead, primarily to make her different in one more visual way from Belit and Valeria.

Enter Allan Howard.

While evidently of no known kinship to Robert E., a fan named Allan Howard wrote an article called "Conan on Crusade" about the adventures of REH's often Conan-like heroes in stories set during that general several-century period. The article had originally appeared in the fan-magazine Amra, devoted to Howard and to sword-and-sorcery fiction, but I first encountered it in a collection called The Conan Swordbook, published by Mirage Press. By then, having become a thorough-going fan of Howard's fiction, I was collecting and reading everything of his I could, including many stories not yet published but sent to me by Glenn Lord, the literary agent for the REH estate, the gent with whom I had concluded the deal that had brought Conan to Marvel Comics in the first place.

Allan Howard didn't really say much about Red Sonya of Rogatine in his "Conan on Crusade" piece. In fact, he didn't even mention her by name! He simply described her as "a red-headed Russian she-cat who would have made a fit companion for Conan. In fact, she might have been a bit too much for him."

These two sentences intrigued me, so I obtained a copy of "Shadow" from Glenn Lord, read it—and from then on, it was only a matter of time (and not too much of it, at that) before she found her way

into comic books. I suggested to artist Barry Smith that we adapt "Shadow of the Vulture" in Conan the Barbarian—and Barry agreed. Admittedly, besides being the writer of the comic, I was also its editor, so Barry might've gone along with what I wanted even if he hadn't much cared for the idea. But I think he liked the story as much as I did, and he did a wonderful job with her, even if I was never totally sold on the idea of her wearing the Hyborian Age equivalent of what were then called "hot pants," and which were a minor rage in New York, if not all over the country.

With Conan the Barbarian #23, we dumped her and the entire "Shadow" story into the middle of the "War of the Tarim" story arc we were then doing, and it worked out perfectly. The story was originally scheduled for #22, but there were some deadline or other problems; and #22 wound up being a reprint—albeit with Barry's powerful cover showcasing Red Sonja, a month before she would grace the comic's interiors.

So—why "Red Sonja" with a "j"? Why not "Red Sonya," even if we dropped the "Rogatina" bit?

I believe I felt that, if she were to be a possibly continuing character in Conan, it might be best to make her a bit more of a "new" character by changing the spelling of her name, ever so slightly. That way, Red Sonya-with-a-"y" would continue to exist, pristine and untouched, in the crumbling pulp pages of old magazines (and in the inevitable and welcome reprints), while Sonja-with-a-"j" was a blank slate, on which I could write and Barry could draw whatever we would.

The initial comic which introduced her adapted the entire "Shadow of the Vulture" story in one tightly-paced issue, keeping Howard's title. With Conan the Barbarian #24, however, we branched out a bit. I won't bother even trying to remember, at this juncture, precisely which of us—Barry or myself—thought of any particular bit in "The Song of Red Sonja," except that I dug up a fragment of REH verse called "Tarantella" which I used as the "song" of the title—and I decided she would have made a vow that she would never have any lover except a man who had defeated her in battle.

Some feminists (and a few guys, too) have taken me to task over the years for that vow, but that's never bothered me. The lineage of the concept was flawless, literary, and respectable—a statement attributed to the warrior-queen Aoife in William Butler's Yeats' beautiful early 20th-century verse-

play On Baile's Strand, one of whose protagonists was the great legendary Irish hero Cuchulain—so I never faltered then or now in support of oath. If I didn't know the motivations of a heroine I had, at the very least, co-created, then who did? Nor did it seem to bother Barry's and my fellow professionals, who voted "The Song of Red Sonja" the best comics story of the year 1973.

At the end of Conan the Barbarian #24, we had Sonja kick Conan in the gut and ride off with a priceless tiara he had helped her liberate from the palace at besieged Makkalet. With that issue, Barry, too, rode off into the sunset so far as the color Conan comic was concerned, though he and I would still do our adaptation of Red Nails for the new black-&-white mag Savage Tales. And thus Valeria of the Red Brotherhood entered the world of comics only slightly later than Red Sonja.

The readers clamored for more of Sonja, just as I'd figured they would, and not too many issues later they got it—a three-part story that began in the first issue of the new Conan-starring black-&-white mag The Savage Sword of Conan, and continued into two issues of the color Conan comic. (I hasten to assure one and all that this clever segue between mags was not some clever marketing ploy on the part of Stan Lee and myself, but was done because, when Savage Sword was abruptly added to Marvel's schedule, there wasn't time for the new major Conan artist, John Buscema, to draw a new story for it, so we just yanked the next one from Conan the Barbarian. It's only by sheer good luck that it happened to bring back Red Sonja, which gave us a chance to have rising painter Boris Vallejo depict both Conan and Sonja on the cover of Savage Sword #1.

For that issue, I wanted to do the story that came in between her exit in CTB #24 and her return, complete with a price of her head, in Savage Sword #1. I was fortunate in enlisting as artist there the esteemed Spanish illustrator Esteban Maroto—with inking by a combination of Maroto himself, Neal Adams, and Ernie Chan (then Ernie Chua). The result was an exquisite gem of a story in terms of visual beauty—with a plot conceived, for reasons I know not, while my first wife Jean and I were attending a Ricky Nelson concert at Carnegie Hall! (Hey, I figured, if I'd sung on the Carnegie Hall stage three years earlier, Ozzie and Harriet's son deserved a shot, as well, right?) And yes, I definitely did mean to imply a homosexual relationship between the king of Pah-Dishah

(a name I borrowed from Frank Herbert's novel Dune, I believe) and his albino bodyguard.

I guess at this point I ought to say a few words about the "metal bikini." I didn't coin that phrase—our readers did—but it fits. As I said above, I hadn't liked certain too-modern aspects of her original outfit, though the mail shirt was fine. As it happened, Esteban Maroto had recently sent me from Spain, unasked, a drawing of Sonja which had her in rather skimpy armor—an illo I printed in Savage Sword #1, and which led to Esteban's drawing a solo Sonja story in that issue. I liked the garb he gave her, and so did John Buscema. After all, Conan often ran around "naked but for a loincloth," so why not Big Red? Soon afterward, I came up with a mildly twisted rationale for her wearing clothing that deliberately tempted men who of course she'd cut off their fingers if they tried to go touchy-feely on her. Hey, she had a troubled childhood, what can I say?

By now, Conan was such a hit that it seemed logical to put other Howard characters like King Kull and Red Sonja (insofar as she was an REH character) out in comics of their own. And so Sonja became, in 1975, only a couple of years after her creation, the star of Marvel Feature. It was probably Marvel's editor-in-chief—then either Marv Wolfman or Archie Goodwin—who suggested that the artist be Frank Thorne, a longtime pro who'd done the post-apocalyptic Mighty Samson comic for Gold Key a few years earlier. I liked his work, so that was fine by me.

Only, once again, Marvel's inevitable scheduling brinksmanship didn't allow Frank enough lead time to do a full-length tale for Marvel Feature #1, and anyway I was in the throes of going through a painful (second) separation from my first wife. So I asked Bruce Jones, who'd written and drawn some fine stories for science-fiction comics I edited, to script the first few "Red Sonja" stories—except for the very first one.

