UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

RED SONJA LLC,                                   )
                                                 )
                    Plaintiff,                   )
                                                 )
v.                                               )        Civil Action No.:
                                                 )        06-CV-00270 (SLR)
PARADOX ENTERTAINMENT, INC.,                     )        **PUBLIC VERSION**
                                                 )
                    Defendant.                   )
_____)

## PLAINTIFF RED SONJA LLC'S OPPOSITION TO DEFENDANT PARADOX ENTERTAINMENT, INC.'S MOTION *IN LIMINE* SEEKING TO STRIKE PLAINTIFF'S EXPERT REPORT AND TO PRECLUDE PLAINTIFF FROM OFFERING ANY EVIDENCE OF DAMAGES AT TRIAL

Richard K. Herrmann, #405
MORRIS JAMES LLP
500 Delaware Avenue, 15th Floor
P.O. Box 2306
Wilmington, DE  19899-2306
Telephone: (302) 888 6816
Facsimile: (302) 571 1750
rherrmann@morrisjames.com

Mark A. Berman, Esquire
Thomas J. Curran, Esquire
Ira Brad Matetsky, Esquire
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
Telephone: (212) 922-9250
Facsimile (212) 922-9335

*Attorneys for Plaintiff RED SONJA LLC*

Original Date:  June 1, 2007
Redacted Date:  June 8, 2007

# TABLE OF CONTENTS

**Summary of Argument**................................................................................................1

**Argument**...................................................................................................................10

**Point 1** – The Court's Determination On the Admissibility of Mr. Tarter's
Report Should Not Be Rendered Until He Has Been Deposed Or
Examined at Trial Or at a <u>Daubert</u> Hearing ........................................................10

**Point II** – Defendant Has Failed To Demonstrate That Mr. Tarter's
Testimony Should Be Excluded Or that Plaintiff Should Be
Precluded From Presenting Evidence of Damages At Trial ...............................13

    A.    The Record Contains Evidence Sufficient to Prove The
Elements Of A Claim For Monetary Damages Arising
From Defendant's Wrongful Conduct and Plaintiff's Damages
Expert Need Not Prove Those Elements Independently.....................................13

          1.  There is Sufficient Proof for An Award
Of Damages On Each Cause of Action.........................................................14

          2.  Proof of Entitlement to Prospective
Corrective Advertising Expenses................................................................20

          3.  Plaintiff is Entitled to Recovery Of Its Attorneys' Fees For
Paradox's Intentional Infringement And Other Wrongful Conduct .............22

    B.    Mr. Tarter's Testimony Is Admissible Under <u>Daubert</u> ........................................23

          1.  Mr. Tarter is Qualified To Opine On
Lost Opportunity Costs...............................................................................24

          2.  Mr. Tarter's Opinions, Which Are Based On His Extensive
Practical Experience In the Fields of Media, Advertising
And Finance, Are Sufficiently Reliable for Admissibility ...........................25

**Conclusion** ................................................................................................................29

# TABLE OF AUTHORITIES

## Cases

A & H Sportswear Inc. v. Victoria's Secret Stores, Inc.,
166 F.3d 197 (3d Cir. 1999)......................................................................................... 15

Accu Personnel, Inc. v. Accustaff, Inc.,
846 F. Supp. 1191 (D. Del. 1994)................................................................................ 15

Adray v. Adry-Mart, Inc.,
76 F.3d 984 (9th Cir. 1995) ................................................................................... 20, 21

Advanced Medical Optics, Inc. v. Alcon, Inc.,
No. CIV A 03-1095-KAJ, 2005 WL 782809 (D. Del. April 7, 2005)...................... 12

Astrazeneca v. Tap Pharmaceutical Prods., Inc.,
444 F. Supp.2d 278 (D. Del. 2006).............................................................................. 12

Benjamin v. Peter's Farm Condominium Owners Assoc.,
820 F.2d 640 (3d Cir. 1987)........................................................................................ 12

Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.,
561 F.2d 1365 (10th Cir. 1977) ............................................................................ 20, 21

Bowersfield v. Suzuki Motor Corporation,
151 F. Supp.2d 625 (E.D. Pa. 2001) .................................................................... 10, 25

Burndy Corporation v. Teledyne Industries, Inc.,
748 F.2d 767 (2d Cir. 1984)................................................................................. 15, 28

Callaway Golf Co. v. Slazenger,
384 F. Supp.2d 735 (D. Del. 2005)....................................................................... 20, 21

Cantor v. Perelman,
No. CIV A 97-586 KAJ, 2006 WL 3462596 (D. Del., Nov. 30, 2006)........................ 26, 27, 28

Chase Manhattan Mortg. Corp. v. Advanta Corp.,
No. CIV A 01-507 KAJ, 2004 WL 422681(D. Del. Mar. 4, 2004). ......................... 11

Children's Medical Center Of Dallas v. Columbia Hospital
At Medical City Dallas Subsidiary, L.P.,
No. 3-04-CV-2436-BD, 2006 WL 616000 (N.D. Tex., Mar. 10, 2006)................... 14

Choice Hotels International, Inc. v. Pennave Associates, Inc.,
Nos. 01-1632, 01-1925, 01-2397,
43 Fed. Appx. 517, 2002 WL 1986509 (3d Cir. Aug. 28, 2002)............................... 15

Clark v. Richman,
339 F. Supp.2d 631 (M.D. Pa. 2004)........................................................................... 11

Daubert v. Merrell Dow Pharms., Inc.,
509 U.S. 579 (1993).............................................................................................. 9, 13

Elcock v. Kmart Corp.,
233 F.3d 734 (3d Cir. 2000)........................................................................................ 11

## TABLE OF AUTHORITIES

Ferrero U.S.A., Inc. v. Ozak Trading, Inc.,
  952 F.2d 44 (3d Cir. 1991)...................................................................................... 22

General Electric Co. v. Joiner,
  522 U.S. 136, 118 S. Ct. 512 (1997)...................................................................... 11

Gumbs v. International Harvester, Inc.,
  718 .2d 88 (3d Cir. 1983)........................................................................................ 12

Heller v. Shaw Industries, Inc.,
  167 F.3d 146 (3d Cir. 1999)..................................................................................... 11

Horodenski v. Commissioner of Social Security,
  No. 06-1813, 2007 WL 412424 (3d Cir., Feb. 7, 2007) ......................................... 26

In re Paoli R.R. Yard PCB Litig.,
  35 F.3d 717 (3d Cir. 1994)........................................................................... 23, 24, 25

Izumi Products Co. v. Konninklijke Philips Electronics N.V.,
  315 F. Supp.2d 589 (D. Del. 2004).......................................................................... 27

Kilmon v. Community Services, Inc.,
  No. CIV A 96-159-GMS, 2000 WL 1728300 (D. Del. Mar. 24, 2000) ............ 10, 25

Kumho Tire Company, Ltd. v. Carmichael,
  526 U.S. 137, 119 S. Ct. 1167 (1999)........................................................... 9, 23, 26

Lauria v. National R.R. Passenger Corp.,
  145 F.3d 593 (3d Cir. 1998)..................................................................................... 24

Oddi v. Ford Motor Co.,
  234 F.3d 136 (3d Cir. 2000)............................................................................... 11, 27

Padillas v. Stork-Garmco, Inc.,
  186 F.3d 412 (3d Cir. 1999)..................................................................................... 10

Parkway Baking Company, Inc. v. Freihofer Baking Company (Inc.),
  255 F.2d 641 (3d Cir. 1958)..................................................................................... 15

Securacomm Consulting, Inc. v. Securacom, Inc.,
  224 F.3d 273 (3d Cir. 2000)..................................................................................... 22