For that one, I quickly adapted a Robert E. Howard short story called "The Temple of Abomination," which was set around 1000 A.D. and featured a Conan-like hero named Cormac Mac Art. I enlisted the talented Dick Giordano, who had recently inked a John Buscema-penciled "Red Sonja" back-up in Conan and loved drawing beautiful women, as the artist, and we held the story down to a very lean 8 pages. I filled out the remainder of the issue by reprinting that Maroto

Sonja story from Savage Sword #1, "first time in color," and so we had our first issue of a solo Red Sonja mag.

I was sorry not to be able to work with Frank Thorne right off the bat, but I loved the work he and Bruce Jones did together. Bruce wrote a script in advance, instead of using the "Marvel method" of having the artist work from a plot and then add dialogue later, and this led to some inventive layouts by Frank, who even lettered his stories. Certain aspects of the story didn't strike me as being quite as much in the Robert E. Howard vein as I wanted, but my quibbles were minor. I liked the stories, even if I was still planning to return after a few issues.

When I did, with Marvel Feature #6, I immediately brought Sonja back more into the Marvel version of the Hyborian Age, with a story in which she encountered Karanthes, who (spelled with a "C" instead of a "K") had been an offstage character in Howard's Conan story "The God in the Bowl." Karanthes was a priest of the Stygian god Ibis, so I even playfully referred to the latter as "Ibis the Invincible," the name of an old Fawcett comics hero who had been a back-up feature in Whiz Comics behind the original Captain Marvel. I was determined to have fun with Red Sonja, and I did. The urban legend of baby pet alligators flushed down toilets and growing up wild in the sewers of New York City led to the gator-men of Marvel Feature #6, of course.

And of course she and Conan meet up in the last panel of my first issue—with the pirate queen Belit tossed in for good measure. Since I was writing both mags, it was fairly easy to dovetail the Sonja stories in Marvel Feature #6-7 with two or three issues of Conan the Barbarian—even bringing in King Kull in the big finale. Unfortunately, we can't reprint that issue of Marvel's original Conan series, so you'll just have to take my word for it: Red Sonja, Conan, and Belit—and Kull, for that matter—come out on top against the Stygian wizard who's set them all up and even pulled Kull from an earlier era, even if Sonja is never going to be high on Belit's Hit Parade.

And, after Marvel Feature #7, such was Sonja's popularity that she even gained her own magazine for a couple of years, graduating into Red Sonja #1.

But that, hopefully, is a tale to be told in a second volume of this series, if the good lord Erlik is willing and the creek don't rise...!

EXHIBIT 6

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ?ED SONJA LLC, | ) |
| Plaintiff, | ) ) ) |
|  | ) Civil Action No.: ) 06-CV-00270 (SLR) |
| ?ARADOX ENTERTAINMENT, INC., | ) ) |
| Defendant. | ) ) |

## PLAINTIFF'S RESPONSE TO
## DEFENDANT'S FIRST SET OF INTERRGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, Plaintiff

?ed Sonja LLC ("Red Sonja" or "Plaintiff") responds and objects to Defendants' First Set

f Interrogatories to Plaintiff (the "Interrogatories") as follows:

## GENERAL OBJECTIONS

Plaintiff makes its objections to specific Interrogatories by, among other things,

ncorporating by reference the following objections.

A.    These responses represent Plaintiff's reasonable effort to provide

nformation in response to the requests based upon information in its possession,

ustody or control, and based upon current knowledge. Plaintiff has not concluded its

nvestigation into the facts relating to this action, its formal discovery, or its preparation

or trial.    Plaintiff, therefore, expressly reserves the right to produce additional

ocuments and things regarding subsequently discovered facts, to alter or amend its

esponses as set forth herein, and otherwise to assert factual and legal contentions as

dditional facts are asserted, analyses are made and legal research completed.

G.    Plaintiff objects to the Interrogatories to the extent that they seek compound responses and/or legal conclusions.

H.    The terms of the Stipulated Protective Order entered in this action are incorporated herein and the provision of any information and production of any documents shall be subject to such Confidentiality Stipulation.

I.    Plaintiff reserves the right to supplement and/or modify its answer to the Interrogatories below based on a further review of its documents and depositions testimony to be taken.

## SPECIFIC OBJECTIONS AND RESPONSES

The Responses to the specific Interrogatories set forth below shall be deemed to incorporate, and shall not be deemed a waiver of, the foregoing General Objections and Responses:

## INTERROGATORY NO. 1:

Separated by good, identify all media through which Plaintiff or its licensees have advertised or promoted the RED SONJA Mark in connection with comic books, magazines and novels since the date of first use of the mark on each.

## RESPONSE TO INTERROGATORY NO. 1:

Subject to the General Objections, Plaintiff objects to this interrogatory as it is vague, overbroad, unduly burdensome, and as it encompasses more than one interrogatory. In addition, the information sought is not within the knowledge of Plaintiff and Defendant should seek to obtain such information from Plaintiff's licensees, such as Ace Books, Marvel Comics, DC Comics (as it relates to the "Red Sonja/Claws series), Cross plains comics, and Dynamic Forces (which deposition Defendant has already noticed).    Notwithstanding these objections and the General Objections, Plaintiff

sponses as follows:   Internet comic industry websites; e-bay, in-house advertising

oth by Marvel Comics (Marvel included Red Sonja in its company advertisements in all

nds of media); Dynamic Forces; industry trade publications; comic book specialty

ores; and major book stores (Barnes & Nobel, Borders etc.)

## ITERROGATORY NO. 2:

. Separated by good, identify all channels of trade through which Plaintiff or its
censees have sold comic books, magazines and novels bearing the RED SONJA
lark.

## ESPONSE TO INTERROGATORY NO. 2:

Please see Objections and Responses to Interrogatory No. 1.

## ITERROGATORY NO. 3:

Identify all comic books sold by Plaintiff or its licensees bearing the RED SONJA
lark since the date of first use, including the title of each comic book, date of
ublication, date sales ended, and the publisher of the comic book, if not published by
laintiff.

## ESPONSE TO INTERROGATORY NO. 3:

Subject to the General Objections, Plaintiff objects to this interrogatory as it is

verbroad and unduly burdensome and as it encompasses more than one interrogatory.

otwithstanding these objections and the General Objections, in addition to the

umerous cross-overs with Conan at Marvel, Plaintiff responses as follows:

Marvel Feature: Issues 1-7 (Marvel Comics) (November, 1975 - November,
1976).

Red Sonja (1st series): Issues 1-15 (Marvel Comics) (January, 1977 - May,
1979).

Red Sonja (2nd series): Issues 1-2 (Marvel Comics) (February - March, 1983).

Red Sonja (3rd series): Issues 1-13 (Marvel Comics) (August, 1983 - May, 1986).

Red Sonja The Movie: Issues 1-2 (Marvel Comics) (November - December,

1985).

"Marvel Team-Up" # 79 (The spirit of Sonja possesses the body of Mary Jane Watson to face her old enemy Kulan Gath).

"What if?" Vol. 2, #16 (Sonja is defeated by Wolverine and becomes his mate).

Red Sonja: Scavenger Hunt (Marvel Comics) (December, 1995).

Red Sonja in 3-D (Blackthorne) (1998).