Tire Company, Ltd. v. Carmichael,
  526 U.S. 137 S. Ct. 1167 (1999).............................................................................. 23

Toro Company v. Textron, Inc.,
  499 F. Supp. 241 (D. Del. 1980).............................................................................. 15

Voilas v. General Motors Corp.,
  73 F. Supp.2d 452 (D. N.J. 1999) ..................................................................... passim

Zelinski v. Columbia 300, Inc.,
  335 F.3d 633 (7th Cir. 2003) .............................................................................. 20, 21

## TABLE OF AUTHORITIES

**Statutes**

15 U.S.C. § 1117(a) ................................................................................................................... 22

15 U.S.C. § 1125(a) ................................................................................................................... 14

15 U.S.C. § 1115 ........................................................................................................................ 14

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| RED SONJA LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No.: |
| | ) 06-CV-00270 (SLR) |
| PARADOX ENTERTAINMENT, INC., | ) **PUBLIC VERSION** |
| | ) |
| Defendant. | ) |
| | ) |

### PLAINTIFF RED SONJA LLC'S OPPOSITION TO DEFENDANT PARADOX ENTERTAINMENT, INC.'S MOTION *IN LIMINE* SEEKING TO STRIKE PLAINTIFF'S EXPERT REPORT AND TO PRECLUDE PLAINTIFF FROM OFFERING ANY EVIDENCE OF DAMAGES AT TRIAL

Plaintiff Red Sonja LLC ("Red Sonja" or "Plaintiff") respectfully submits this Memorandum of Law in opposition to Defendant Paradox Entertainment, Inc.'s ("Paradox" or "Defendant"), motion *in limine* seeking to strike Plaintiff's expert report and to further preclude Plaintiff from offering any evidence of damages at trial.

### SUMMARY OF ARGUMENT

Paradox sets forth facts designed to show the purportedly unintentional nature of its acts. To do so, it completely omits those facts most damaging to this contention. In this brief, we shall demonstrate the intentional and malicious nature of Paradox's acts giving rise to the damages claimed. We submit that Paradox seeks to have all inferences, intent and malice effectively decided without a trial; yet these are essential to demonstrating Plaintiff's damages and the form in which they should be awarded.[1]

---

[1] As an initial matter, Paradox, through its former counsel, steadfastly refused to produce any documents retaining to Defendant's Conan the Barbarian ("Conan") character, even though such character is clearly relevant to Plaintiff's claims (and Defendant's counterclaims) in this action. Plaintiff has, in part, predicated its own motion *in limine* to preclude Defendant's reliance on such character at trial based on such refusal. Thus, it is both ironic and

Paradox begins its motion *in limine* by asserting that it purportedly specifically acquired the Red Sonya character in 2006. What Paradox acquired in 2006, however, was the Library of the Estate of Robert E. Howard containing materials that reference hundreds and hundreds of characters, *sans* <u>only</u> one Robert E. Howard character, Red Sonja. This Red Sonja character had been previously assigned by the Estate to the predecessor of Plaintiff, Red Sonja Corp., and has been, other than Conan, the biggest money earner of all the Robert E. Howard characters.

In the library acquired by Paradox, there was a story entitled <u>Shadow of the Vultures</u>, which contained, among other characters, Red Sonya – a character different from Plaintiff's Red Sonja character. Since that story was published in 1934, use of the Red Sonya character has been utterly dormant; on the other hand, Plaintiff's Red Sonja character has been long commercialized and is universally well known.[2]

---

disingenuous that Paradox opens up in the second sentence of its motion *in limine* and then repeats throughout such motion, its reliance upon and ownership of the Conan character.

[2]    Plaintiff's Red Sonja character has achieved world-wide notoriety, as set forth below, in comparison to Paradox's dormant Red Sonya character." Contrary to Paradox's contention, Plaintiff's Red Sonja was not in "hibernation," but rather has been actively commercialized and has infused itself in American culture. For instance,

- Red Sonja is the title of a major motion picture by Universal Studios co-starring Brigitte Nielsen and Arnold Schwarzenegger.

- Red Sonja was mentioned at the 2007 Academy Awards ceremony.

- Red Sonja was mentioned in a recent episode of the VH1 series "The Surreal Life."

- The character Red Sonja has starred in roughly 100 comics, under her own trademark which have sold millions of copies world-wide.

- The character Red Sonja has co-starred with the character Conan in over 60 Marvel comics.

- California Governor Arnold Schwarzenegger mentioned Red Sonja in his State of the State Address on January 6, 2004.

- The character Red Sonja has co-starred in comic books with Wolverine and Spiderman.

- The character Red Sonja has five crossover issues with Spiderman due out in 2007.

- The cover of the Comic Buyers Guide last year featured the character Red Sonja on the cover as the face of

Paradox attempts to characterize its admitted infringement and dilution of and unfair competition with Plaintiff's Red Sonja character by asserting that this case is based on nothing more than a "harmless" or "innocent" mistake on Defendant's part, and that Paradox mitigated all damages when, *after* being sued by Plaintiff, it agreed to not commercialize its Red Sonya character. Such simple disclaimer, however, does not immunize itself from what we shall demonstrate is its intentional infringement and dilution of Plaintiff's character and the damage it has caused to Plaintiff.

The real and uncontested facts of Paradox's intentional usurpation of Plaintiff's Red

---

Sword and Sandal fantasy.

- The Cover of Warman's comic book field guide from 2004 contained the character Red Sonja as a homage to the earlier Red Sonja Marvel work.

- The character Red Sonja was featured on the cover of "The Superhero Women: Featuring the Fabulous Females of Marvel Comics" by Stan Lee published in 1977.

- The Philadelphia Daily News featured the character Red Sonja in an article in December of 2006 under the heading "Heroine of the year."

- The character Red Sonja was featured in a recent article in "Smooth Magazine."

- The character Red Sonja was featured in "Wizard Magazine" multiple times.

- The character "Red Sonja" was referenced in the lyrics of "Lay it on ya" by Rap/Hip Hop artist Ugly Duckling released in September 2000.

- The movie announcement for the "Red Sonja" movie was in Variety Magazine and her picture was featured on a number of other relevant magazines and websites.

- The character Red Sonja has inspired fan theater groups, and impersonators.

- The character Red Sonja has inspired an Independent rock band to be named after her.

- A number of bloggers use the screen name Red Sonja.

- There was an "Advanced Dungeons and Dragons Book" entitled "Red Sonja Unconquered" published in 1986.

- Greenland band "Cracker" released a song Red Sonja which was published in 1995 on their album "Bob's Car" and which also appeared on the band F.S.K.'s album "The Sound of Music."

- The character Red Sonja was on an episode of the Conan television show. and

- The Red Sonja character was mentioned in the 'New York Review of Books' on April 7, 2005.

Sonja tells a far different and more sinister story than what Paradox's counsel puts before this Court.

Paradox's former CEO and president, Peter Sederowsky, who was fired from Paradox after his deposition, the reasons for which Paradox has refused to provide discovery, had been for years trying to acquire from Red Sonja Corp., the predecessor to Plaintiff, the Red Sonja character and trademark for Paradox. No such agreement was ever reached, though, because the price was more than Paradox was willing to pay. See Declaration of Arthur M. Lieberman dated May 31, 2007, at ¶ 3 ("Lieberman Decl.").

1.     After such unsuccessful negotiations, and on the eve of Paradox's acquisition of all the remaining characters of Robert E. Howard, except Plaintiff's Red Sonja, Mr. Sederowsky informed Arthur Lieberman, Red Sonja Corp.'s president, that Paradox was acquiring a literary story that contained the character Red Sonya and that Paradox intended to license it and no longer needed to acquire Red Sonja. Mr. Lieberman advised Mr. Sederowsky (an attorney) that Paradox could not do that because a single story does not convey trademark rights in such character (and, indeed, it is insufficient to even register with the United States Patent and Trademark Office), and that he well knew that having been in this field a long time. Mr. Sederowsky responded "we will see" and terminated the conversation. See Lieberman Decl., at ¶¶ 4 – 6.