Red Sonja: A Death in Scarlet (Cross Plains) (1999).

Red Sonja (4th series): Issues 0-21 (Dynamite Entertainment) (2005).

Red Sonja Vs. Thulsa Doom: Issues 1-4 (Dynamite Entertainment) (2005).

Red Sonja & Claw:  Issues 1-4 (Wildstorm) (2006).

Red Sonja: Goes East (Dynamite Entertainment) (2006).

Red Sonja: One More Day (Dynamite Entertainment) (2006).

Red Sonja: Monster Island (Dynamite Entertainment) (2006).

Savage Red Sonja: Queen of the Frozen Wastes 1-4 (Dynamite Entertainment) (2006).

Adventures of Red Sonja:  Vol #1  (Dynamite Entertainment) (2006)

Adventures of Red Sonja:  Vol #2  (Dynamite Entertainment) (2007)

Adventures of Red Sonja:  Vol #3  (Dynamite Entertainment) (2007)

Giant Sized Red Sonja #1 (Dynamic Entertainment) (2007)

Red Sonja:  She Devil With a Sword Annual #1 (Dynamite Entertainment) (2007)

Adventures of Red Sonja:  Vol #1  (Dynamite Entertainment) (2006)

Adventures of Red Sonja:  Vol #2  (Dynamite Entertainment) (2007)

Adventures of Red Sonja:  Vol #3  (Dynamite Entertainment) (2007)

Red Sonja She-Devil With a Sword Vol #1 Hardcover/softcover   (Dynamite Entertainment) (2006)

Red Sonja She-Devil With a Sword Vol #2 Hardcover/softcover    (Dynamite Entertainment) (2007)

Red Sonja Vs Thulsa Doom (Dynamite Entertainment) (2006)

Red Sonja/Claw: Devil's Hands (DC Comics) (2007)

Red Sonja: Queen of the Frozen Wastes (Dynamite Entertainment) (2007)

ITERROGATORY NO. 4:

Other than the following alleged six novels: The Ring of Ikribu (1981), Demon ight (1982), When Hell Laughs (1982), Endithor's Daughter (1982), Against the Prince  Hell (1983), and Star of Doom (1983), which were all allegedly published by Ace, entify all novels sold by Plaintiff or its licensees bearing the RED SONJA Mark since e date of first use, including the title of each book, date of publication, dates sales nded, and the publisher of the novel, if not published by Plaintiff.

ESPONSE TO INTERROGATORY NO. 4:

Please see Objections and Responses to Interrogatory No. 3.

ITERROGATORY NO. 5:

Identify the details surrounding Ace's publication of novels related to the RED ONJA character, including the full company name of Ace, Ace's address, dates of any ontracts and/or licenses between Plaintiff and Ace, whether the contracts and/or enses are still in force, and the names of Ace, employees associated with the RED ONJA project.

ESPONSE TO INTERROGATORY NO. 5:

The full name of Ace is ACE Books, It is currently a subsidiary of the Penguin

roup, and, to the best of Plaintiff's knowledge, its address is 375 Hudson Street, New

ork, NY 10014. The Ace agreement(s) are from in or about 1981/1982 and is no longer

the posession, custody or control of Plaintiff and, as such, Plaintiff is unaware of

hether any contracts and/or licenses with Plaintiff are still in force. Ace's present

anagement, who may or may not have knowledge of the above can be identified by

illing them at (212) 366-2000 or by contacting them through their website at

INTERROGATORY NO. 19:

Identify in detail the factual basis for your contention in the Complaint that Plaintiff has been damaged in the amount of at least $5,000,000 through Defendant's actions, and identify all documents substantiating the same.

RESPONSE TO INTERROGATORY NO. 19:

Plaintiff responds to this Interrogatory by directing the Defendant to the allegations contained in Plaintiff's Complaint and avers that to answer such question now is premature as it needs to await expert discovery. The predicate for Plaintiff's damages is the amount of money it is believed it will take to unwind the public's confusion caused by Defendants in their releasing to the public its "Red Sonya" character.

INTERROGATORY NO. 20:

Identify in detail the factual basis of your contention in the Complaint that the RED SONJA Mark is widely known and famous, identify all documents substantiating the same, and further identify the date when Plaintiff alleges the RED SONJA Mark became famous.

RESPONSE TO INTERROGATORY NO. 20:

Plaintiff responds to this Interrogatory with the following examples:

- A typical Google search of "Red Sonja" will turn up approximately 537,000 websites ("Red Sonya" is referred to in about 26,000, and most actually concern Red Sonja, and only mention "Red Sonya" as the inspiration for Red Sonja; or are as a result of a simple misspelling arising from confusion between the two characters)

- "Red Sonja" has been the title of a major motion picture by Universal Studios co-starring Brigitte Neilson and Arnold Schwarzenegger.

- The character "Red Sonja" has starred in roughly 100 comics, under her own trademark which have sold millions of copies world-wide.

- The character "Red Sonja" has co-starred with the character Conan in over 60 Marvel comics.

<u>RESPONSE TO INTERROGATORY NO. 22:</u>

Subject to the General Objections, Plaintiff objects to this interrogatory as it is unduly burdensome, and as it encompasses more than one interrogatory. In addition, Defendant is respectfully referred to Plaintiff's Objections and Responses to Interrogatory Nos. 3, 9 and 12 and that the information sought is not within the knowledge of Plaintiff and Defendant should seek to obtain such information from Plaintiff's licensees.

Dated:    New York, New York
          February 2, 2007

Richard K. Herrmann #405
MORRIS JAMES HITCHENS & WILLIAMS, LLP
222 Delaware Avenue, 10th Floor
Wilmington, DE 19801
(302) 888-6800
rherrmann@morrisjames.com

– and –

Mark A. Berman
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
(212) 922-9250

Attorneys for Plaintiff Red Sonja LLC

21

# EXHIBIT 7

REDACTED

# EXHIBIT 8

REDACTED

# EXHIBIT 9

# B|W|R Public Relations
### An Ogilvy PR Worldwide Company

9100 WILSHIRE BLVD, SIXTH FLOOR, WEST TOWER, BEVERLY HILLS, CA 90212
☎ 310-550-7776 (phone)  ✆ 310-550-1701 (facsimile)

FOR IMMEDIATE RELEASE

Contact: Lynda Dorf / Alfred Hopton
(310) 248-6105 / (310) 248-6160
ldorf@bwr-la.com / ahopton@bwr-la.com

## PARADOX ENTERTAINMENT ACQUIRES RIGHTS TO
## ROBERT E. HOWARD'S LIBRARY



*Beverly Hills, CA (February 6, 2006)* - Paradox Entertainment announced today that the company has acquired all rights to the library of author Robert E. Howard, the creator of *Conan* and over 800 other literary pieces. Paradox Entertainment has owned Howard's *Conan* since 2002 and the new addition of the entire library gathers all of Howard's writings under one company. The property was sold to Paradox Entertainment by the Texas-based Alla Ray Morris Generation Skipping Exemption Trust. The transaction is financed through Paradox Entertainment. Paradox Entertainment is represented by . The Gersh Agency.