It is in this light that the Court needs to view the wrongful conduct of Defendant. Defendant first issued a press release (highlighting Conan) that announced its purchase of "all" or the "entire[ty]" of Robert E. Howard's Library (*not true*) and then Paradox's own home page, boasted

4

> ... WE BUILD BRANDS," stating that "Paradox Entertainment, Inc. controls a
> vast library of entertainment properties and brings these in all aspects to the
> market. Our portfolio consists of such successful brands as ... Red Sonya [sic]...

highlighting an obscure character named Red Sonya, which was surely not famous (unless it was

confused with the long commercialized Red Sonja). The homepage then solicited Red Sonya's

availability for licensing. (Complaint, Exh. Y).

What inference can one possibly draw from Paradox's inclusion of Red Sonya in its press

release and on its website other than that Peter Sederowsky was acting on his promise.

Paradox then sat silent as entertainment's most famous daily magazine, the Hollywood

Reporter, as well various other online sources, misinterpreted Paradox's home page and

misreported that Paradox had acquired the Red Sonja character. Not content to leave such

misreporting to stand on its own, Paradox then republished the incorrect Hollywood Reporter

article, *without correction*, on its website – the same site where Paradox was simultaneously

soliciting licenses for its characters.

The above confusion caused by Paradox's so-called innocent posting on its website "of

an errant article written by a third party about the REH Library acquisition" no doubt led

Plaintiff's licensee, the producer of the upcoming Red Sonja movie, to be confused as to owner

of Red Sonja and its relationship with Red Sonya, as demonstrated on page 18 below.

Moreover, nothing provides clearer evidence of Paradox's malicious and unfairly

competitive conduct than its further attempt to "unhook" Plaintiff's contract with its

producer/licensee by offering its Conan property as leverage in an attempt to force Plaintiff's

licensee to halt or delay the production of the upcoming Red Sonja movie and thus to interfere

with Plaintiff's commercialization of its mark.

Joseph Gatta, a representative of Millennium/New Image, a licensee of Red Sonja from Plaintiff, testified:

REDACTED

Further, Paradox, which actively polices its comic book licensee, Dark Horse Comics, had published a response to a purported letter to the editor in a Conan comic which advised the public that it would be bringing Conan's love interest Red Sonya[3] (with a "y") back into the comic book series (although such a character never existed in the Conan series to begin with). (Complaint, Exh. X).  Such letter to the editor was no doubt fabricated.

---

[3]     Red Sonja, not Red Sonya, was Conan's love interest.

Significantly, neither Paradox nor Dark Horse has ever produced this purported letter to the editor – the clear inference being that it never existed.  But the response to this fake letter to the editor did certainly fulfill Paradox's Chief Operating Officer's August 20, 2005 e-mail to Dark Horse which stated:

# REDACTED

(August 20, 2005 e-mail from Fred Malmberg to Dark Horse Comics)

In another press release Defendant attached the registration symbol ® on its unregistered Red Sonya mark also, no doubt, to further confuse the two trademarks (Complaint, Exh. Z); however, there is no such federal registration for Red Sonya, and thus the use of the ® symbol is clearly in violation of the federal trademark laws.

The above is not the "stuff" of unintentional, harmless errors.  It evidences a clear intent to usurp the Red Sonja mark and to financially damage Plaintiff in the public marketplace.  It is clear that Paradox's publicity as to its purchase of the Red Sonya character, a character that had only appeared in **one** story approximately **70** years ago, was done with the intent to cause confusion and to piggy-back on the popularity of Plaintiff's Red Sonja character.  Nor are Paradox's actions something correctable by simply disseminating a press release stating to the effect:  we are sorry to those who were confused!  Mr. Tarter addresses that issue and concludes that such a retraction is completely insufficient to overcome the amount of publicity Defendant had derived through its public disclosures.

\* \* \*

Paradox in its motion *in limine* seeks not only to strike Plaintiff's expert report, but also seeks to preclude Plaintiff from offering any evidence at trial of its damages on each of its claims, whether for unfair competition (Count I), common law trademark infringement (Count II), statutory trademark infringement (Count III) or trademark dilution (Count IV). Paradox's memorandum of law, however, provides zero basis for the Court to preclude all evidence of Plaintiff's damages, and, as demonstrated below, its position that Mr. Tarter's report should be stricken is without basis in law.

Mr. Tarter as an expert is not testifying to prove Paradox's liability or to the existence of confusion in the marketplace -- this will be demonstrated through documentary evidence and testimony. Rather, Mr. Tarter's testimony is being provided to set forth the amount of monetary damages needed to make Plaintiff whole. Similarly, Mr. Tarter's report is not being proffered to prove that Paradox is liable to Red Sonja for corrective advertising expenses, but rather to provide a means for calculating the amount such corrective advertising expenses would cost to repair the damage to Plaintiff's "Red Sonja" mark inflicted by Defendant. Thus, despite Paradox's assertions to the contrary, there is no need for Mr. Tarter to demonstrate a causal link between the harm incurred by Red Sonja and the amount of damages, nor would one expect such an expert in his report to do so when calculating Plaintiff's damages.

Mr. Tarter has decades of experience in protecting entertainment values through advertising and will testify that, after achieving the level of publicity obtained by Paradox for its Red Sonya character (which publicity was obtained by Paradox releasing a press release announcing its acquisition of the so-called "famous" Red Sonya in the press and on its website), a simple corrective press release and web announcement is insufficient to correct its prior confusing public proclamations and that, rather, what is required are certain levels of publicity to

first offset and then turn around in the public's mind the statements that Paradox sought to infuse in the marketplace.  Simply stated, Mr. Tarter is no doubt sufficiently qualified, and his non-scientific testimony is sufficiently reliable to pass the test for admissibility under <u>Daubert v. Merrell Dow Pharms., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Company, Ltd. v. Carmichael,</u> 526 U.S. 137, 119 S. Ct. 1167 (1999); his report is not speculative, conclusory or unsupported as contended by Paradox, and is properly based on his decades-long experience in the advertising and entertainment industry.

## ARGUMENT

## POINT I

### THE COURT'S DETERMINATION ON THE ADMISSIBILITY OF MR. TARTER'S REPORT SHOULD NOT BE RENDERED UNTIL HE HAS BEEN DEPOSED OR EXAMINED AT TRIAL OR AT A DAUBERT HEARING

The Third Circuit has "long stressed the importance of in limine hearings under Rule 104(a) in making the reliability determination required under Rule 702 and <u>Daubert</u>." <u>Padillas v. Stork-Garmco, Inc.</u>, 186 F.3d 412, 417 (3d Cir. 1999). This provides the court and the parties with the appropriate means and forum to explore the qualifications of an expert and the methodology underlying her opinions because, under examination, she can explain or elaborate upon the bases for her opinions. An expert would thus have the opportunity to defend her written opinion with oral testimony, without concern of the written opinion being excluded on the basis that an opposing party pre-deposition claimed it to be conclusory and thus subject to preclusion. As the party proffering the testimony has the burden of establishing admissibility, and the requested sanction of preclusion is drastic, the proponent of the expert report should be readily provided the opportunity to defend it. <u>See</u> <u>Padillas</u>, 186 F.3d at 417-18 ("The need for this opportunity is compelling because the burden of establishing admissibility by a preponderance of the evidence . . . is on the proponent"); <u>Kilmon v. Community Services, Inc.</u>, No. CIV A 96-159-GMS, 2000 WL 1728300, at *8 (D. Del. Mar. 24, 2000) (same).