"We have been negotiating this transaction for a year and we are confident of its tremendous value. Through the acquisition we are controlling more rights which we are going to capitalize on, as we have done with *Conan*. I don't think it's possible to overestimate the magnitude of this purchase," said Peter Sederowsky, Chairman of the Board at Paradox Entertainment AB.

As the rights owner, Paradox Entertainment will license properties to other companies, leaving commercialization to them. The main *Conan* licensees are expected to spend more than $200,000,000 dollars in development and advertising during the next few years.

"Robert E. Howard is undoubtedly one of the greatest fantasy authors of the 20th century, with an enormous list of works. It is mind-boggling that only four movies have been made based on his writings. Through this purchase we are securing an extensive production slate through long-term partnership in all areas of entertainment and media. We are already considering many projects and are excited for the future," said Fredrik Malmberg, Head of Licensing & Creative Affairs at Paradox Entertainment Inc. in Los Angeles.

-more-

Page 2

Robert E. Howard was one of the greatest authors of his time and is considered the creator of the genre "Sword & Sorcery", perhaps most known through the character *Conan*. Despite his short literary career – Howard died at the mere age of 30, after only 12 years as a productive author – he wrote over 800 stories and poems. Howard's breakthrough came when being published in the pulp magazine Weird Tales during the 1930s. His stories take us to such different surroundings as ancient Atlantis, the North African desert during WW1, hidden opium dens in dark alleys of the Big City, and northern Britain during the invasion of the Roman Legions.

Over the years, many authors have been inspired by Howard's stories, and have praised his literary legacy, among them H. P. Lovecraft, Michael Moorcock, and Stephen King, who said about Howard: "In his best work, Howard's writing seems so highly charged with energy that it nearly gives off sparks. Stories such as 'People of the Black Circle' glow with the fierce and eldritch light of his frenzied intensity."

**Paradox Entertainment AB**

Paradox Entertainment AB owns, develops and licenses mainly character-based properties. The company owns all stories and characters created by pulp author Robert E. Howard, among others Conan, Kull, Bran Mak Morn, Solomon Kane and Red Sonya. Paradox also owns the self-created property Mutant Chronicles. In all, the property portfolio consists of around 1000 stories and characters. Industries exploiting the company property portfolio include film, TV, book, comics, videogame, Internet/mobile/wireless, toys, apparel, and more. The business is mainly conducted through the subsidiary Paradox Entertainment Inc., based in Los Angeles, USA. Paradox Entertainment AB is traded on the Stockholm NGM Equity list (PDXE, SE0000598054).

### #

# EXHIBIT 10

# Paradox pounces on pulp

**By GABRIEL SNYDER**

Paradox Entertainment, which owns literary rights to Robert E. Howard's "Conan" character, has purchased the rest of the pulp-fiction scribe's library, some 890 other literary properties.

Among the characters Paradox now controls are Kull, Bran Mak Morn, Solomon Kane and Red Sonja. Howard published most of his stories in pulp mags including Weird Tales, Spicy Adventure and Strange Detective in the 1920s and 1930s.

Paradox purchased "Conan" in 2002 and bought the rest of the library from the Texas-based Alla Ray Morris Generation Skipping Exemption Trust.

Paradox hopes to license its new literary properties for film, TV, vidgames, comics, toys and other areas.

"King Conan: Crown of Iron," a remake of John Milius' 1982 adaptation "Conan the Barbarian," has long been in development at Warner Bros. But the project hit a bump in 2003 when Arnold Schwarzenegger, the breakout star of "Conan," was elected governor of California.

**Variety, 7 Feb 2006**

# Writings of 'Conan' author at Paradox

Paradox Entertainment has acquired the rights to the library of author Robert E. Howard, the creator of Conan the Barbarian. Paradox has owned "Conan" since 2002, and the new deal, a year in the making, gathers the rest of Howard's writings under one company. The library includes female sword-wielder Red Sonja, the Atlantis king Kull the Conqueror, 17th century adventurer Solomon Kane and Celtic king Bran Mak Morn.

**Hollywood Reporter, 7 Feb 2006**

EXHIBIT 11

**PARADOX ACQUIRES REMAINDER OF REH PROPERTIES**



According to a report in *Variety*, Swedish based Paradox Entertainment, which already owns the literary rights to Robert E. Howard's Conan, has purchased the remainder of the rights to the REH library from the late writer's estate, amounting to 800 or more properties. As the report relates, Paradox now controls Kull, Bran Mak Morn, Solomon Kane and Red Sonya, and, again, according to *Variety* "hopes to license its new literary properties for film, TV, videogames, comics, toys and other areas."

The press release from Paradox reads:

*Paradox Entertainment announced today that the company has acquired all rights to the library of author Robert E. Howard, the creator of Conan and over 800 other literary pieces. Paradox Entertainment has owned Howard's Conan since 2002 and the new addition of the entire library gathers all of Howard's writings under one company. "We have been negotiating this transaction for a year and we are confident of its tremendous value. I don't think it's possible to overestimate the magnitude of this purchase," said Peter Sederowsky, Chairman of the Board at Paradox Entertainment AB.*

*"Robert E. Howard is undoubtedly one of the greatest fantasy authors of the 20th century, with an enormous list of works. It is mind-boggling that only four movies have been made based on his writings. Through this purchase we are securing an extensive production slate through long-term partnership in all areas of entertainment and media. We are already considering many projects and are excited for the future," said Fredrik Malmberg, Head of Licensing & Creative Affairs at Paradox Entertainment Inc. in Los Angeles.*

*Robert E. Howard was one of the greatest authors of his time and is considered the creator of the genre "Sword & Sorcery", perhaps most known through the character Conan. Despite his short literary career -- Howard died at the mere age of 30, after only 12 years as a productive author -- he wrote over 800 stories and poems. Howard's breakthrough came when being published in the pulp magazine Weird Tales during the 1930s. His stories take us to such different surroundings as ancient Atlantis, the North African desert during WW1, hidden opium dens in dark alleys of the Big City, and northern Britain during the invasion of the Roman Legions.*

*Over the years, many authors have been inspired by Howard's stories, and have praised his literary legacy, among them H. P. Lovecraft, Michael Moorcock, and Stephen King, who said about Howard: "In his best work, Howard's writing seems so highly charged with energy that it nearly gives off sparks. Stories such as 'People of the Black Circle' glow with the fierce and eldritch light of his frenzied intensity."*

As for how this impacts the Howard properties most relevant to comic fans, namely, Dark Horse's Conan and Dynamite Entertainment's Red Sonja series, the short version is, it doesn't.



While this deal will simplify things, the world of REH licensed properties is still slightly complicated, with all of the creator's characters not sharing one "universe" that can be owned or licensed.

In regards to Conan, Dark Horse licenses the character from Conan Properties International, a wholly owned subsidiary of Paradox. CPI controls not only Conan, but all associated characters from the Hyborian world.

Except Red Sonja.

As explained previously, Red Sonja is controlled by the Red Sonja Corporation, a wholly separate company, distinct from the REH Estate, Paradox, and CPI. Reportedly (and to make just a few more lines

cross), Red Sonja Corp currently has the rights to the Thulsa Doom character (originally a Kull nemesis, who then appeared in the first *Conan* film), which it has, in turn, licensed to Dynamite for use in **Red Sonja** comics.