Indeed, in <u>Bowersfield v. Suzuki Motor Corporation</u>, 151 F. Supp.2d 625 (E.D. Pa. 2001), the court implied that it was premature for defendant to move against an expert report on the grounds, as sought here, that it was purportedly conclusory and without methodology where defendant did not examine the expert to test his theories or before a <u>Daubert</u> hearing was held. <u>Id.</u> at 632 (interpreting Third Circuit law). Denying defendant's motion *in limine* even after a

court-ordered <u>Daubert</u> hearing had been held, the court criticized defendant for moving against the expert report without first examining the expert stating, "What defendants should have done upon receipt of [the expert's] conclusory report was to take his deposition, but they did not do so." <u>Id.</u> The court further noted that the "[t]estimony of an expert on matters within the expert's expertise but outside of the expert's report is not only permissible at trial, but the exclusion of such testimony may be reversible error.... An expert may testify beyond the scope of his report absent surprise or bad faith." <u>Id.</u> at 631 (citations omitted).

Moreover, when expert testimony is proffered at a bench trial, the court's gatekeeper function under <u>Daubert</u> is arguably "less essential" than at a jury trial, where the court needs to be more careful of what testimony reaches the trier of fact – the jury.[4]   <u>See Clark v. Richman</u>, 339 F. Supp.2d 631, 648 (M.D. Pa. 2004).   Accordingly, in <u>Clark</u>, the court denied plaintiff's motion to strike a portion of defendant's expert testimony based upon <u>Daubert</u>, ruling that "the issues will best be resolved at [the bench] trial rather than now in writing or following a <u>Daubert</u> hearing sometime prior to trial." <u>Id.</u>

Here, Paradox seeks to exclude the expert testimony of Mr. Tarter without ever so much as requesting an opportunity to depose or otherwise examine Mr. Tarter in an attempt to better explore his qualifications or the methodology and rationales underlying his conclusions.[5]

---

[4]    "We remain cognizant that existing Third Circuit precedent does not indicate whether a district court's obligations to hold a <u>Daubert</u> hearing differ for bench trials.  <u>See Chase Manhattan Mortg. Corp. v. Advanta Corp.</u>, No. CIV A 01-507 KAJ, 2004 WL 422681, at *9-10 (D. Del. Mar. 4, 2004).   Yet, like the <u>Chase Manhattan</u> court, we recognize that existing Third Circuit case law does not indicate whether a decision to exclude expert testimony must be decided prior or subsequent to the bench trial." <u>Clark</u>, 339 F. Supp.2d at 648.

[5]    Indeed, this very fact distinguishes nearly all of the cases relied upon by Defendant to support its argument that Mr. Tarter's report should be excluded as unreliable.   In nearly every case cited by Defendant, the expert witness was either deposed, examined at a <u>Daubert</u> hearing, or actually testified at trial, before the Court rendered a decision on whether to exclude the expert's testimony. <u>See General Electric Co. v. Joiner</u>, 522 U.S. 136, 136, 118 S. Ct. 512, 514 (1997) (expert witnesses were deposed); <u>Elcock v. Kmart Corp.</u>, 233 F.3d 734, 738 (3d Cir. 2000) (holding that there should have been a <u>Daubert</u> hearing to determine the reliability of expert's testimony); <u>Oddi v. Ford Motor Co.</u>, 234 F.3d 136, 141 (3d Cir. 2000) (defendant moved for summary judgment on the grounds that plaintiff's expert testimony was inadmissible <i>after</i> deposing the experts); <u>Heller v. Shaw Industries, Inc.</u>, 167 F.3d 146, 151 (3d Cir. 1999) (court held a <u>Daubert</u> hearing before deciding upon motion <i>in limine</i> to exclude expert

Defendant strategically chose not to conduct such an examination before making the instant motion; however, it should not be rewarded for such strategy. Defendant apparently did not want Mr. Tarter to have the opportunity to further explain his qualifications, methodology and conclusions. Clearly, given the important role that Mr. Tarter's testimony will play in providing this Court with guidance in determining the amount of damages suffered by Plaintiff, Defendant's tactic of seeking to silence Mr. Tarter without Plaintiff being permitted to have a right to more fully develop and explain Mr. Tarter's methods and findings should not be countenanced.

Accordingly, this Court, if necessary, and we submit it is not, should direct a <u>Daubert</u> hearing be held before determining Paradox's motion *in limine*. Moreover, as this case is a bench trial, we further submit that it would be more efficient for the Court to reserve decision on the instant motion until after the Court hears Mr. Tarter's testimony on direct and cross, and then to rule on the admissibility of his testimony in connection with its trial decision on the merits.

---

testimony); Benjamin v. Peter's Farm Condominium Owners Assoc., 820 F.2d 640, 642 at fn. 5 (3d Cir. 1987) (plaintiff's expert witness testified and was cross-examined at trial before defendant moved to strike testimony); Gumbs v. International Harvester, Inc., 718 .2d 88, 98 (3d Cir. 1983) (expert testified at trial); Astrazeneca v. Tap Pharmaceutical Prods., Inc., 444 F. Supp.2d 278, 285 (D. Del. 2006) (expert deposed); Advanced Medical Optics, Inc. v. Alcon, Inc., No. CIV A 03-1095-KAJ, 2005 WL 782809, at *2 (D. Del. April 7, 2005) (expert deposed). As Paradox had not so much as even requested a deposition of Mr. Tarter prior to bringing this motion, each of these cases is inapplicable.

**POINT II**

**DEFENDANT HAS FAILED TO DEMONSTRATE THAT MR. TARTER'S
TESTIMONY SHOULD BE EXCLUDED OR THAT PLAINTIFF SHOULD BE
PRECLUDED FROM PRESENTING EVIDENCE OF DAMAGES AT TRIAL**

A.    The Record Contains Evidence Sufficient To Prove
       The Elements Of A Claim For Monetary Damages Arising
       From Defendant's Wrongful Conduct and Plaintiff's Damages
       Expert Need Not Prove Those Elements Independently

Although Defendant characterizes its motion as one to strike an expert report by way of

Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), Defendant's first argument as to the

deficiency of Mr. Tarter's report actually eschews the Daubert analysis, instead arguing that Mr.

Tarter's report is insufficient because it fails to demonstrate all of the elements necessary for

Plaintiff to be awarded damages for trademark infringement.  Then, inexplicably, Defendant's

motion demands that not only should Mr. Tarter's report be stricken, but also that Plaintiff be

precluded from offering any evidence of damages at trial whatsoever on each of its four claims.

However, Defendant itself seems cognizant of just how baseless this request for total preclusion

of all damage evidence is as it does not even warrant any discussion in Defendant's own

memorandum of law.

Defendant contends that Mr. Tarter's report (he has not yet been deposed or testimony

taken from him) fails to demonstrate a causal link between the harm caused by Paradox's

wrongful conduct and the amount of Plaintiff's damages.  However, Mr. Tarter's testimony is

not being offered to prove liability, but rather, to set forth the amount of monetary damages

needed to make Plaintiff whole.  There is no need for Mr. Tarter to demonstrate a causal link

between the harm incurred and the amount of damages, nor would one expect such an expert in

his report to do so when addressing the amount of damages required to make Plaintiff whole and

the calculation of such damages.  See Children's Medical Center Of Dallas v. Columbia Hospital

13

At Medical City Dallas Subsidiary, L.P., No. 3-04-CV-2436-BD, 2006 WL 616000, at *7 (N.D. Tex., Mar. 10, 2006) ("It is not necessary for Jacobs, or any other damages expert, to establish the requisite causal connection between liability and damages" because "plaintiff may establish causation by other means"). Rather, Plaintiff can prove the elements of its claims for entitlement to trademark, dilution and unfair competition damages, including causation, through testimonial and documentary evidence. As demonstrated herein, the record contains evidence demonstrating Plaintiff's entitlement to damages, yet, for no cause whatsoever, Defendant demands that Plaintiff be precluded from presenting all such damages evidence at trial for each of its causes of action. Clearly, this argument is without merit.