The ownership lines became fuzzy between 2000-2003, during which time Stan Lee Media bought the rights to Conan (late 2000) when it purchased CPI, promising to make, among other things, a film at Warner Bros., and "webisodes" of the barbarian's adventures. Stan Lee Media of course, went under in a storm of controversy and alleged wrongdoing in December of 2000. In 2002, Paradox bought into the Conan property, but by that point, the Howard Estate had spun off the Red Sonja rights into their own company, the Red Sonja Corporation. The REH Estate kept the rights to all the other Howard properties.

As noted above though, Paradox does on the rights to Red Sonya, while the Red Sonja Corporation retains the rights to Red Sonja. The difference of course, being in the spelling of the last name. "Red Sonya," which Paradox now owns, is the original Howard version, a female pirate who was *not a* contemporary of Conan. "Red Sonja" is the character derived from Howard's works by Roy Thomas and Barry Windsor-Smith in 1973. "Sonja" is the character who previously appeared in Marvel's *Conan* comics and her own miniseries, while "Sonya" is known perhaps best to Howard aficionados.

The move by Paradox, with their stated aim of seeking to further exploit the characters in, among other media, comics, is notable, as it can be assumed that the process to developing more REH properties for comics may be a little more streamlined. Before their launches, both Conan and Sonja were on the rubbish heap of comics, their viability questionable at best. But as both Dark Horse and Dynamite have shown with their respective series (**Red Sonja** currently outsells **Conan** in months that Sonja ships), there is still a demand for Howard's characters in the market, when treated with care and respect by both publishers and creators.

# EXHIBIT 12

**YAHOO!** FINANCE

Yahoo!  My Yahoo!  Mail

Sign In
New User? Sign Up

Search the Web

Finance Home - Help

Search

Business Wire

**Welcome [Sign In]**

To track stocks & more, Register

**Financial News**

Enter symbol(s)          Basic          Get    Symbol Lookup

Press Release                                          Source: Paradox Entertainment

# Paradox Entertainment to Develop Robert E. Howard Western

Friday April 21, 7:53 pm ET

LOS ANGELES--(BUSINESS WIRE)--April 21, 2006--Not long after acquiring the entire Robert E. Howard library, Paradox Entertainment announced it has commenced development of a motion picture based on one of Howard's many western stories, titled "Vultures of Wahpeton."

The story is an action thriller that focuses on the character Steve Corcoran, an amoral Texas gunslinger who finds himself far from home in a mining boomtown. Appointed Sheriff, his job is to rid the town of its crushing lawlessness. But Corcoran soon finds himself drawn into a conspiracy to rob the town, led by a mysterious gang known as The Vultures.

The movie will be produced by Paradox's Peter Sederowsky and Fredrik Malmberg along with producer Ken Aguado via his company, Standard Film Group. Leif Rahmqvist acts as executive producer. Paradox has hired David Heller to adapt the novella into a screenplay.

Says Aguado, "This is really one of the best stories I've read since 'Unforgiven.' It has all the elements of the great Hollywood westerns: a strong, enigmatic lead fighting evil while battling his inner demons."

Ken Aguado is the producer of movies such as "Sexual Life" (Anne Heche), "The Salton Sea" (Val Kilmer, Vincent D'Onofrio) and "Ticker" (Dennis Hopper). David Heller was represented by Caren Bohrman of The Bohrman Agency.

It was on February 1, 2006, that Paradox Entertainment announced the acquisition of all rights to the stories and characters of pulp author Robert E. Howard. One of the greatest authors of his time, Howard is considered the creator of the genre "Sword & Sorcery," perhaps most known through the character Conan. His stories take us to such different surroundings as ancient Atlantis, the North African desert during WW1, hidden opium dens in dark alleys of the Big City, the Wild West and northern Britain during the invasion of the Roman Legions.

Paradox Entertainment also owns the self-created property Mutant Chronicles, presently in pre-production for a live-action feature, directed by Simon Hunter.

Paradox Entertainment AB

Paradox Entertainment AB owns, develops and licenses mainly character-based properties. The company owns all stories and characters created by pulp author Robert E. Howard, among others Conan®, Kull®, Bran Mak Morn® and Red Sonya®. Paradox also owns the self-created property Mutant Chronicles®. In all, the property portfolio consists of around 1,000 stories and characters. Industries exploiting the company property portfolio include film, TV, book, comics, videogame, Internet/mobile/wireless, toys, apparel and more. The business is mainly conducted through the subsidiary Paradox Entertainment Inc., based in Los Angeles, USA. Paradox Entertainment AB is traded on the Swedish NGM Equity list (PDXE, SE0000598054).

*Contact:*

Paradox Entertainment

# EXHIBIT 13

REDACTED

# EXHIBIT 14



**paradox**
entertainment

April 27, 2006

Dear Conan and Robert E. Howard Fans and Licensees,

It has come to our attention that there may be some Conan and Robert E. Howard fans or licensees who could be confused about the origins and ownership of Red Sonya (with a "y") and Red Sonja (with a "j") and their relationship to Hyboria. We don't believe that there should be any such confusion and would like to do all that we can to clear up any that might exist.

The Red Sonya (with a "y") character was created in 1934 by Robert E. Howard. Howard's Red Sonya of Rogatino first appeared in the Howard story *The Shadow of the Vulture*. She was a 16th century Russian woman fighter who participated in the battle against the Turks in Vienna. She had absolutely nothing to do with Conan, or the Conan world of Hyboria.

The Red Sonja (with a "J") character was created by Roy Thomas in 1974 and was set in Conan's Hyborian Age. This Red Sonja was the heroine of the 1985 Film entitled *Red Sonja* and is featured in the current Dynamite Comic books.

Ownership of all Robert E. Howard characters, including *Conan®, Kull®, Bran Mak Morn*™, and *Red Sonya*™ (with a "y") was acquired by either Paradox Entertainment, Inc. or by its affiliated company, Conan Properties International LLC, from the various entities which held the rights to the Howard characters and the derivative characters created over the years by such licensees as Marvel.

Red Sonja® (with a "j") is owned by Red Sonja LLC which is *not* affiliated with either Paradox Entertainment, Inc., or Conan Properties International LLC.

Conan Properties International and Paradox Entertainment, Inc. own the copyrights and trademarks to the Robert E. Howard world of Hyboria™. Red Sonja LLC is a licensee of Paradox Entertainment, Inc. and Conan Properties International LLC and has been granted the non-exclusive right to use the Hyboria world and setting as the home for its Red Sonja character, but only in that context, as long as there is no use of the Conan character in connection with any use by Red Sonja LLC of its Red Sonja character.

At the moment neither Paradox Entertainment, Inc., nor Conan Properties International, LLC has any intention of using the Red Sonya (with a "y") character in any stories set in Hyboria, or otherwise, nor has it granted any of its licensees permission to use the Red Sonya character. Anyone desiring to use the character Red Sonja® should observe the trademark of Red Sonja LLC in this respect and contact them.

If there is any remaining confusion about this issue, please bring it to our attention so that we may clear it up.