> 1.    There Is Sufficient Proof For An Award
>        Of Damages On Each Cause Of Action

Plaintiff's Complaint alleges four different causes of action – (1) Count I – Unfair Competition Pursuant to 15 U.S.C. § 1125(a); (2) Count II – Common Law Infringement and Unfair Competition Pursuant to State Statutes and Common Law; (3) Count III – Trademark Infringement Pursuant to 15 U.S.C. § 1115; and (4) Count IV – Trademark Dilution Pursuant to the Lanham Act. For each of these causes of action, there are different, albeit similar, requirements that must be met to state a claim for monetary damages. As demonstrated herein, there is more than sufficient documentary and testimonial evidence demonstrating Plaintiff's entitlement to monetary damages for each of these claims. Certainly, Defendant has presented no reason whatsoever why any of this evidence related to Plaintiff's entitlement to recover damages should be precluded from trial.

a.    Counts I, II and III – Unfair Competition Under The Lanham Act,
      Common Law Infringement and Unfair Competition, and
      Trademark Infringement Under The Lanham Act

In general, in order to state a claim for monetary damages arising from unfair competition

or trademark infringement, courts throughout the country, including the Third Circuit and the

District of Delaware, require that a Plaintiff demonstrate that the offending use of the mark in

question has caused a degree of actual confusion in the relevant marketplace or that the

defendant acted with an intent to deceive.  A & H Sportswear Inc. v. Victoria's Secret Stores,

Inc., 166 F.3d 197, 209 (3d Cir. 1999) ("damages . . . were measured based on actual confusion

even though liability may have been sustained under a lesser burden"); Parkway Baking

Company, Inc. v. Freihofer Baking Company (Inc.), 255 F.2d 641, 648 (3d Cir. 1958) (in the

context of a false advertising claim under the Lanham Act, Plaintiff must prove actual consumer

deception); Accu Personnel, Inc. v. Accustaff, Inc., 846 F. Supp. 1191, 1215 (D. Del. 1994);

Toro Company v. Textron, Inc., 499 F. Supp. 241, 254 (D. Del. 1980).[6]

"[A]lthough the quantum of damages . . . must be demonstrated with specificity, courts

may engage in some degree of speculation in computing the *amount* of damages, particularly

when the inability to compute them is attributable to the defendant's wrongdoing." Australian

Gold, Inc. v Hatfield, 436 F.2d 1228, 1241 (10th Cir. 2006) (citation omitted) (emphasis in

original); Burndy Corporation v. Teledyne Industries, Inc., 748 F.2d 767, 771 (2d Cir. 1984).

Direct evidence of both actual confusion and loss of licensees arising from Defendant's

misuse of the "Red Sonya" mark through trademark infringement and unfair competition has

---

[6]    In a 2002 case which was not selected for publication in the Federal Reporter, the Third Circuit ruled that a
trademark holder need not prove actual confusion to obtain an award for damages in a trademark infringement
action.  Choice Hotels International, Inc. v. Pennave Associates, Inc., Nos. 01-1632, 01-1925, 01-2397, 43 Fed.
Appx. 517, 519, 2002 WL 1986509, at *1 (3d Cir. Aug. 28, 2002).  However, as Plaintiff has presented evidence of
actual confusion and damages, there is no need to discuss whether a mere likelihood of confusion is sufficient for an
award of monetary damages, which there no doubt is here.

been demonstrated.[7]   Indeed, Paradox's April 27th press release acknowledges such confusion

when it, although failing to disclose this litigation, states:

> it has come to our attention that there may be some Conan and Robert E. Howard
> fans or licensees who could be confused about the origins and ownership of Red

---

[7]      The Hollywood Reporter article erroneously reported that Paradox's purchase of the Robert E. Howard Library "includes female sword-wielder Red Sonja." This article used the spelling of Plaintiff's Red Sonja character and identified her as a "sword-wielder," a characteristic associated with Plaintiff's Red Sonja, who bears the moniker "She-Devil with a Sword," rather than with Robert E. Howard's original character from the 16th Century, Defendant's Red Sonya, who used guns as well as swords, and who was mentioned in the 1934 story Shadow of the Vultures. (Complaint, at ¶ 43).

ComicBookMovie.com's article reporting on Paradox's purchase was headlined: "Solomon Kane, Red Sonja Projects Planned," using the spelling of Plaintiff's character. The article reported that Paradox had obtained Red Sonja and identified her as one of several Howard characters "which appeared in 1930s pulp magazines and were made into comics in the 1970s and 1980s." (Complaint, at ¶ 45 and Exh. V). This description of a character made into comics in the 1970s and 1980s refers directly to Plaintiff's character, and not to any character allegedly acquired by Paradox.

Industry commentators valiantly attempted to parse out the confusing distinctions between Plaintiff's Red Sonja and Defendant's 16th Century Red Sonya character. ICV2, reporting on the sale, stated that Paradox had obtained Red Sonya. However, it also alerted readers to the problems in distinguishing the two: "One key point for pop culture retailers -- while Dark Horse's Conan comic book series ... would be licensed from Paradox, Dynamite Entertainment's Red Sonja comic book series is not. ... Paradox now owns the rights to Robert E. Howard's Red Sonya (note the slight spelling difference), a gun-toting female pirate from a much later period in history who never crossed paths with Conan."

Demonstrating the convoluted gymnastics required to keep the two characters distinct, Newsarama.com, reporting on Paradox's purchase, noted that Plaintiff's Red Sonja character is not within the "universe" of characters purchased by Paradox.

> Paradox does [own] the rights to Red Sonya, while the Red Sonja Corporation retains the rights to Red Sonja. The difference of course, being in the spelling of the last name. 'Red Sonya,' which Paradox now owns, is the original Howard version, a female pirate who was *not* a contemporary of Conan. 'Red Sonja' is the character derived from Howard's works by Roy Thomas and Barry Windsor-Smith in 1973. 'Sonja' is the character who previously appeared in Marvel's Conan comics and her own miniseries, while 'Sonya' is known perhaps best to Howard aficionados.

(Complaint, at ¶ 46 and Exh. W).

The article's only two pictures depict Defendant's Conan and Plaintiff's Red Sonja, and it goes on to state:

> As for how this [transaction] impacts the Howard properties most relevant to comic fans, namely Dark Horse's **Conan** and Dynamite Entertainment's **Red Sonja** series [Plaintiff's licensee], the short version is, it doesn't.

(id.)(emphasis in original).

Individual postings responding to Newsarama.com's article, reflected the confusion in the marketplace with comments such as: "That is so confusing."; "so, uh, does this mean that 'Red Sonja' is owned by Roy Thomas and Barry Windsor-Smith?"; "My mind is bleeding. It's a good job they're called Paradox." (Complaint, at ¶ 47).

Sonya (with a "y") and Red Sonja (with a "j") and their relationship to Hyboria. We don't believe that there should be any such confusion and would like to do all that we can to clear up any that might exist. . . . [Red Sonya] had absolutely nothing to do with Conan, or the Conan world of Hyboria.[8]   The Red Sonja (with a "J") character . . . was set in Conan's Hyborian Age.