Best Regards,

*Leigh Stone*

Leigh Stone
Licensing Manager
Paradox Entertainment

8484 WILSHIRE BLVD
SUITE 870
BEVERLY HILLS, CA 90211
PHONE (323) 655 1700
FAX (323) 655 1720
www.paradox-entertainment.com

CONFIDENTIAL
ATTORNEYS EYES ONLY

DEF00230

# EXHIBIT 15



Powered by
Business Wire



Search Results for Google

🖶 Print this Release

May 02, 2006 02:08 PM US Eastern Timezone

# Millennium Films and Emmett/Furla Go into Battle with ``Red Sonja''

LOS ANGELES--(BUSINESS WIRE)--May 2, 2006--Family Room Entertainment (OTCBB:FMLY) is pleased to announce that earlier this morning, its wholly owned subsidiary, Emmett/Furla Films, announced in conjunction with Millennium Films that they had acquired the rights to produce and distribute a feature film based on the "Red Sonja" property. The picture will be produced by Randall Emmett, George Furla and Avi Lerner as well as executive produced by M. Dal Walton III, Luke Lieberman, Nick Barrucci, Danny Dimbort, Trevor Short and Boaz Davidson. The property is currently out to writers and directors.

Based on a character by Sword and Sorcery legend Robert E. Howard, Red Sonja was introduced into Marvel's "Conan the Barbarian" comics in 1973, and was soon given her own title series. In the years that followed, Red Sonja became an iconic figure in the Comic Book and Fantasy genres.

In 2005 Dynamite Entertainment launched a new Red Sonja comic book series with great success. Red Sonja has consistently been the best selling mainstream independent comic book since its launch in July 2005. Featuring a stunning array of talent, the book launched with a "#0" issue – and sold in excess of 240,000 copies. Along with comics, other Red Sonja merchandise has been released including: trading cards, collectible statues, high-end lithographs and more.

Lerner stated: "I am thrilled to be producing 'RED SONJA.' Few other properties are as visually exciting and action-packed. Once again, Randy and George have found a winner."

Emmett and Furla stated: "We have made it a priority of our company to acquire 'branded properties' and we believe that there are few properties out there which have as much untapped franchise potential as 'Red Sonja,' who is already a leader in both the Comic book and fantasy genres."

Luke Lieberman, vice-president of Red Sonja LLC, currently serves as editor on the Red Sonja comic series, as well as co-writing the best-selling Red Sonja Vs. Thulsa Doom series, with a sequel being developed for release later this year.

The deal was negotiated on behalf of Red Sonja, LLC by Arthur Lieberman, Esq. and The Gersh Agency and by M. Dal Walton, III on behalf of Emmett/Furla Films.

About Millennium Films

Nu Image Films was established in 1992 by Avi Lerner and Danny Dimbort, veteran film producers from Israel, and has annually produced 15 to 18 low-budget and foreign-sale films. In 1996, Nu Image formed Millennium Films to address the market's growing need for quality art films and higher budget action features. Since 1999, Nu Image has filmed 40 films at their studios in Sofia, Bulgaria, and Millennium Films now has titles on its slate with budgets of up to $68 million. These include Brian De Palma's "THE BLACK DAHLIA," starring Scarlett Johansson, Josh Hartnett and Hilary Swank, "16 BLOCKS" starring Bruce Willis, which was produced with Emmett/Furla Films, and the remake of the 1973 thriller "THE WICKER MAN," starring Nicolas Cage, which was also produced with Emmett/Furla Films. Nu Image/Millennium Films had a co-production deal with Miramax/Dimension Films, which had been in place till the Weinstein Brothers left both companies. Nu Image recently announced plans to produce "POE," a film about the life and works of gothic author, Edgar Allen Poe, to the screen with Sylvester Stallone helming the director's chair for the first time since 1985's smash-hit, "ROCKY IV," and scheduled to begin production prior to "RAMBO IV," which will be produced with Emmett/Furla Films.

DEF00007

## About Dynamite Entertainment

Nick Barrucci is president of Dynamite Entertainment and its parent company, Dynamic Forces, Inc. Dynamite Entertainment has debuted as the comic book industry's leading new comic book publisher with titles including Red Sonja, Thulsa Doom, Army of Darkness, Re-Animator, and Battlestar Galactica. DF is the comic book industry's leader of limited edition and autographed memorabilia, including comic books, resin figures, lithographs.

## About Family Room Entertainment

Family Room Entertainment Corporation, with its subsidiaries, Emmett Furla Films Productions ("EFFP"), Emmett Furla Films Distribution ("EFFD") and EFF Independent ("EFFI"), is a publicly held company trading on the NASDAQ Bulletin Board under the symbol "FMLY." Family Room Entertainment develops, produces and performs production related services for the entertainment industry. Family Room Entertainment's goal, through EFFI and EFFP, is to facilitate relationships (and as such, provide production related services) between creative talent (including writers, actors and directors) and companies who produce, finance and distribute motion pictures. FMLY derives its income from producer fees, production consulting and service fees and royalties as well as participation in the profits, if any, of certain of the pictures it produces.

The FMLY co-founders, Randall Emmett and George Furla, believe that they have the expertise and contacts within the entertainment industry, specifically in the competitive development, production and distribution arenas, to profitably acquire content, package product by adding value to the content with top quality talent and arrange with third parties to produce and finance motion pictures which are in the moderate to higher level budgets, which can be distributed by those with the expertise to effectively do so to a mass worldwide audience. However, there is no assurance that any motion picture, which has not yet been released, will be released, that a change in the scheduled release dates of any such films will not occur or, if such motion picture is released, it will be successful.

## Forward Looking Statement:

Safe Harbor: Statements contained in this news release, which are not historical facts, are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to risks and uncertainties, which could cause results to differ materially from those projected.

This news release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 (the "ACT"). In particular, when used in the preceding discussion, the words "plan," "confident that," "believe," "expect," "intend to" and similar conditional expressions are intended to identify forward-looking statements within the meaning of the ACT and are subject to risks and uncertainties, and actual results could differ materially from those expressed in any forward-looking statements. Such risks and uncertainties include, but are not limited to, market conditions, competitive factors, the ability to successfully complete additional financings and other risks.

### Contacts

Family Room Entertainment
Corporation
M. Dal Walton, III, 310-659-9411
x127 (IR Contact)
dwalton@fmlyroom.com

 Print this Release

DEF00008

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RED SONJA LLC,                          :
                                        :
            Plaintiff,                  :
                                        :
      v.                                :        Civil Action No.
                                        :        1:06-CV-00270 (SLR)
PARADOX ENTERTAINMENT INC.,             :
                                        :
            Defendant.                  :
                                        :

### DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant, Paradox Entertainment, Inc. (hereinafter, "Defendant"), by its attorneys, Blank Rome LLP, requests that Plaintiff, Red Sonja LLC, answer each of the following interrogatories within the time specified by the Rules and subject to the following instructions and definitions.

### DEFINITIONS AND INSTRUCTIONS

1.    "Document" means all written or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including without limitation correspondence, memoranda, notes, speeches, press releases, contracts, reports, studies, checks, statements, receipts, returns, summaries; pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations of any sort of conversations, telephone calls, meetings or other

18.   Identify the name, address and positions of all
individuals associated with Emmett Furla Films Productions and
Nu Image Films with whom Plaintiff has had any discussions
regarding the alleged film project referenced in Paragraph 65 of
the Complaint, further identifying the date and location
(including whether via telephone) of all meetings/discussions
related to the same and a description of what was discussed
during each.