Further, Paradox offered a third party an exclusive license to use the "Age of Hyboria" despite the fact that it was fully aware that Plaintiff's Red Sonja character was set in the Age of Hyboria, and that Defendant's own Red Sonya character was not. (Lieberman Decl. at ¶ 8)  By so doing, Defendant was attempting to limit the extent to which the Red Sonja character could be used, even though such character had for years been associated with the Age of Hyboria and was, after Conan, the second highest grossing Hyborian character ever.  Id.

Moreover, at his deposition, the principal of Emmett Furla Films, George Steven Furla, a

---

[8]    Notwithstanding the above position taken by Paradox in its April 27th Press Release, Plaintiff in Count I of its Complaint had to sue asserting unfair competition:

> On February 3, 2006, even before announcing its acquisition of the Howard library, **defendant applied to the USPTO to register the word "HYBORIA"** as a trademark and service mark in multiple classes and for hundreds and hundreds of goods and services including virtually every type of goods and services in which RED SONJA could ever possibly appear. (*See* USPTO TESS printouts, attached hereto as Exhibit AA.)

> **Amongst the hundreds of products to which defendant seeks to apply its trademark for the word "HYBORIA" are the very products in which RED SONJA currently appears** including comic books, motion pictures, novels, posters, lithographs, toy figurines, trading cards and other media, and in which she is routinely identified as a character of the Age of Hyboria.

> **Defendant's applications were made with the full knowledge that the "Age of Hyboria" and the word "HYBORIA" are equally identified with RED SONJA, a character it does not own, as with Conan.**  When defendant made its application it also knew that Red Sonja LLC has the right to use the word "HYBORIA" or its variants in all of its RED SONJA products, has used it in virtually all of its products consistently for over 30 years, since RED SONJA's first public appearance, and continues to use it to this day.

> **RED SONJA is well-known as a character of the Hyborian Age** and it is one of her key identifying characteristics.  In addition to using the word or its variants in each of its products, Red Sonja LLC also uses the word "HYBORIA" in its advertising, marketing and promotional materials publicizing its RED SONJA products in the marketplace.

(Complaint, at ¶¶ 56 - 59) (emphasis added.)

licensee of Plaintiff's Red Sonja mark and a producer of the upcoming Red Sonja movie, indicated that he was confused by Paradox's use of Red Sonya:

REDACTED

(Emmett Furla Tr. at p. 48, lns. 5 – 18) (emphasis added).   Mr. Furla, a sophisticated businessman who is preparing to produce the next Red Sonja movie, was himself uncertain as to the ownership of the character his company had licensed.

In addition to this proof of confusion, Arthur Lieberman testified as to the damaging effect that the confusion Paradox inflicted had upon Plaintiff's ability to commercialize its Red Sonja character:

> A.     The damages as best I can ascertain them now from speaking to any number of people are somewhere between 750 and a million something.  And where it comes from is straightening the record in the marketplace.
>
> When Conan was announced as a movie, I must have gotten 150 calls because it was being announced as a movie and because people wanted to know what the licensing opportunities were.  As I said to you earlier in our conversation, as ofttimes happens in this particular field, and being involved with licensing companies for at least 20 years, maybe – as a matter of fact, I've been involved in licensing companies now for 30 years, and I sat on the board of one of the largest licensing companies.  You have two ways to approach a marketplace.  One is, you approach

prospective licensees and attempt to sell them. Tough job.

The second is you raise the profile of your character sufficiently so that the licensees approach you. The second works better. The negotiating posture is different. They're coming to you desiring a license. If you can be standoff-ish with respect to it, it negotiates your rates better.

With Conan, that's exactly what happened. We pushed and pushed and pushed Conan. But before Conan was announced as a movie, there was very little movement in Conan licenses.

In Red Sonja, Red Sonja was announced as a movie very close in time to your announcement that you owned Red Sonya with a Y, the consequence of which we got no calls, not some, not diminimus, zero calls looking for a license. That surprised me. That surprised people that I knew in the industry and that know me in the industry.

(Arthur Lieberman Tr., at p. 348, ln. 21 – p. 350, ln. 16).

Thus, it is clear that, regardless of the expert testimony proffered by Mr. Tarter, Plaintiff has presented evidence concerning actual confusion and the damaging effect such confusion has had on it, and Plaintiff intends on presenting additional evidence of confusion at trial. Clearly, there is no reason why Plaintiff should be precluded from presenting any such evidence at trial.

           b.     Count IV -- Trademark Dilution Pursuant To the Lanham Act

The Federal Trademark Dilution Act, codified as part of the Lanham Act at 15 U.S.C.A. 1125(c), expressly provides for an award of monetary damages if certain conditions are met. Specifically, among other things, if plaintiff proves that the defendant willfully intended to trade on the owners' reputation or to cause dilution of the famous mark, then the owner of the diluted mark is entitled to recover monetary damages.

As is set forth in greater detail in the Declaration of Arthur Lieberman, Defendant willfully and intentionally sought to trade upon and dilute the popularity and reputation of Plaintiff's Red Sonja mark when publicizing its ownership of and intent to exploit the Red Sonya

character. Paradox sought to license the Red Sonya character even after being advised that they had no right to do so, and no doubt used the similarity in the names to generate the appearance that the two characters were the same. (Lieberman Decl. at ¶¶ 4-7)

As with the first three counts discussed supra, Mr. Tarter's report is not meant to demonstrate Paradox's liability to Plaintiff, but rather, to provide a means for calculating damages that Plaintiff should be awarded. Thus, regardless of Mr. Tarter's report, Plaintiff has presented more than sufficient evidence to support an award of monetary damages, and Defendant has given no valid reason why any such evidence should be precluded at trial.

        2.    Proof of Entitlement to Prospective Corrective Advertising Expenses

Defendant contends that Mr. Tarter's report fails to demonstrate that Plaintiff is entitled to an award of corrective damages. However, once again, Mr. Tarter's report (and he has not yet been deposed), is not being offered to prove that is Paradox is liable to Plaintiff for corrective advertising but rather, to provide a means for calculating the amount such corrective advertising would cost to repair Plaintiff's "Red Sonja" mark. Plaintiff has presented evidence through deposition testimony and will present additional evidence sufficient to demonstrate its entitlement to an award of corrective advertising expenses.

The law is well settled that Red Sonja is entitled, as part of its monetary damages, to recover the amount it has or will need to expend on publicity and advertising to correct marketplace confusion caused by the infringement. See Zelinski v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003) (holding that a jury could find that plaintiff was entitled to corrective advertising costs); Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1995); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374-75 (10th Cir. 1977); Callaway Golf Co. v. Slazenger, 384 F. Supp.2d 735, 740 (D. Del. 2005) ("Although corrective

advertising damages are usually for costs incurred prior to trial, damages may be awarded to allow an aggrieved party to conduct corrective advertising after trial"). In Callaway, the court noted, however, that, to be entitled to an award of corrective advertising costs not yet actually incurred, there must be "an economic rationale" for such an award. Callaway, 384 F. Supp. 2d at 740. Accord Zelinski, 335 F.3d at 640 (plaintiff "had to show that 'repair' of the old trademark, rather than adoption of a new one, is the least expensive way to proceed"); Big O Tire, 561 F.2d at 1375 (awarding prospective corrective advertising costs where plaintiff was financially unable to launch corrective advertising campaign before initiating litigation); cf., Adray, 76 F.3d at 988-989 (holding that prospective corrective advertising awards should not be limited to cases where the plaintiff was financially unable to launch corrective campaign earlier).

While the court in Callaway ultimately refused to award prospective corrective advertising costs because there was no economic rationale for such an award, such finding was based on the fact that plaintiff was no longer marketing the product which was the subject of the litigation. This is not the case here; the opposite is true as Plaintiff is currently and will continue to actively and aggressively market and commercialize its mark. Indeed, Plaintiff, through its licensees, continues to market and sell its Red Sonja comic and related products such as sculptures and posters throughout the United States and Red Sonja's licensee is working on producing an upcoming feature movie to be produced by Emmett Furla and New Image Productions.