**RESPONSE:**

19.   Identify in detail the factual basis for your
contention in the Complaint that Plaintiff has been damaged in
the amount of at least $5,000,000 through Defendant's actions,
and identify all documents substantiating the same.

**RESPONSE:**

20.   Identify in detail the factual basis of your
contention in the Complaint that the RED SONJA Mark is widely

14

RESPONSE:

Dated: January 3, 2007          By:

BLANK ROME LLP

Timothy D. Pecsenye
Emily J. Barnhart
Joel L. Dion
One Logan Square
Philadelphia, PA 19103

(215) 569-5619
Attorneys for Defendant,
Paradox Entertainment Inc.

16

125338.00601/11566574v.2

## CERTIFICATE OF SERVICE

I hereby certify that on May 23, 2007 I electronically filed the foregoing

with the Clerk of the Court using CM/ECF, which will send notification of such filing to:.

Richard K. Herrmann, Esquire
Morris James LLP

I further certify that I caused to be served copies of the foregoing

document on May 23, 2007 upon the following in the manner indicated:

Richard K. Herrmann, Esquire                    *VIA ELECTRONIC MAIL*
Morris James LLP                                     *and HAND DELIVERY*
500 Delaware Avenue
15th Floor
Wilmington, DE  19801

Mark A. Berman, Esquire                         *VIA ELECTRONIC MAIL*
Thomas J. Curran, Esquire                        *and FIRST CLASS MAIL*
Ira B. Matetsky, Esquire
Ganfer & Shore, LLP
360 Lexington Avenue
New York, NY  10017

*/s/ Richard J. Bauer (#4828)*
Richard J. Bauer (#4828)

CONFIDENTIAL: Peter U. Sederowsky

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
-----

RED SONJA LLC,               : C.A. NO. 06-270
Plaintiff,                   :
           v.                :
PARADOX ENTERTAINMENT,       :
INC.,                        :
Defendant                    :


-----
Friday, August 25, 2006
-----

Videotape examination of PETER ULF SEDEROWSKY, held

in the offices of BLANK, ROME LLP, One Logan Square,

Philadelphia, PA  19103, commencing at 9:14 a.m.,

on the above date, before Mickey Dinter, Registered

Professional Reporter and Notary Public for the

Commonwealth of Pennsylvania.


-----
CORBETT & WILCOX
230 North Market Street
Wilmington, Delaware 19801
302.571.0510
-----

Page 165

```
 1   Patent and Trademark Office?
 2       A. Yes.
 3       Q. How did you become aware of that?
 4       A. I saw a press release where it's in
 5   a tag line.  It said Red Sonya with a
 6   circle around it or a T with a circle
 7   around it.  Some kind of insignia.
 8       Q. That was a mistake, you thought?
 9       A. Yes.
10       Q. Did you inform anyone that you
11   thought that that was a mistake?
12       A. Yes.
13       Q. Who?
14       A. Mr. Joakim Zutterberg.
15       Q. What did you say to Mr. Zutterberg
16   and what did he say to you?
17       A. The gist of it, that I was very
18   angry and I hadn't seen the press release
19   before it was issued and I wanted it never
20   to happen again.
21       Q. So, you issued corrective
22   instructions, is that fair?
23       A. To whom?
24       Q. To whoever was using Red Sonya with
```

# EXHIBIT 14



**paradox**
entertainment

April 27, 2006

Dear Conan and Robert E. Howard Fans and Licensees,

It has come to our attention that there may be some Conan and Robert E. Howard fans or licensees who could be confused about the origins and ownership of Red Sonya (with a "y") and Red Sonja (with a "j") and their relationship to Hyboria. We don't believe that there should be any such confusion and would like to do all that we can to clear up any that might exist.

The Red Sonya (with a "y") character was created in 1934 by Robert E. Howard. Howard's Red Sonya of Rogatino first appeared in the Howard story *The Shadow of the Vulture*. She was a 16th century Russian woman fighter who participated in the battle against the Turks in Vienna. She had absolutely nothing to do with Conan, or the Conan world of Hyboria.

The Red Sonja (with a "j") character was created by Roy Thomas in 1974 and was set in Conan's Hyborian Age. This Red Sonja was the heroine of the 1985 Film entitled *Red Sonja* and is featured in the current Dynamite Comic books.

Ownership of all Robert E. Howard characters, including *Conan®, Kull®, Bran Mak Morn™,* and *Red Sonya™* (with a "y") was acquired by either Paradox Entertainment, Inc. or by its affiliated company, Conan Properties International LLC, from the various entities which held the rights to the Howard characters and the derivative characters created over the years by such licensees as Marvel.

Red Sonja® (with a "j") is owned by Red Sonja LLC which is *not* affiliated with either Paradox Entertainment, Inc., or Conan Properties International LLC.

Conan Properties International and Paradox Entertainment, Inc. own the copyrights and trademarks to the Robert E. Howard world of Hyboria™. Red Sonja LLC is a licensee of Paradox Entertainment, Inc. and Conan Properties International LLC and has been granted the non-exclusive right to use the Hyboria world and setting as the home for its Red Sonja character, but only in that context, as long as there is no use of the Conan character in connection with any use by Red Sonja LLC of its Red Sonja character.

At the moment neither Paradox Entertainment, Inc., nor Conan Properties International, LLC has any intention of using the Red Sonya (with a "y") character in any stories set in Hyboria, or otherwise, nor has it granted any of its licensees permission to use the Red Sonya character. Anyone desiring to use the character Red Sonja® should observe the trademark of Red Sonja LLC in this respect and contact them.

If there is any remaining confusion about this issue, please bring it to our attention so that we may clear it up.

Best Regards,

*Leigh Stone*

Leigh Stone
Licensing Manager
Paradox Entertainment

8484 WILSHIRE BLVD
SUITE 870
BEVERLY HILLS, CA 90211
PHONE (323) 655 1700
FAX (323) 655 1720
www.paradox-entertainment.com

CONFIDENTIAL
ATTORNEYS EYES ONLY

DEF00230

# EXHIBIT 15

Millennium Films and Emmett/Furla Go into Battle with ``Red Sonja"                    Page 1 of 2



Search Results for Google

 Print this Release

May 02, 2006 02:08 PM US Eastern Timezone

## Millennium Films and Emmett/Furla Go into Battle with ``Red Sonja"

LOS ANGELES--(BUSINESS WIRE)--May 2, 2006--Family Room Entertainment (OTCBB:FMLY) is pleased to announce that earlier this morning, its wholly owned subsidiary, Emmett/Furla Films, announced in conjunction with Millennium Films that they had acquired the rights to produce and distribute a feature film based on the "Red Sonja" property as well as the allied and ancillary rights. The picture will be produced by Randall Emmett, George Furla and Avi Lerner as well as executive produced by M. Dal Walton III, Luke Lieberman, Nick Barrucci, Danny Dimbort, Trevor Short and Boaz Davidson. The property is currently out to writers and directors.

Based on a character by Sword and Sorcery legend Robert E. Howard, Red Sonja was introduced into Marvel's "Conan the Barbarian" comics in 1973, and was soon given her own title series. In the years that followed, Red Sonja became an iconic figure in the Comic Book and Fantasy genres.