Further, given that the infringed mark concerns a character that has long existed, it would be impracticable for Plaintiff to simply adopt a new mark to mitigate its damages. Such rationale proposed by certain courts as a basis to deny the imposition of corrective expense damages does not apply here. Quite simply, the Red Sonja character is Plaintiff's mark and that is what this

case is about. Here, Plaintiff cannot create a new character to repair the existing one. Further, Plaintiff's testimony has demonstrated that Plaintiff had been and remains in no financial condition to launch a corrective advertising campaign on its own prior to starting this litigation, as it has not yet turned a profit, which financial condition has only been exacerbated by the lost licensing opportunities caused by Defendant's wrongful conduct. The testimony provided in discovery thus clearly demonstrates the economic rationale necessary to support an award of prospective corrective advertising expenses, and there is no reason why any such evidence should be precluded from trial.

### 3. Plaintiff Is Entitled To Recovery Of Its Attorneys' Fees For Paradox's Intentional Infringement And Other Wrongful Conduct

The Lanham Act permits a prevailing plaintiff to recover costs, along with damages and profits, as a matter of course and allows a recovery of attorneys' fees in "exceptional" cases. 15 U.S.C. § 1117(a). In order to award attorneys' fees, first a court "must decide whether the defendant engaged in any culpable conduct," which would include bad faith, fraud, malice, and knowing infringement as non-exclusive examples of the sort of culpable conduct that could support a fee award. Ferrero U.S.A., Inc. v. Ozak Trading, Inc., 952 F.2d 44, 47 (3d Cir. 1991) . The culpable conduct may relate not only to the circumstances of the Lanham Act violation, but also to the way the losing party handled himself during the litigation. Securacomm Consulting, Inc. v. Securacom, Inc., 224 F.3d 273, 282 (3d Cir. 2000) . Second, if a court finds culpable conduct, it then needs to decide whether the circumstances are "exceptional" enough to warrant a fee award. See Ferrero, 952 F.2d at 49 (noting that the court may consider factors other than the defendant's culpable conduct, such as the closeness of the liability question and whether the plaintiff suffered damages). As demonstrated above, Paradox's intentional wrongful conduct, combined with its bad faith and malice in knowingly deciding to infringe Plaintiff's Red Sonja

22

mark as well as its wrongful conduct in defending against Plaintiff's claims, mandates an award of attorneys' fees. Clearly, Paradox's motion cannot preclude such an award.

B.    Mr. Tarter's Testimony Is Admissible Under Daubert

In Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167 (1999), the United States Supreme Court ruled that the gatekeeper function of the courts with respect to the admissibility of scientific expert testimony set forth in Daubert applies to the admissibility of non-scientific expert testimony as well. Id., 526 U.S. at 147–49, 119 S. Ct. at 1174–75. However, the Court cautioned to note that the Daubert principles, which were formulated in the context of scientific expert testimony, may not always be applicable to non-scientific testimony such as economic testimony, and that other factors such as practical experience and general knowledge in a given field may be more relevant for such types of non-scientific testimony. Id., 526 U.S. at 150-51, 119 S. Ct. at 1175.

The Third Circuit has clarified that the court's "gatekeeper function" under Daubert breaks down into a determination of whether given testimony is sufficient in three areas: (a) qualification – that is, whether the expert is qualified in the area he testifies, (b) reliability – that is, whether the testimony can be used to assist the trier of fact, and (c) fit – that is, whether there is a connection between the testimony and the facts of the case so as to render the testimony relevant. In re Paoli R.R. Yard PCB Litig., 35 F.3d 717, 741–43 (3d Cir. 1994). Mr. Tarter is no doubt sufficiently qualified, and his non-scientific testimony is sufficiently reliable to pass the test for admissibility under Daubert and Kumho Tire.[9]

---

[9]    Defendant does not argue that Mr. Tarter's testimony does not "fit" within the facts of the case. Certainly, it cannot be disputed that, if he is qualified and his testimony sufficiently reliable, then his opinion relating to the calculation of damages caused by Defendant's wrongful conduct is relevant. Thus, the issue of "fit" will not be further addressed.

1.    <u>Mr. Tarter Is Qualified To Opine On Lost Opportunity Costs</u>

The Third Circuit has adopted a "liberal policy of admissibility" with respect to the qualification of experts.  <u>In re Paoli</u>, 35 F.3d at 741.  Indeed, an expert witness need not be formally educated in his given area of expertise, but rather, "can qualify on the basis of practical experience" or general knowledge.  <u>Lauria v. National R.R. Passenger Corp.</u>, 145 F.3d 593, 599 (3d Cir. 1998); <u>In re Paoli</u>, 35 F.3d at 741 ("We have eschewed imposing overly rigorous requirements of expertise and have been satisfied with more generalized qualifications"); <u>Voilas v. General Motors Corp.</u>, 73 F. Supp.2d 452, 457 (D. N.J. 1999).

Mr. Tarter more than meets the liberal standard for being qualified as an expert witness in this case.  Indeed, it is quite telling that Defendant does not generally object to Mr. Tarter's qualifications.  Rather, it merely argues that he is unqualified to render his opinion as to the value of the lost licensing opportunities caused by Defendant's wrongful conduct.  However, reading, as Defendant improperly seeks to do, that Mr. Tarter's qualifications are limited to "the purchase, sale and barter of advertising and media time," such completely ignores the full scope of his experience and how it has provided him with expertise in understanding the value of licensing opportunities.

Upon reviewing Mr. Tarter's full career history, which includes being the Chairman or Board Member of several media companies in the areas of radio (Freedom Broadcast Foundation), cinema (Screenvision Cinema Network), and print and publishing (Caribbean News Services, Inc. and Affinity Communications Corp.), as well as his past being recognized as an expert in the areas of media advertising and barter worldwide, it is clear that Mr. Tarter's expertise extends to advertising, marketing and media in general.  Further, his *curriculum vitae* also demonstrates significant experience in the financial field through his connection with Epic

Associates, LLC, a developer of financial structures, and Asset Marketing Systems, LLC, the world's largest direct distributor of fixed and equity indexed annuities. His experience and expertise necessarily includes how to effectively utilize advertising and media outlets to exploit and maximize the value of a media product, which includes trademarks and licensing opportunities. Such experience provides him with the ability to opine on the marketing, advertising and exploitation of licensing and cross-promotional opportunities for products, and thus he is certainly qualified to opine on the lost licensing opportunities caused by Defendant's wrongful usurpation of Plaintiff's Red Sonja mark.

In any event, as explained supra, if Defendant or this Court wishes to probe Mr. Tarter's specific qualifications in greater detail, such examination could appropriately be taken at a deposition, at a Daubert hearing or at trial; preclusion based solely on his report is simply improper and premature. It would be inappropriate to rule that Mr. Tarter is unqualified for any purpose simply based on what Defendant improperly contends are conclusory opinions contained in his report. See Kilmon, 2000 WL 1728300, at *8; Bowersfield, 151 F. Supp.2d at 632.

2.    Mr. Tarter's Opinions, Which Are Based On His Extensive
      Practical Experience In The Fields Of Media, Advertising
      And Finance, Are Sufficiently Reliable For Admissibility

"The Third Circuit has cautioned against applying the reliability requirement too strictly, . . . explaining that 'the reliability requirement must not be used as a tool by which the court excludes all questionably reliable evidence.'" Voilas, 73 F. Supp.2d at 460 (quoting In re Paoli, 35 F.3d at 742). This need for flexibility in determining an expert opinion's reliability is all the more essential with respect to non-scientific expert testimony.