In 2005 Dynamite Entertainment launched a new Red Sonja comic book series with great success. Red Sonja has consistently been the best selling mainstream independent comic book since its launch in July 2005. Featuring a stunning array of talent, the book launched with a "#0" issue -- and sold in excess of 240,000 copies. Along with comics, other Red Sonja merchandise has been released including: trading cards, collectible statues, high-end lithographs and more.

Lerner stated: "I am thrilled to be producing 'RED SONJA.' Few other properties are as visually exciting and action-packed. Once again, Randy and George have found a winner."

Emmett and Furla stated: "We have made it a priority of our company to acquire 'branded properties' and we believe that there are few properties out there which have as much untapped franchise potential as 'Red Sonja,' who is already a leader in both the Comic book and fantasy genres."

Luke Lieberman, vice-president of Red Sonja LLC, currently serves as editor on the Red Sonja comic series, as well as co-writing the best-selling Red Sonja Vs. Thulsa Doom series, with a sequel being developed for release later this year.

The deal was negotiated on behalf of Red Sonja, LLC by Arthur Lieberman, Esq. and The Gersh Agency and by M. Dal Walton, III on behalf of Emmett/Furla Films.

About Millennium Films

Nu Image Films was established in 1992 by Avi Lerner and Danny Dimbort, veteran film producers from Israel, and has annually produced 15 to 18 low-budget and foreign-sale films. In 1996, Nu Image formed Millennium Films to address the market's growing need for quality art films and higher budget action features. Since 1999, Nu Image has filmed 40 films at their studios in Sofia, Bulgaria, and Millennium Films now has titles on its slate with budgets of up to $68 million. These include Brian De Palma's "THE BLACK DAHLIA," starring Scarlett Johansson, Josh Hartnett and Hilary Swank, "16 BLOCKS" starring Bruce Willis, which was produced with Emmett/Furla Films, and the remake of the 1973 thriller "THE WICKER MAN," starring Nicolas Cage, which was also produced with Emmett/Furla Films. Nu Image/Millennium Films had a co-production deal with Miramax/Dimension Films, which had been in place till the Weinstein Brothers left both companies. Nu Image recently announced plans to produce "POE," a film about the life and works of gothic author, Edgar Allen Poe, to the screen with Sylvester Stallone helming the director's chair for the first time since 1985's smash-hit, "ROCKY IV," and scheduled to begin production prior to "RAMBO IV," which will be produced with Emmett/Furla Films.

## About Dynamite Entertainment

Nick Barrucci is president of Dynamite Entertainment and its parent company, Dynamic Forces, Inc. Dynamite Entertainment has debuted as the comic book industry's leading new comic book publisher with titles including Red Sonja, Thulsa Doom, Army of Darkness, Re-Animator, and Battlestar Galactica. DF is the comic book industry's leader of limited edition and autographed memorabilia, including comic books, resin figures, lithographs.

## About Family Room Entertainment

Family Room Entertainment Corporation, with its subsidiaries, Emmett Furla Films Productions ("EFFP"), Emmett Furla Films Distribution ("EFFD") and EFF Independent ("EFFI"), is a publicly held company trading on the NASDAQ Bulletin Board under the symbol "FMLY." Family Room Entertainment develops, produces and performs production related services for the entertainment industry. Family Room Entertainment's goal, through EFFI and EFFP, is to facilitate relationships (and as such, provide production related services) between creative talent (including writers, actors and directors) and companies who produce, finance and distribute motion pictures. FMLY derives its income from producer fees, production consulting and service fees and royalties as well as participation in the profits, if any, of certain of the pictures it produces.

The FMLY co-founders, Randall Emmett and George Furla, believe that they have the expertise and contacts within the entertainment industry, specifically in the competitive development, production and distribution arenas, to profitably acquire content, package product by adding value to the content with top quality talent and arrange with third parties to produce and finance motion pictures which are in the moderate to higher level budgets, which can be distributed by those with the expertise to effectively do so to a mass worldwide audience. However, there is no assurance that any motion picture, which has not yet been released, will be released, that a change in the scheduled release dates of any such films will not occur or, if such motion picture is released, it will be successful.

## Forward Looking Statement:

Safe Harbor: Statements contained in this news release, which are not historical facts, are forward-looking statements as defined in the Private Securities Litigation Reform Act of 1995. Such forward-looking statements are subject to risks and uncertainties, which could cause results to differ materially from those projected.

This news release contains forward-looking statements within the meaning of the Private Securities Litigation Reform Act of 1995 (the "ACT"). In particular, when used in the preceding discussion, the words "plan," "confident that," "believe," "expect," "intend to" and similar conditional expressions are intended to identify forward-looking statements within the meaning of the ACT and are subject to risks and uncertainties, and actual results could differ materially from those expressed in any forward-looking statements. Such risks and uncertainties include, but are not limited to, market conditions, competitive factors, the ability to successfully complete additional financings and other risks.

### Contacts

Family Room Entertainment
Corporation
M. Dal Walton, III, 310-659-9411
x127 (IR Contact)
dwalton@fmlyroom.com

Print this Release

Terms of Use    |    © Business Wire 2006

DEF00008

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RED SONJA LLC,                          :
                                        :
          Plaintiff,                    :
                                        :
     v.                                 :    Civil Action No.
                                        :    1:06-CV-00270 (SLR)
PARADOX ENTERTAINMENT INC.,             :
                                        :
          Defendant.                    :
                                        :

## DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Defendant, Paradox Entertainment, Inc. (hereinafter, "Defendant"), by its attorneys, Blank Rome LLP, requests that Plaintiff, Red Sonja LLC, answer each of the following interrogatories within the time specified by the Rules and subject to the following instructions and definitions.

## DEFINITIONS AND INSTRUCTIONS

1.   "Document" means all written or printed matter of any kind, including the originals and all non-identical copies, whether different from the original by reason of any notation made on such copies or otherwise (including without limitation correspondence, memoranda, notes, speeches, press releases, contracts, reports, studies, checks, statements, receipts, returns, summaries, pamphlets, books, prospectuses, interoffice and intraoffice communications, offers, notations of any sort of conversations, telephone calls, meetings or other

125338.00601/11566574v.2

18.  Identify the name, address and positions of all individuals associated with Emmett Furla Films Productions and Nu Image Films with whom Plaintiff has had any discussions regarding the alleged film project referenced in Paragraph 65 of the Complaint, further identifying the date and location (including whether via telephone) of all meetings/discussions related to the same and a description of what was discussed during each.

**RESPONSE:**

19.  Identify in detail the factual basis for your contention in the Complaint that Plaintiff has been damaged in the amount of at least $5,000,000 through Defendant's actions, and identify all documents substantiating the same.

**RESPONSE:**

20.  Identify in detail the factual basis of your contention in the Complaint that the RED SONJA Mark is widely

14

RESPONSE:

Dated: January 3, 2007          By:      BLANK ROME LLP

_____

Timothy D. Pecsenye
Emily J. Barnhart
Joel L. Dion
One Logan Square
Philadelphia, PA 19103

(215) 569-5619
Attorneys for Defendant,
Paradox Entertainment Inc.

16