In general, an opinion's reliability is based upon whether such opinion is founded upon "good grounds." In re Paoli, 35 F.3d at 742; Voilas, 73 F. Supp.2d at 460. Oftentimes, this

inquiry looks to determine whether a proper scientific method or procedure was followed, and it was in this context in which the <u>Daubert</u> factors were crafted. However, with respect to non-scientific expert testimony, the <u>Daubert</u> factors are not always relevant to the inquiry and thus may not be applicable at all. <u>Voilas</u>, 73 F. Supp.2d at 461. The particular reliability inquiry a court makes must be based upon the facts and circumstances of that individual case. <u>See Kumho Tire</u>, 526 U.S. at 150, 119 S. Ct. at 1175.

Indeed, as the Supreme Court in <u>Kuhmo</u> noted, in certain cases, the "relevant reliability concerns may focus upon a person's knowledge or experience." <u>Kumho Tire</u>, 526 U.S. at 150; 119 S. Ct. at 1175; <u>Voilas</u>, 73 F. Supp.2d at 461. "This is so because in the nonscientific world, theories are often not subject to testing or experimentation." <u>Voilas</u>, 73 F. Supp.2d at 461.

Thus, courts in the Third Circuit have found reliable and admissible non-scientific expert testimony that was based upon the witness's review and analysis of relevant documents and testimony in light of his experiences rather than some clearly defined and testable scientific method. <u>See, e.g.</u>, <u>Horodenski v. Commissioner of Social Security</u>, No. 06-1813, 2007 WL 412424, at *2 (3d Cir., Feb. 7, 2007) (vocational expert testified "based on his review of Department of Labor studies and his own personal experience as a vocational expert"); <u>Cantor v. Perelman</u>, No. CIV A 97-586 KAJ, 2006 WL 3462596, at *7– 8 (D. Del., Nov. 30, 2006) (financial expert's testimony was based on his experience); <u>Voilas</u>, 73 F. Supp.2d at 461–62 (economist expert).

For example, in <u>Cantor v. Perelman</u>, the court found unavailing defendant's argument that the opinion of plaintiff's expert was unreliable, and thus inadmissible, because they were supported only by personal experience. 2006 WL 3462596, at *7. The court ruled that, under Federal Rule of Evidence 702, plaintiff's expert's "experience as a corporate lawyer and his

service on several boards of directors can form the basis for reliable expert testimony." Id.

Indeed, in supporting the case for experience-based testimony, the court in Cantor distinguished Oddi v. Ford Motor Co., 234 F.3d 136 (3d Cir. 2000), a case relied upon by Defendant in the present motion. The Court noted that, in Oddi, the testimony was unreliable because it concerned a subject in which one would expect a testable hypothesis – vehicle design – and the testimony lacked an identifiable methodology. Cantor, 2006 WL 3462596, at *8. However, in Cantor, the testimony concerned business customs and practices, which was not easily subject to a testable hypothesis, and thus, the court found it acceptable to rely upon the training and experience of the expert in lieu of a testable hypothesis. Id.; see also, Voilas, 73 F. Supp.2d at 461 ("an experienced economist's clarification and summary of a large corporation's business plans could certainly prove helpful to the average juror who presumably lacks such experience in and knowledge about complex financial matters, even if doing so does not require employing any particular methodology but simply a straightforward review of the corporation's data").

The testimony of Mr. Tarter would be far closer in nature to the economic and business testimony of the experts in Cantor and Voilas, than the precision required by the technical engineering testimony in Oddi.[10]  More than being just *ipse dixit*, Mr. Tarter's calculation of damages was based upon his review of relevant testimony and documents in light of his significant experience in the areas of media and advertising.  Given the nature of his report, this is a perfectly acceptable and reliable method, and his testimony would flesh this out.  Certainly, it would be hard to imagine the type of testable hypothesis and scientific analysis to which a calculation of corrective advertising costs or lost opportunity costs could be subject under the

---

[10]     Similarly, the expert testimony proffered in Izumi Products Co. v. Konninklijke Philips Electronics N.V., 315 F. Supp.2d 589 (D. Del. 2004), another case cited by Defendant to support its argument that Mr. Tarter's report is unreliable, was also of a technical engineering type as in Oddi, and thus, Izumi is inapplicable to the facts at bar.

facts of this case. Rather, such calculations would best be formed based on years of experience in relevant fields – which is the basis upon which Mr. Tarter formed his opinions as set forth in his report. See Cantor, 2006 WL 3462596, at *8; Voilas, 73 F. Supp.2d at 461.

Moreover, to the extent that Defendant contends that Mr. Tarter's calculations are speculative, "courts may engage in some degree of speculation in computing the *amount* of damages, particularly when the inability to compute them is attributable to the defendant's wrongdoing." Australian Gold, 436 F.3d at 1241; Burndy Corporation v. Teledyne Industries, Inc., 748 F.2d at 771.

Certainly, it is difficult to concretely identify all of the opportunities for licensing the Red Sonja character, especially during a period when the Red Sonja movie is being developed, which have been and are currently being lost due to Defendant's wrongful conduct or the precise amount of advertising or number of ads or their size that it will take to fully repair the damage done by Paradox to the Red Sonja mark – although the cost of such ads are, of course, easily determinable and calculable. Given that this difficulty is the direct result of Defendant's wrongful conduct, some degree of estimation in computing the amount of damages incurred by Plaintiff is appropriate, and thus, Mr. Tarter's report (and his trial testimony) should be found admissible.

## CONCLUSION

For the foregoing reasons, it is respectfully requested that Defendant's motion *in limine* should be denied in all respects.

Dated: June 1, 2007

Richard K Herrmann, #405
MORRIS JAMES LLP
500 Delaware Avenue, 15th Floor
P.O. Box 2306
Wilmington, DE 19899-2306
Telephone: (302) 888 6816
Facsimile: (302) 571 1750
rherrmann@morrisjames.com

Thomas J. Curran, Esq.
Mark A. Berman, Esq
GANFER & SHORE, LLP
360 Lexington Avenue
New York, New York 10017
Telephone: (212) 922-9250
Facsimile (212) 922-9335

29

## CERTIFICATE OF SERVICE

I hereby certify that on this 8th day of June 2007, I electronically filed the foregoing document, **REDACTED VERSION OF PLAINTIFF RED SONJA LLC'S OPPOSITION TO DEFENDANT PARADOX ENTERTAINMENT, INC.'S MOTION *IN LIMINE* SEEKING TO STRIKE PLAINTIFF'S EXPERT REPORT AND TO PRECLUDE PLAINTIFF FROM OFFERING ANY EVIDENCE OF DAMAGES AT TRIAL**, with the Clerk of the Court using CM/ECF which will send notification of such filing to the following:

Jack B. Blumenfeld, Esq.
Maryellen Noreika, Esq.
Morris, Nichols, Arsht & Tunnell
1201 Market Street
Wilmington, DE 19801
jblumenfeld@mnat.com
mnoreika@mnat.com

Additionally, I hereby certify that on this 8th day of June 2007, the foregoing document was served By E-Mail on the following:

Jack B. Blumenfeld, Esq.
Maryellen Noreika, Esq.
Morris, Nichols, Arsht & Tunnell
1201 Market Street
Wilmington, DE 19801
jblumenfeld@mnat.com
mnoreika@mnat.com

       */s/ Richard K. Herrmann*
       Richard K. Herrmann (#405)
       MORRIS JAMES LLP
       500 Delaware Avenue, 15th Floor
       Wilmington, DE  19801
       (302) 888-6800
       rherrmann@morrisjames.com
       Attorneys for Plaintiff RED SONJA LLC