## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

RED SONJA LLC,                              )
                                            )
                    Plaintiff,              )
                                            )
          v.                                )    C. A. No. 06-270 (SLR)
                                            )
PARADOX ENTERTAINMENT, INC.,                )
                                            )
                    Defendant.              )

## <u>JOINT PRETRIAL ORDER</u>

Richard K. Herrmann (#405)              Jack B. Blumenfeld (#1014)
Mary B. Matterer (#2696)                Maryellen Noreika (#3208)
MORRIS JAMES LLP                        Richard J. Bauer (#4828)
500 Delaware Avenue                     MORRIS, NICHOLS, ARSHT &
15th Floor                                   TUNNELL LLP
Wilmington, DE  19801                   1201 N. Market Street
(302) 888-6816                          P.O. Box 1347
mmatterer@morrisjames.com               Wilmington, DE  19899-1347
                                        (302) 658-9200
                                        rbauer@mnat.com

OF COUNSEL:
                                        OF COUNSEL:

Mark A. Berman, admitted *pro hac vice*
Thomas J. Curran, admitted *pro hac vice*   Frederick U. Fierst
GANFER & SHORE, LLP                     Fierst, Pucci & Kane LLP
360 Lexington Avenue                    64 Gothic Street
New York, NY  10017                     Northampton, MA  01060
(212) 922-9250                          (413) 584-8067

On June 27, 2007 at 3:30 p.m., counsel for Red Sonja, LLC ("Plaintiff" or "Red Sonja") and counsel for Paradox Entertainment, Inc. ("Defendant" or "Paradox") shall attend a pretrial conference before this Court pursuant to Rule 16 of the Federal Rules of Civil Procedure and Rule 16.4 of this Court.  The following matters as to the trial scheduled to commence on July 16, 2007, are hereby ordered by the Court.

## I.    NATURE OF THE ACTION AND PLEADINGS

Plaintiff's Position:

This action is brought by Red Sonja LLC against the Defendant Paradox Entertainment, Inc., alleging that the Defendant unfairly competed, willfully infringed, and intentionally diluted the value of Plaintiff's "Red Sonja" trademark by publicly claiming that it owns the "Red Sonja" mark, by attempting to promote the non-existent Red Sonya character (which was adapted by Roy Thomas into the Red Sonja mark), by attempting to use Defendant's purported Red Sonya character with Conan the Barbarian, in an effort to dilute the value of the "Red Sonja" mark and by intentionally misleading the public to believe that Plaintiff's popular Red Sonja character is the same as Defendant's non-existent Red Sonya character.  A further description of Plaintiff's position is set forth in Plaintiff's attached Statement of Proof.

Defendant's Position:

Plaintiff sued Paradox on April 25, 2006, alleging unfair competition under 15 U.S.C. § 1125(a) ("Count I"), trademark infringement and unfair competition under state statutory and common law ("Count II"), trademark infringement under 15 U.S.C. § 1115 ("Count III"), and trademark dilution under 15 U.S.C. § 1125(c), and state statutory and common law ("Count IV").

On May 30, 2006, Paradox answered, denying plaintiff's allegations, and asserting three counterclaims for fraud on the U.S. Patent and Trademark Office, unfair competition under § 43(a)(1)(B) of the Lanham Act, and abuse of process. Defendant also asserted as defenses, among others, that there is no likelihood of confusion, no unfair competition, and no trademark dilution, as well as statutory fair use.

## II.    BASES FOR FEDERAL JURISDICTION

This is an action for trademark infringement, unfair competition and trademark dilution under the Lanham Act, 15 U.S.C. §§ 1051 *et seq*., and Delaware statutory and common law. Subject matter jurisdiction over this action is proper under 28 U.S.C. §§ 1331, 1338 and 1367. Neither party contests personal jurisdiction or venue.

## III.    STATEMENT OF FACTS WHICH ARE ADMITTED AND REQUIRE NO PROOF

Plaintiff and Defendant agrees to the inclusion of the following as admitted facts:

A.    Red Sonja, LLC is limited liability company organized under the laws of the State of Delaware.

B.    Paradox Entertainment, Inc. is a Delaware Corporation with a principal place of business in Beverly Hills, CA.

## IV.    STATEMENT OF ISSUES OF FACT REMAINING TO BE LITIGATED

1.    Plaintiff's statement of issues of fact remaining to be litigated is attached as Exhibit 1.

2.    Defendant's statement of issues of fact remaining to be litigated is attached as Exhibit 2.

V.      **STATEMENT OF ISSUES OF LAW REMAINING TO BE LITIGATED**

1.      Plaintiff's statement of issues of law remaining to be litigated is attached as Exhibit 3.

2.      Defendant's statement of issues of law remaining to be litigated is attached as Exhibit 4.

VI.     **EXHIBITS**

The parties will offer as exhibits at trial one or more of the exhibits set forth in their respective trial exhibit lists. Each party reserves the right to offer an exhibit designated by the other party, even if not introduced by the designated party. The listing of an exhibit by one party does not constitute a waiver by that party of any objection to that exhibit if it is offered by the other party.

1.      Plaintiff's list of exhibits and Defendant's objections is attached as Exhibit 5.

2.      Defendant's list of exhibits and Plaintiff's objections is attached as Exhibit 6.

VII.    **WITNESSES TO BE CALLED IN PERSON OR BY DEPOSITION**

1.      Plaintiff's list of witnesses is attached as Exhibit 7.

2.      Defendant's list of witnesses is attached as Exhibit 8.

VIII.   **STATEMENT OF INTENDED PROOFS**

1.      In support of its claims, in addition to the facts not in dispute, Plaintiff expects to offer the proofs set forth in Exhibit 9.

2.    In support of its claims, in addition to the facts not in dispute, Defendant expects to offer the proofs set forth in Exhibit 10.

## IX.    STATEMENTS CONCERNING AMENDMENTS TO PLEADINGS

The pleadings in this matter are closed, and there are no amendments.

## X.    OUTSTANDING MATTERS

Point IV of Plaintiff's Motion in Limine, which the Court reserved decision on until the pre-trial conference.

The parties agree that defendant claims it produced a document in its June 18 supplement production,  that was inadvertently produced and is protected by the attorney-client privilege.  If the parties cannot resolve this dispute, it will be addressed at the pre-trial conference.

Pursuant to the telephone conference with the Court on Friday, June 22, Defendant produced an attorney as a 30(b)(6) witness who refused to answer certain questions during the deposition claiming that the answers to such questions were protected by the attorney-client privilege.  The Court has agreed to review the deposition transcript in camera and resolve the issue.

## XI.    EFFORT TO EXPLORE SETTLEMENT

The parties certify that two-way communication has occurred between the persons having authority in a good-faith effort to explore the resolution of the controversy by settlement.  No agreement has been reached.

## XII.    OTHER MATTERS

Joint Statement

1.    The parties will exchange all documentary exhibits (with exhibit labels) by July 9.

2.    The parties will exchange all demonstrative exhibits no less than 72 hours before the use of that demonstrative exhibit at trial.

3.    The parties will exchange the list and order of witnesses whom it intends to call on direct examination by July 12.

4.    Plaintiff's statement of other matters is attached as Exhibit 11.

5.    Defendant's statement of other matters is attached as Exhibit 12.

This order shall control the subsequent course of the action unless modified by the Court to prevent manifest injustice.

MORRIS JAMES LLP

MORRIS,     NICHOLS,     ARSHT     &
TUNNELL LLP

___*/s/ Mary B. Matterer*_____
Richard K. Herrmann (#405)
Mary B. Matterer (#2696)
500 Delaware Avenue
15th Floor
Wilmington, DE  19801
(302) 984-6000
rherrmann@mnat.com

*Attorneys for Plaintiff*
*Red Sonja, LLC*

___*/s/ Richard J. Bauer*_____
Jack B. Blumenfeld (#1014)
Maryellen Noreika (#3208)
Richard J. Bauer (#4828)
1201 North Market Street
P.O. Box 1347
Wilmington, Delaware  19899-1347
(302) 658-9200
rbauer@mnat.com

*Attorneys for Defendant*
*Paradox Entertainment, Inc*

OF COUNSEL:

OF COUNSEL:

Mark A. Berman, admitted *pro hac vice*
Thomas J. Curran, admitted *pro hac vice*
GANFER & SHORE, LLP
360 Lexington Avenue
New York, NY  10017
(212) 922-9250

Frederick U. Fierst
Fierst, Pucci & Kane LLP
64 Gothic Street
Northampton, MA  01060
(413) 584-8067

Dated:  June 22, 2007

6

### Exhibit 1

### Statement Of Facts Plaintiff Intends To Prove At Trial[1]

- Beginning in the 1930s, Robert E. Howard became among the most prolific American pulp writers, and is generally considered the father of the "Sword and Sorcery" genre.

- In 1934, Robert E. Howard wrote a short story titled, "Shadow of a Vulture" published in the January 1934 edition of "Magic Carpet" magazine.

- Among the characters in the "Shadow of a Vulture" story was a sword-wielding woman with red hair named "Red Sonya."

- Robert E. Howard's Red Sonya "lived" during the 16th century in Vienna and was placed in battles against the Turks.

- This is the sole appearance of "Red Sonya" in any media of any kind.

- Roy Thomas adapted this character into the world of Conan the Barbarian, called "Hyboria", changing her name slightly to "Red Sonja."

- Red Sonja first appeared in Marvel Comics "Conan the Barbarian #23", in an issue subtitled "Shadow of a Vulture," published in 1973.

- Roy Thomas has stated in an article entitled "Red Sonja and Red Nails" Robert E. Howard's "Shadow of a Vulture" was "99% identical" to the story in Marvel's Conan the Barbarian #23.

- "Red Sonja and Red Nails" was published in a Dark Horse publication approved by Paradox, and brought to market in 2004.

- Red Sonja was born in the fictional land of "Hyrkania," which is a country in the fictional "Hyborian" age.

- The Hyborian Age is a fictional time period created by Robert E. Howard.

- The Hyborian Age is inhabited by Conan the Barbarian and, after Roy Thomas's adaptation, Red Sonja.

- Conan the Barbarian and Red Sonja are the two most profitable characters that exist in the fictional Hyborian world.

---

[1]     Despite Defendant admitting many of these facts during the course of this litigation, Defendant was unwilling to stipulate to any of these facts as "uncontested."

- Plaintiff has commercially exploited the Hyborian Age in connection with its Red Sonja character.

- Red Sonya has never appeared in the Hyborian Age.

- Conan the Barbarian and Red Sonja are the two highest grossing characters that Robert E. Howard ever created.

- Defendant applied for a trademark of the word "Hyboria".

- Roy Thomas introduced Red Sonja into comic books and the Hyborian Age.

- Roy Thomas states that he adapted the short story "Shadow of a Vulture" into the Conan comics.

- Roy Thomas states that he changed the name of its heroine from Red Sonya to Red Sonja in his article "A Fond Look Back at Big Red."

- Red Sonja often appeared with the introduction "from the creator of Conan now comes…" or "Robert E. Howard's Red Sonja."

- Red Sonja often appeared with the introduction from the fictional Nemedian Chronicles "Know also O Prince that in those selfsame days that Conan the Cimmerian did Stalk the Hyborian Kingdoms, one of the few swords worthy to cross with his was that of Red Sonja, warrior woman out of majestic Hyrkania…"

- Prior to purchasing the remaining Robert E. Howard Library, Paradox and licensee Dark Horse attempted to bring in another red-headed, sword-wielding, female love interest into the Conan comics, named "Janissa," which was intended to resemble Red Sonja.

- Prior to finalizing the purchase of the remaining Robert E. Howard library, Paradox and its licensee Dark Horse conspired to bring Red Sonya -- purportedly as a "reintroduction" that was really based upon the confusion created with the established Red Sonja -- into comic books, despite the fact that Red Sonya never previously appeared in a comic book.

- Paradox and its licensee Dark Horse fabricated a letter to the editor asking when Conan's love interest Red Sonya would be returning to the Conan comics (even though Red Sonya had never appeared in a Conan comic). The editor responded to this "letter" by stating it would be happening soon.

- Defendant did not specifically acquire Red Sonya as a character, instead purchasing a library of stories encompassing hundreds of characters.

- Defendant did not purchase Red Sonya as a "character" because simple reference to it in a short story from 70 years ago does not endow a character with trademark rights.

- No copyright renewal records for "Shadow of a Vulture" exist, so Defendant's claim on the story is without merit.

- Paradox's former C.E.O., Peter Sederowsky, attempted to purchase Red Sonja from Red Sonja LLC.

- On the eve of Paradox's acquisition of the remaining Howard library, Mr. Sederowsky informed Arthur Lieberman that Paradox would inherit Red Sonya in the deal and no longer needed to acquire Red Sonja.

- Mr. Lieberman advised Mr. Sederowsky, who is also an attorney, that Paradox could not utilize Red Sonya in this manner because its passing presence in a single story does not convey trademark rights in such a character and is insufficient to register a trademark. Mr. Sederowsky replied "we'll see" and terminated the conversation.

- Red Sonja is a famous trademark and has been for the last 35 years.

- A comic book entitled, the "Song of Red Sonja" was awarded the 1973 Academy of Comic Book Arts Award for Best Individual Story

- Red Sonja has since starred in approximately 100 comic books, novels and magazines under her own title including, a major feature film, Universal Theme Park Stage Show, trading cards, busts, posters and other licensed merchandise.

- In the 1970's, 80's and 90's Red Sonja guest-starred in dozens of Marvel comic books along side Conan.

- Red Sonja #0, published in 2005 by Dynamite Entertainment, shipped over 200,000 copies.

- Conan #0, published in 2004 by Dark Horse Comics, shipped just over 100,000 copies.

- Red Sonja #1, published in 2005 by Dynamite Entertainment, was nominated "Comic Book of the Year" by Diamond Comic Distributors.

- Defendant Paradox created a Press Release claiming ownership of all of Robert E. Howard's characters including the three "most famous" among those named was Red Sonya.

- Defendant identified Red Sonya as one of its "successful brands" on its website advising the public that Red Sonya was available for licensing.

- An entertainment periodical, the "Hollywood Reporter," and other media sources reported that Defendant had, in fact, purchased Red Sonja.

- Defendant posted the Hollywood Reporter article on its website without correction.

- Defendant put out a Press Release in which Red Sonya bore a registration symbol even though the mark is unregistered.

- Defendant designated Red Sonya one of Robert E. Howard's "most famous" characters in press releases and on its website.

- A letter appeared in comic book "Conan #23" from the Dark Horse comic book series published in December 2005 in which a reader allegedly asked "[i]s there a possibility of seeing any of Conan's love interests such as Valeria, Red Sonya, Belit, or any Darkhorse version, in upcoming issues?"

- The editor replied to this letter by stating, "All the women you asked about will appear in the comic before too long, but they'll be based on how Howard described them, so don't expect any of them to be wearing chain mail bikinis."

- A Chain-mail bikini is Red Sonja's trademark costume.

- No such letter has been produced by Defendant or its licensees during discovery.

- Roy Thomas adapted the "Shadow of a Vulture" story into the Hyborian world in Marvel comics Conan #23 subtitled 'Shadow of a Vulture' including most of the dialogue and basic plot.

- Red Sonya was converted into Red Sonja and is not, never has been, and cannot become a separate character.

- Defendant singled out Red Sonya in their Press Release as one of the 3 "most famous" Robert E. Howard characters is part of an aggressive pattern of behavior designed to confuse the public, profit off the popularity of Red Sonja, usurp Red Sonja's position in the marketplace, and steal Plaintiff's property.

- Defendant singled Red Sonya out as a "successful brand" front and center on the homepage of the Paradox website as part of an aggressive pattern of behavior designed to confuse the public, profit off the popularity of Red

Sonja, usurp Red Sonja's position in the marketplace, and steal Plaintiff's property.

- Defendant's posting of an erroneous 'Hollywood Reporter' article claiming Paradox owned Red Sonja on the Paradox website without ever issuing any corrections of any kind, is part of the aggressive pattern of behavior designed to confuse the public, profit off the popularity of Red Sonja, usurp Red Sonja's position in the marketplace, and steal Plaintiff's property.

- Defendant assigned a registration symbol to Red Sonya in their press releases even though Red Sonya is, and always has been, unregistered, which is part of the aggressive pattern of behavior designed to confuse the public, profit off the popularity of Red Sonja, usurp Red Sonja's position in the marketplace, and steal Plaintiff's property.

- All of this intentional behavior was perpetrated in a short period of time between the announcement of the purchase of the outstanding Howard library and the filing of this suit

- The behavior confused Red Sonja licensee George Furla as to the origins of the character.

- Defendant's attempt to trademark "Hyboria" is a further attempt to push Red Sonja out of the marketplace and steal Plaintiff's property.

- Defendant offered a third-party an exclusive license to use the "Age of Hyboria" despite the fact that it was fully aware that Plaintiff's Red Sonja character was set in the age of Hyboria.

- The Press Release, "Clarifications Regarding the Character Red Sonya", while admitting confusion in the market place, does not mitigate damages as it further confuses the public. It falsely claims that Red Sonja is not a Robert E. Howard character, and that Red Sonya is a Robert E. Howard character. It falsely claims that Red Sonja is purely a creation of Roy Thomas, when Paradox officers know this to be untrue as, in fact, Roy Thomas has directly told them.

- Defendant's purported 'clarification' was placed on the Conan website and not the Paradox website.

- Paradox attempts to destroy the value of Red Sonja by denying the Robert E. Howard heritage of Red Sonja.

- Red Sonja is derived from the works of Robert E. Howard and has long been associated with the author in all forms of media in which Red Sonja has appeared.

- Paradox only began denying Red Sonja's Robert E. Howard heritage after it decided it would not be able to acquire Red Sonja. Previously, they had referred to Red Sonja as a Robert E. Howard character in its Conan graphic novels published by its licensee Dark Horse and approved by Paradox.

- Fredrik Malmberg and Paradox were upset by the success of the Red Sonja franchise and sought to destroy and undermine Conan's legitimate competitor Red Sonja by bringing a virtually identical character to market in a planned effort to deny Red Sonja's Robert E. Howard heritage, and destroy Red Sonja's position in the marketplace.

- As part of Paradox's plan to destroy Red Sonja's position in the marketplace and steal Plaintiff's property, Defendant actively encouraged confusion in the marketplace and took advantage of the natural confusion which occurs when you bring an obscure character named Red Sonya to market against an already well-established Red Sonja character.

- Even if no Red Sonya product was ever licensed, the possibility of there being two identical characters weakened Red Sonja's ability to license and profit.

- Defendant attempted to undermine Plaintiff's movie contract with Nu Image using a potential Conan movie contract as leverage

- Defendant attempted to solicit licenses for Red Sonya in the same categories which Red Sonja already produces products and targets the same audience.

- In 1999, Defendant purchased all rights to Conan from the Robert E. Howard Estate.

- In 2005, the heirs of the Robert E. Howard Estate sold their majority interest in Red Sonja Corp.

- Red Sonja Corp. is the predecessor to Red Sonja LLC.

- In 2006, the Heirs sold the remaining Howard library to Defendant.

- Conan is currently being published by Dark Horse Comics.

- Red Sonja is currently being published by Dynamite Entertainment.

- Dynamite Entertainment is the publishing arm of Dynamic Forces.

- Both Conan and Red Sonja have previously been published by Marvel Comics.

- Following Robert E. Howard's death in 1936, his father Dr I.M. Howard inherited his entire estate, including the rights to all his characters.

- Following Dr. I.M. Howard's death in 1944, Howard's estate, including the rights to his characters passed to Dr. P.M. Kuykendall in accordance with the will of Dr. I.M. Howard.

- Following the death of P.M. Kuykendall in 1959, Alla Ray Kuykendall and Alla Ray Morris (Collectively the 'Heirs') were appointed as co-executrixes of P.M. Kuykendall's estate.

- P.M. Kuykendall's estate, including Howard's characters, passed to Alla Ray Kuykendall, in accordance with her husband's will.

- In 1982, pursuant to an agreement with the Howard Heirs, the Howard Heirs assigned all right, title and interest in the character Red Sonja to Red Sonja Corp.

- Pursuant to the Agreement the Howard Heirs assigned the registered trademark for Red Sonja, Registration no. 1,161,847 which was registered on June 17,1986 and renewed June 22, 2006.

- Thereafter, Marvel Comics assigned all copyright registrations of the Red Sonja comics it had published to Red Sonja Corp.

- Red Sonja Corp merged with and into Red Sonja LLC in 2002, transferring all right, title and interest in Red Sonja to Red Sonja LLC.

- In order for the sale of the remaining Robert E. Howard library to go through to Paradox, Arthur Lieberman had to divest himself from his share of the remaining library. He owned 1/3 of Kull, a 1/3 of Solomon Kane and 1/3 of Red Sonja. Jack Baum, who along with his sister owned the Robert E. Howard Estate, called and asked if Mr. Lieberman would take 100% of one of these characters in exchange for his shares in the other two. Mr. Lieberman agreed and became sole owner of Red Sonja.

- Paradox was comfortable with this arrangement because after the deal went through they could attempt to establish the obscure Red Sonya and thereby steal the market value of Plaintiff's Red Sonja. This would allow them a full monopoly of the Hyborian characters without actually having to pay for it.

- Paradox and its principals held an ongoing grudge against Arthur Lieberman for his control of various Howard-related characters such as Red Sonja and Thulsa Doom (which he holds a 15-year exclusive license to), when they saw a monopoly of all Howard related characters as their right.

- Paradox attempted to regain Thulsa Doom from Arthur Lieberman without compensation of any kind.

- In late 2005 Plaintiff entered into contract with Emmet/Furla Films and Nu Image to develop a motion picture featuring Red Sonja.

- This motion picture was to be set in the Hyborian Age.

- Until recently, Defendant was under contract at Warner Brothers to develop a film featuring Conan the Barbarian.

- Defendant is no longer under contract at Warner Brothers to develop a film featuring Conan the Barbarian.

- Directly after the filing of this lawsuit, Defendant issued a Press Release entitled "clarification regarding the character Red Sonya."

- Prior to filing the lawsuit, Defendant had not issued a statement of any kind relating to its activities concerning Red Sonya.

- Over the years, Defendant had, from time to time, approached Plaintiff concerning the latter's Red Sonja.  The parties discussed the possibility of Defendant purchasing Plaintiff's Red Sonja

- Defendant discussed the possibility of developing Conan for a feature film with officers of Nu Image when Red Sonja was under contract with Nu Image to develop a feature film.

- Since the filing of this action, Peter Sederowsky has been terminated as President/CEO of Paradox, and Fredrik Malmberg has replaced him as President/CEO of Paradox.

- Defendant discussed with its licensee Dark Horse the possibility of launching Red Sonya as a Dark Horse comic book character.

- California Governor Arnold Schwarzenegger mentioned "Red Sonja" in his State of the State Address January 6, 2004.

- Clint Eastwood mentioned Red Sonja in the 2007 Academy Award ceremony when introducing Ennio Morricone for the "Lifetime Achievement" award.

- The character "Red Sonja" has co-starred in comic books with Wolverine and Spiderman.

- The character "Red Sonja" has five-crossover issues with Spiderman due out in 2007.

- The cover of the Comic Buyers Guide this last year featured the character "Red Sonja" on the cover as the face of Sword and Sandal fantasy.

- The Cover of Warman's comic book field guide from 2004 contained the character "Red Sonja" as an homage to the earlier "Red Sonja" Marvel work.

- The character "Red Sonja" was featured on the cover of "The Superhero women: Featuring the Fabulous Females of Marvel Comics" by Stan Lee published in 1977.

- The Philadelphia Daily News featured the character "Red Sonja" in an article in December of 2006 under the heading "Heroine of the year."

- The character "Red Sonja" was featured in a recent article in "Smooth Magazine."

- The character "Red Sonja" was featured in "Wizard Magazine" multiple times.

- The character "Red Sonja" was referenced in the lyrics of "Lay it on ya" by Rap/Hip Hop artist Ugly Duckling released in September 2000.

- In May 2006, Variety Magazine announced the plans for a new "Red Sonja" movie being produced and released by Millennium Films and Emmett/Furla Films. This announcement, including a picture of Red Sonja, was featured in a number of other relevant magazines and on various websites.

- The character "Red Sonja" has inspired fan theater groups, and impersonators.

- The character "Red Sonja" has inspired an independent rock band to be named after her.

- A number of bloggers use the screen name "Red Sonja."

- An "Advanced Dungeons and Dragons Book" entitled "Red Sonja Unconquered" was released in 1986.

- The band "Cracker" released a song "Red Sonja" published in 1995 on their album "Bob's Car."

- The character "Red Sonja" was on an episode of the Conan television show.

- VH1 referenced "Red Sonja" constantly in advertising the "Surreal Life" around 2004 to promote Brigitte Neilson's participation in that show.

- The "Red Sonja" character was mentioned in the 'New York Review of Books' on April 7, 2005.

- Defendant engaged in wrongful conduct in the discovery phase of the trial.

**EXHIBIT 2**

**DEFENDANT'S STATEMENT OF ISSUES OF FACT**
**THAT REMAIN TO BE LITIGATED**

All paragraphs listed in defendant's list of issues of law are incorporated herein to the extent that the Court may rule that they are issues of fact. Defendant specifically incorporates and realleges those portions of defendant's issues of law that may be considered to raise issues of fact.

I.    **NONINFRINGEMENT AND UNFAIR COMPETITION**

A.    Paradox did not use the name Red Sonya to identify the source of a product or services and, therefore, is not an actionable use under the Lanham Act.

B.    The validity, protectibility and enforceability of plaintiff's marks.

C.    Paradox's use of the name Red Sonya is unlikely to cause confusion as to the source or origin of its goods or services based upon the *Lapp* factors, including, but not limited to, the following:

1.    The parties' respective marks bear little semblance to each other.

2.    Plaintiff has a weak mark that has neither a high degree of conceptual distinctiveness nor a high level of commercial strength.

3.    Plaintiff has done no advertising for its marks.

4.    Third party usage of similar marks demonstrates the lack of distinctiveness of plaintiff's mark.

5.    The goods and services the parties sell are unrelated. There is no overlap between the goods and services the parties provide.

6.    The services provided by the parties are in different price ranges. The parties license character-based properties that range from several thousand to more than hundred of thousands of dollars.

7.    Licensing character-based properties are not casual purchases, but are expensive and significant transactions.

8.    Potential consumers consist of sophisticated licensees who perform due diligence, such as a chain of title searches, before deciding to license a character based property.

9.   Plaintiff's Roy Thomas Red Sonja character is targeted at a different group of consumers than Paradox's Robert E. Howard Red Sonya

10.   There have been no instances of actual confusion between plaintiff and Paradox with respect to mistaken purchasing decisions.

11.   Any use of the Robert E. Howard Red Sonya character by Paradox was in good faith.

12.   The parties' goods and services are not generally marketed through the same channels of trade or advertised through the same media. Plaintiff does no marketing or advertising.

D.   Whether the fact that plaintiff did not conduct a consumer survey warrants an inference that there is no likelihood of confusion.

## II.   NO TRADEMARK DILUTION

A.   Paradox's use of the name Red Sonya is not actionable as dilution under the Lanham Act.

B.   The name Red Sonya is unlikely to cause dilution of plaintiff's mark based upon, but not limited to, the following:

1.   Plaintiff's mark is not widely recognized by the general consuming public of the United States as a designation of source of the goods or services of the plaintiff.

2.   Plaintiff is not engaging in substantially exclusive use of its mark.

3.   Plaintiff's Red Sonja mark is not distinctive.

4.   Paradox did not intend to create an association with plaintiff's mark.

## III.   STATUTORY FAIR USE DEFENSE TO INFRINGMENT, UNFAIR COMPETITION AND DILUTION

A.   Paradox's use of the name Red Sonya constitutes a statutory "fair use" under the Lanham Act, including but not limited to, the following:

1.   Paradox used the Robert E. Howard Red Sonya character otherwise than as a mark;

2.   The name "Red Sonya" is descriptive of Paradox's Robert E. Howard Red Sonya character; and

3.   Paradox used the name "Red Sonya" fairly and in good faith only to describe its Robert E. Howard character.

## IV.    FRAUD ON THE U.S. PATENT AND TRADEMARK OFFICE

A.    Plaintiff's registration No. 1,397,608 for the trademark RED SONJA was maintained fraudulently, and should be cancelled based upon, but not limited to, the following:

1.    Plaintiff's president, Arthur Lieberman, filed and signed a Declaration of Use with an Application for Renewal, claiming Red Sonja was used in commerce on all goods listed, when he knew or should have known that it was in use only on comic books.

2.    Plaintiff's president, Arthur Lieberman, filed a verified Appilication for Renewal, when, in fact, he knew or should have known that the specimen attached was not currently in use.

3.    Plaintiff's representative, Arthur Lieberman, filed and signed Section 8 and 15 affidavits in 1993 claiming that the trademark Red Sonja was continuously used for five years in commerce on novels when he knew or should have known that it had not been used on novels since 1983.

## V.    UNFAIR COMPETITION UNDER THE LANHAM ACT

A.    Plaintiff is falsely advertising and misrepresenting its Roy Thomas Red Sonja character as created by Robert E. Howard in violation of § 43(a) of the Lanham Act, 15 U.S.C. 1125(a)(1)(B), based upon, but not limited to, the following:

1.    Plaintiff and its licensees are aware of, and have acknowledged, that the Robert E. Howard Red Sonya character is much different from the Roy Thomas Red Sonja character.

2.    Plaintiff has falsely attributed Robert E. Howard's name in commercial advertising and promotion of its products featuring the Roy Thomas Red Sonja character.

3.    Plaintiff has misrepresented its Roy Thomas Red Sonja character as created by Robert E. Howard.

4.    Plaintiff licensee's have been deceived by plaintiff's misrepresentations, and that has influenced its licensees in deciding to license plaintiff's Roy Thomas Red Sonja character.

5.    A comic book series featuring the Roy Thomas Red Sonja character travels in interstate commerce.

6.    There is a likelihood of injury to the Paradox's business reputation and good will.

## VI.    ABUSE OF PROCESS

    A.    Whether plaintiff's lawsuit was initiated and has been pursued for a purpose for which the legal process was not designed, including but not limited to:

        1.    Plaintiff has offered to sell Paradox an interest in the Roy Thomas Red Sonja character so that the competition between the parties would disappear.

        2.    Plaintiff maintains this action in an attempt to compel Paradox to purchase an interest in the Roy Thomas Red Sonja character.

        3.    Plaintiff maintains this action in an attempt to improperly draw off the substantial good will and name recognition of Robert E. Howard.

        4.    Plaintiff maintains this action against Paradox to benefit from the potential financial gain derived from the anticipated increase in media coverage and publicity generated for Roy Thomas Red Sonja character in the comic book community.

**Exhibit 3**

**Plaintiff's Statement Of Issues Of Law Remaining To Be Litigated**

Liability:

Count I -- Unfair Competition Pursuant to 15 U.S.C. § 1125(a)

Plaintiff will prove that Defendant is liable for unfair competition under 15 USC § 1125 (the Lanham Act) by demonstrating: (1) the mark "Red Sonja" is valid and legally protectable, (2) the mark "Red Sonja" is owned by plaintiff, and (3) Defendants use of the "Red Sonya" mark in connection with goods and services was likely to create confusion concerning the origin of the goods and services. Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004); Medavante, Inc. v. Proxymed, Inc., 2006 WL 2927623, at *5 (D. N.J., Oct. 12, 2006); Super 8 Motels, Inc. v. Sai Krupa Victoria, Inc., 2006 WL 2830965, at *4 (D. N.J., Sept. 29, 2006); Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp.2d 543, 569 (D. N.J. 2003).

When analyzing the "likelihood of confusion" element, courts in the Third Circuit examine a number of factors including: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of the consumers when making a purchase; (4) the length of time the Defendant has used the mark without evidence of actual confusion arising; (5) the intent of the Defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing or not competing, are marketed through the same media; (8) the extent to which the targets of the parties sales efforts of the same; (9) the relationship of the goods in the minds of the consumers, whether because of the near identity of the products, the

similarity of the function, or other factors; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the Defendant's market, or expect a prior owner is likely to expand into the Defendant's market." Kos, 369 F.3d at 709; Medavante, 2006 WL 2927623, at *6; Video Pipeline, 275 F. Supp.2d at 570.  No single factor is determinative and the Court's must weigh each of the factors when determining whether there is a likelihood of confusion. Kos, 369 F.3d at 709; Video Pipeline, 275 F. Supp.2d at 570.. An examination of these various factors, to the extent they are relevant to the case at bar, will weigh in favor of a finding that Defendant's use of the purported "Red Sonya" mark created a likelihood of confusion with plaintiff's "Red Sonja" mark.

In addition, the District of Delaware has also applied an alternative standard with respect to Unfair Competition claims.  This standard requires that plaintiff demonstrate that (1) the Defendant used a false designation; (2) the use of the false designation occurred in interstate commerce in connection with goods and services; (3) that such false designation is likely to cause confusion, mistake or deception as to the origin, sponsorship or approval of defendant's goods or services by another person, and (4) that plaintiff has been or is likely to be damaged. Liafail, Inc. v. Learning 2000, Inc. 2002 WL 31667861, at * 8 (D. Del. Nov. 25, 2002).  Plaintiff will demonstrate that Defendant's use of the Red Sonya mark constituted a false designation in interstate commerce which was likely to cause confusion and, thus, damaged plaintiff.

Count II – Common Law Infringement and Unfair Competition Pursuant to State Statutes and Common Law

The elements for claims of common law trademark infringement and unfair competition are essentially the same as claims for trademark infringement and unfair

competition under the Lanham Act. <u>One World Botanicals Ltd. V. Gulf Coast Nutritionals, Inc.</u>, 987 F. Supp. 317, 331 (D. N.J. 1997). Thus, plaintiff will prove that Defendant is liable for common law trademark infringement and unfair competition by demonstrating that (1) the mark "Red Sonja" is valid and legally protectable, (2) the mark "Red Sonja" is owned by plaintiff, and (3) Defendants use of the "Red Sonya" mark in connection with goods and services was likely to create confusion concerning the origin of the goods and services. <u>Ford Motor Company v. Summit Motor Products, Inc.</u>, 930 F.2d 277, 291 (3d Cir. 1991); <u>One World</u>, 987 F. Supp. at 331.

Moreover, 6 Del. C. § 3312 provides that it shall be infringement for a person to "use, without the consent of the registrant, any reproduction, counterfeit, copy or colorable imitation of a mark registered under this chapter in connection with the sale, offering for sale or advertising of any goods or services, or in connection with which such use is likely to cause confusion or to deceive as to the source or origin of such goods or services." Thus, trademark infringement under the Delaware Trademark Act requires similar elements as trademark infringement under the Lanham Act and at common law. Plaintiff will prove that Defendant is liable for trademark infringement under the Delaware Trademark Act by demonstrating that Defendant's use the "Red Sonya" mark is likely to -- and indeed did -- create confusion in the marketplace.

<u>Count III – Trademark Infringement Pursuant to 15 U.S.C. §1115</u>

Plaintiff will prove that Defendant is liable for trademark infringement under 15 USC § 1125 by demonstrating: (1) the mark "Red Sonja" is valid and legally protectable, (2) the mark "Red Sonja" is owned by plaintiff, and (3) Defendants use of the "Red Sonya" mark in connection with goods and services was likely to create confusion

concerning the origin of the goods and services. Marshak v. Treadwell, 240 F.3d 184, 198 (3d Cir. 2001); Sanofi-Aventis v. Advancis Pharm. Corp., 453 F. Supp.2d 834, 847 (D. Del. 2006); Acxiom Corp. v. Axiom, Inc., 27 F. Supp.2d 478, 490-91 (D. Del. 1998); Rockland Mortgage Corp. v. S'holders Funding, Inc., 835 F. Supp. 182, 188 (D. Del. 1993).

When analyzing the "likelihood of confusion" element, courts in the Third Circuit examine a number of factors including: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of the consumers when making a purchase; (4) the length of time the Defendant has used the mark without evidence of actual confusion arising; (5) the intent of the Defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, competing of not competing, are marketed through the same media; (8) the extent to which the targets of the parties sales efforts of the same; (9) the relationship of the goods in the minds of the consumers, whether because of the near identity of the products, the similarity of the function, or other factors; and (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the Defendant's market, or expect a prior owner is likely to expand into the Defendant's market." Sanofi-Aventis, 453 F. Supp.2d at 847-48; Acxiom, 27 F. Supp.2d at 493-94; Rockland Mortgage, 835 F. Supp. at 191. No single factor is determinative and the Courts must weigh each of the factors when determining whether there is a likelihood of confusion. Sanofi-Aventis, 453 F. Supp.2d at 848. An examination of these various factors, to the extent they are relevant to the case at bar, will weigh in favor of a finding

that Defendant's use of the "Red Sonya" mark created a likelihood of confusion with plaintiff's "Red Sonja" mark.

Count IV – (Trademark Dilution Pursuant to the Lanham Act, and State Statutory and Common Law)

Plaintiff will prove that Defendant is liable for trademark dilution under the Federal Trademark Dilution Act by demonstrating that (1) plaintiff's "Red Sonja" mark, which it owns, is a "famous" mark; (2) Defendant is making commercial use in interstate commerce of a mark or trade-name (i.e. the "Red Sonya" mark); (3) Defendant's use of the "Red Sonya" mark began after plaintiff's "Red Sonja" mark became famous; and (4) Defendant's use of the "Red Sonya" mark caused dilution of plaintiff's "Red Sonja" mark by lessening the capacity of plaintiff's mark to identify and distinguish goods or services. Times Mirror Magazines, Inc. v. Las Vegas Sporting News, L.L.C., 212 F.3d 157, 163 (3d Cir. 2000); see Eli Lilly & Co. v. Natural Answers, Inc., 233 F.3d 456, 466 (7th Cir. 2000); Panavision Int'l., L.P. v. Toeppen, 141 F.3d 1316, 1324 (9th Cir. 1998).

When analyzing whether a mark is "famous" vis-à-vis dilution, courts examine eight non-exclusive factors including: (1) the degree of inherent or acquired distinctiveness of the mark; (2) the duration and extent of use of the mark in connection with the goods and services with which the mark is used; (3) the duration and extent of advertising and publicity of the mark; (4) the geographical extent of the trading area in which the mark is used; (5) the channels of trade for the goods and services with which the mark is used; (6) the degree of recognition of the mark in the trading areas and channels of trade used by the marks' owner and the person against whom the injunction is sought; (7) the nature and extent of use of the same or similar marks by third parties; and (8) whether the mark was registered under the Act of Marc 3, 1881 or the Act of

February 20, 1905 or on the principal register. 15 U.S.C. 1125(c)(1)(A)-(H) (amended

October 6, 2006); <u>Times Mirror</u>, 212 F.3d at 163. An examination of these factors will

weigh in favor of a finding that plaintiff's "Red Sonja" mark is famous.

Moreover, the Delaware Trademark Act contains a provision dealing with

trademark dilution, which provides

> Likelihood of injury to a business reputation or of dilution
> of the distinctive quality of a mark registered under this
> chapter, or a mark valid at common law or a trade name
> valid at common law, shall be ground for injunctive relief
> notwithstanding the absence of competition between the
> parties, or the absence of confusion as to the source of
> goods or services"

6 Del. C. § 3313. Plaintiff will demonstrate that Defendant's use of the "Red Sonya"

mark has created a likelihood of dilution of the distinctiveness of plaintiff's own "Red

Sonja" mark, and thus plaintiff is entitled to injunctive relief under the Delaware

Trademark Act. <u>Sanofi-Aventis</u>, 453 F. Supp.2d at 855.

<u>Damages:</u>

<u>Counts I, II and III</u>

a.    <u>Monetary Damages</u>

In general, in order to recover damages for trademark infringement and unfair

competition, plaintiff must demonstrate, in addition to the above cited elements, that the

offending use of the mark caused some degree of actual confusion in the marketplace.

<u>Australian Gold, Inc. v. Hatfield</u>, 436 F.3d 1228, 1241 (10th Cir. 2006); <u>A&H Sportswear</u>

<u>Inc. v. Victoria's Secret Stores, Inc.</u>, 166 F.3d 197, 209 (3d Cir. 1999); <u>Getty Petroleum</u>

Corp. v. Island Transp. Corp., 878 F.2d 650, 655 (2d Cir. 1989).[1]  Plaintiff will demonstrate actual confusion was caused by Defendant's use of the "Red Sonya" mark sufficient to warrant an award of damages for trademark infringement and unfair competition.

b.    Costs of Prospective Corrective Advertising

A plaintiff in a trademark infringement action is entitled to receive an award of the amount it will need to expend on publicity and advertising to correct the marketplace confusion caused by the infringement. Zelinksi v. Columbia 300, Inc., 335 F.3d 633, 640 (7th Cir. 2003); Adray v. Adry-Mart, Inc., 76 F.3d 984, 988 (9th Cir. 1995); Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co., 561 F.2d 1365, 1374 (10th Cir. 1977); Callaway Golf Co. v. Slazenger, 384 F. Supp.2d 735, 740 (D. Del. 2005).  Plaintiff will be able to demonstrate that there is an "economic rationale" to support an award of prospective corrective advertising costs – e.g., plaintiff will demonstrate that it is still actively marketing its product, it would be impracticable for Plaintiff to adopt a new mark to mitigate its damages, and plaintiff was in no financial condition to launch a prospective advertising campaign prior to starting this litigation. Zelinski, 335 F.3d at 640; Big O Tire, 561 F.2d at 1374, Callaway, 384 F. Supp.2d at 741; cf., Adray, 76 F.3d at 988-989 (holding that prospective corrective advertising awards should not be limited to cases where the plaintiff was financially unable to launch corrective campaign earlier).

---

[1] Courts in the Third Circuit have recently ruled that, with respect to claims under the Lanham Act, evidence of actual confusion is not necessary for an award of damages – likelihood of confusion is sufficient. Choice Hotels Int'l, Inc. v. Pennave Associates, Inc., Nos. 01-1632, 01-1925, 01-2397, 43 Fed. Appx. 517, 519, 2002 WL 1986509, at *1 (3d Cir. Aug. 28, 2002); Video Pipeline, 275 F. Supp.2d at 574. However, Plaintiff will demonstrate proof of actual confusion.

c.    <u>Treble Damages – Under Lanham Act (Counts I and III)</u>

Pursuant to 15 U.S.C. 1117(a), Plaintiff will demonstrate its entitlement to up to a trebling of any award of damages it receives because Defendant's infringement was willful, knowing, and in bad faith. <u>Nintendo of America, Inc. v. Dragon Pacific Int'l.</u>, 40 F.3d 1007, 1010 (9th Cir. 1994); <u>Palmer v. Slaughter</u>, No. Civ.A. 99-899-GMS, 2000 WL 1010261, at *5-*6 (D. Del. 2000); <u>Microsoft Corp. v. CMOS Technologies, Inc.</u>, 872 F. Supp. 1329, 1339 (D. N.J. 1994).

d.    <u>Attorneys' Fees – Under Lanham Act (Counts I and III)</u>

The Lanham Act permits a prevailing plaintiff to recover costs as a matter of course, and allows a recovery of attorneys' fees in "exceptional" cases. 15 U.S.C. § 1117(a).  Courts award attorneys fees where the infringer engaged in "culpable conduct", including, but not limited to, willful infringement, bad faith, fraud or malice. <u>Securacomm Consulting, Inc. v. Securacom, Inc.</u>, 224 F.3d 273, 280-82 (3d Cir. 2000); <u>Shields v. Zuccarini</u>, 254 F.3d 476, 487 (3d Cir. 2001) (awarding attorneys' fees under the Anticybersquatting Consumer Protection Act); <u>Microsoft</u>, 872 F. Supp. at 1341; <u>Heartland Payment Sys., Inc. v. Merchant Services of America, Corp.</u>, No. 06-2811 (MLC), 2006 WL 3779764, at *2 (D. N.J. Dec. 20, 2006).  The culpable conduct need not only relate to the Lanham Act violation itself, but may also relate to the way the losing party handled himself during the litigation. <u>Securacomm</u>, 224 F.3d at 282.  The Court may award attorneys fees even if it does not otherwise award monetary damages. <u>Silva v. Karlsen</u>, 43 Fed. Appx. 486, 487 (3d Cir. 2002).  Plaintiff will demonstrate that Defendant engaged in culpable conduct sufficient to warrant an award of attorneys' fees.

Such culpable conduct will include bad faith, malice, knowing and willful infringement, and Defendant's conduct in defending against Plaintiff's claims.

Count IV

Plaintiff is entitled to an award of damages under the Federal Trademark Dilution Act because plaintiff will demonstrate that Defendant, in using the "Red Sonya" mark, intended to trade upon the reputation of plaintiff's "Red Sonja" mark or cause dilution of plaintiff's Red Sonja mark. The Federal Trademark Dilution Act expressly provides for an award of damages when such proof is demonstrated. 15 U.S.C.A. 1125(c) (amended October 6, 2006); B & H Mfg. Co., Inc. v. Bright, No. CVF016619AWISMS, 2005 WL 1342815, at *13 (E.D. Ca., May 10, 2005).

A.    DEFENDANT'S FIRST COUNTERCLAIM –
       FRAUDULENT REGISTRATION

To prove that Plaintiff committed fraud on the Patent and Trademark Office with regards to the application for and the continuation of the Red Sonja trademark, Paradox must prove all of the elements of a claim for fraud, including that (1) Plaintiff made a false representation regarding a material fact, (2) Plaintiff had knowledge or belief that the representation is false, (3) Plaintiff had an intent to induce the Patent and Trademark Office to act or refrain from acting in reliance upon the misrepresentation, (4) the Patent and Trademark Office did act in reliance upon the misrepresentation, and (5) there was damage proximately resulting from such reliance. La Cena Fine Foods, Ltd. v. Jennifer Fine Foods, No. 01-CV-5746 (JLL), 2006 WL 2014503, at *5 (D. N.J., July 18, 2006) Dial-A-Mattress Operating Corp. v. Mattress Madness, Inc., 841 F. Supp. 1339, 1353 (E.D.N.Y. 1994). Thus, Paradox must prove that Plaintiff made knowingly false, material representations in connection with the application. Quiksilver, Inc. v. Kymsta

Corp., 466 F.3d 749, 755 (9th Cir. 2006); L.D. Kichler Co. v. Davil, Inc., 192 F.3d 1349,

1352 (Fed. Cir. 1999) Metro Traffic Control, Inc. v. Shadow Network, Inc., 104 F.3d

336, 340 (Fed. Cir. 1997); Halo Mgmt., LLC v. Interland, Inc., 308 F.Supp.2d 1019, 1031

(N.D. Ca. 2003).

      Paradox cannot meet its heavy evidentiary burden by simply demonstrating that

Plaintiff made false statements to the Patent and Trademark Office; Paradox must prove

that any such false statements must have been intentionally and knowingly made and

with an intent to deceive. Kichler, 192 F.3d at 1352 ("must be a showing that [party]

knowingly submitted a false declaration with an intent to deceive"); Metro Traffic, 104

F.3d at 340-41 (no fraud where statements, though false, were not made with an intent to

deceive); Halo, 308 F. Supp.2d at 1031 (although false statements may have been made,

"it does not necessarily follow ... [that party] made a deliberate attempt to mislead the

PTO, nor that [party] offered misleading information with respect to a fact sufficiently

material to affect the PTO's processes"). It shall not be fraud if any such false statements

were made with an innocent or honest belief of as to their veracity. Quiksilver, 466 F.3d

at 755 (no fraud where party incorrectly "believed Quiksilver to be the owner of the

'ROXY' mark and that, 'to the best of his knowledge and belief, no other person, firm,

corporation or association has the right to use [the 'ROXY'] mark in commerce"); In re

Pasteurized Eggs Corp., No. 02-13086-JMD, 2003 WL 21715358 (Bankr., D. N.H., July

15, 2003) (no fraud where charging party could not prove that registrant knew or believed

that signature was a forgery or unauthorized); American Fidelity & Liberty Ins. Co. v.

American Fidelity Group, No. CIV. A. 97-4307, 2000 WL 1385899, at *17 (E.D. Pa.,

Sept. 25, 2000).  Paradox must further show that the Patent and Trademark Office did rely on such false statements in deciding to grant registration or renewal of the trademark.

Further, Paradox must definitively prove these elements by clear and convincing evidence, and any doubt must be weighed against the party alleging fraud. Kilcher, 192 F.3d at 1351; Metro Traffic, 104 F.3d at 340; La Cena, 2006 WL 2014503, at *2 (finding no fraud where the alleging party relied on vague, conclusory statements attacking the mark's validity); Halo, 308 F. Supp.2d at 1031; American Fidelity, 2000 WL 1385899, at *17 (fraud must be proved by clear and convincing evidence); Dial-A-Mattress, 841 F.Supp. at 1353.

B.    DEFENDANT'S SECOND COUNTERCLAIM – UNFAIR COMPETITION

1.    Timing Of Interposing False Advertising Claim

Paradox's claim for false advertising under the Lanham Act should be precluded because such claim was not pleaded in Paradox's Counterclaims, but rather, was impermissibly raised for the first time in the pre-trial order and has not been subject to discovery. Missigman v. USI Northeast, Inc., 131 F. Supp.2d 498, 517-18 (S.D.N.Y. 2001); Sound Video Unlimited, Inc. v. Video Shack Inc., 700 F. Supp. 127, 150-51 (S.D.N.Y. 1988) (precluding claim for rescission based on frustration of purpose, mutual mistake and material breach of contract which was raised for the first time in pretrial order); Shafarman v. Ryder Truck Rental, Inc., No. 83 Civ. 3000 (SWK), 1984 WL 904, at *2-*3  (S.D.N.Y., Sept. 24, 1984) (amending pretrial order to eliminate claim which was raised therein for the first time).

2.    <u>Defendant's False Advertising Claim Is Deficient As A Matter Of Law</u>

To the extent that Defendant's second counterclaim for Unfair Competition sounds in False Advertising, Paradox would be required to prove that (1) Plaintiff has made false or misleading statements as to its own product, (2) that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience, (3) that the deception is material in that it is likely to influence purchasing decisions, (4) that the advertised goods travelled in interstate commerce, and (5) that there is a likelihood of injury to the plaintiff in terms of declining sales, loss of good will. <u>Johnson & Johnson-Merck Consumer Pharm. Company v. Rhone-Poulenc Rorer Pharm., Inc.</u>, 19 F.3d 125, 129 (3d Cir. 1994); <u>Ditri v. Coldwell Banker Residential Affiliates, Inc.</u>, 954 F.2d 869, 872 (3d 1992); <u>Labware, Inc. v. Thermo Labsystems, Inc.</u>, No. Civ. A 04-2545, 2005 WL 1541028, at *9 (E.D. Pa., June 29, 2005).

To succeed on its cause of action, Paradox must prove that the allegedly false claim is false or misleading, and not merely unsubstantiated. <u>Johnson</u>, 19 F.3d at 129. If Paradox cannot prove that the allegedly false claim is literally false, then it bears the burden of proving, by a preponderance of the evidence, that the claim was both impliedly false and that is caused some degree of actual confusion or misleading in the consumer public. <u>Ditri</u>, 954 F.2d at 872 ("If the advertisement does not state literal falsehoods, then the burden is on the plaintiff to show that the advertisement's intended audience is left with a false impression"); <u>Sandoz Pharm. Corp. v. Richardson-Vicks, Inc.</u>, 902 F.2d 222, 228-29 (3d Cir. 1990) ("where advertisements are not literally false, plaintiff bears the burden of proving actual deception") (citations omitted); <u>Astrazeneca LP v. Tap Pharmaceutical Prod., Inc.</u>, 444 F. Supp.2d 278 (D. Del. 2006) ("Where a plaintiff cannot

show that a claim is literally false under the Lanham Act, it must show that the advertisement conveyed an impliedly false message that was misleading to consumers"); Regscan, Inc. v. Dean Mark Brewer, No. 04-6043, 2006 WL 4100007, at *4 (E.D. Pa. Sept. 5, 2006). The actual public reaction to the claim is the proper measure of the claim's impact, and thus Paradox "cannot obtain relief by arguing how consumers *could* react; it must show how consumers *actually do* react." Sandoz, 902 F.2d at 229; accord, Johnson, 19 F.3d at 129-30; Astrazeneca, 444 F. Supp.2d at 295-96.

3.    To The Extent That The Second Counterclaim Is For Unfair Competition

To the extent that Paradox continue to assert its original theory of Unfair Competition – that Plaintiff has somehow acted unfairly in relation to the Conan character – Paradox must demonstrate, among other things, that it owns the "Conan" mark. Kos Pharm., Inc. v. Andrx Corp., 369 F.3d 700, 708-09 (3d Cir. 2004); Medavante, Inc. v. Proxymed, Inc., 2006 WL 2927623, at *5 (D. N.J., Oct. 12, 2006); Super 8 Motels, Inc. v. Sai Krupa Victoria, Inc., 2006 WL 2830965, at *4 (D. N.J., Sept. 29, 2006); Video Pipeline, Inc. v. Buena Vista Home Entm't, Inc., 275 F. Supp.2d 543, 569 (D. N.J. 2003). Paradox cannot now claim that it is the owner of the "Conan" mark for the purposes of this unfair competition claim, when throughout the discovery process, it has insisted that it was not the owner of such mark. Pediatric Affiliates v. United States, No. 06-1979, 2007 WL 1113785, at *2 (3d Cir. April 16, 2007) (a party to a litigation will not be permitted to assume "inconsistent or mutually contradictory positions with respect to the same matter in the same or a successive series of suits"); Scarano v. Central R. Co., 203 F.2d 510, 513 (3d Cir. 1953).

C.    DEFENDANT'S THIRD COUNTERCLAIM – ABUSE OF PROCESS

To succeed on a claim of abuse of process, Paradox must prove that Plaintiff had (1) an ulterior purpose and (2) committed a willful act in the use of process that is not proper in the regular conduct of proceedings. Bayer AG v. Sony Electronics, Inc., 229 F. Supp.2d 332, 368 (D. Del. 2002); Marvel v. Lasher, 129 B.R. 27, 28 (D. Del. 1991); Feinman v. Bank of Delaware, 728 F. Supp. 1105, 1115 (D. Del. 1990). Plaintiff, as the trademark owner, had an entitlement to bring litigation to defend its mark. Compare Bayer, 229 F. Supp.2d at 368 (presumptive owner of patent was entitled to bring action to defend patent). Thus, Paradox will need to prove more than that Plaintiff had bad motives in bringing the suit; Plaintiff must have used the process after its issuance to coerce or injure. Carmel v. Integrated Brands, Inc., No. 05CV 1729(DMC), 2006 WL 383769, at * 2 (D. N.J. Feb. 17, 2006); Bannum, Inc. v. Citizens Fro A Safe Ward Five, Inc., 383 F. Supp.2d 32, 47 (D. D.C. 2005) ("simply filing a lawsuit is not actionable, regardless of the ulterior motive that may have prompted the lawsuit"); Fresh Made, Inc. v. Lifeway Foods, Inc., No. Civ.A. 01-4254, 2002 WL 31246922, (E.D. Pa., Aug. 2002) ("complaint alleging only that one party initiated suit against another for improper purposes is insufficient to state a claim for malicious abuse of process"). "Merely carrying out the process to its authorized conclusion" would not result in liability, even if Plaintiff did so with bad intentions; Paradox must show some form of coercion to obtain a collateral advantage, not properly involved in the proceeding itself. Bayer, 229 F. Supp.2d at 368 (holding there must be a "definite act or threat not authorized by the process or aimed at an objective not legitimate in the use of process") (citation omitted); Marvel, 129 B.R. at 28; Feinman, 728 F. Supp. at 1115.

Further, Paradox's claim for abuse of process is insufficient if it merely alleges that Plaintiff brought the instant action with an intent to harass or force Paradox to expend money. Broadway Mgmt. Services, Ltd. V. Cullinet Software, Inc., 652 F. Supp. 1501, 1503 (D. Mass. 1987); Federal Pharmacal Supply, Inc. v. Murray, 352 F. Supp. 278, 281 (W.D. Mo. 1972) (allegation of intent to harass not a willful act sufficient to support a claim for abuse of process).

D.    DEFENDANT'S AFFIRMATIVE DEFENSE FOR FAIR USE

In order to succeed on its fair use affirmative defense, Paradox must prove that it used the "Red Sonya" mark (or the "Red Sonja" mark to the extent that it improperly used such mark as well), (1) to describe a characteristic of its own product, (2) not as a trademark (source identifier), and (3) such use was in good faith. Paccar Inc. v. Telescan Technologies, L.L.C., 319 F.3d 243, 255 (6th Cir. 2003); Brother Records, Inc. v. Jardine, 318 F.3d 900, 906 (9th Cir. 2003) Smith v. Ames Department Stores, Inc., 988 F. Supp. 827, 836 (D. N.J. 1997); accord, 15 U.S.C. § 1115(b)(4) (it is a defense to infringement "[t]hat the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark, of the party's individual name in his own business, or of the individual name of anyone in privity with such party, or of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party, or their geographic origin"). The rationale behind the fair use defense is that "[w]hen a plaintiff chooses a mark with descriptive qualities . . . 'he cannot altogether exclude some kinds of competing uses,' particularly those which use words in their primary descriptive and non-trademark sense." Smith, 988 F. Supp. at 836 (quoting

<u>United States Shoe Corp. v. Brown Group, Inc.</u>, 740 F. Supp. 196, 198 (S.D.N.Y. 1990)

<u>aff'd</u>, 923 F.2d 844 (2d Cir. 1990)).

Thus, under Third Circuit law, Paradox can only avail itself of the fair use defense if the Court finds that plaintiff's "Red Sonja" mark is descriptive, as opposed to suggestive or arbitrary. <u>Smith</u>, 988 F. Supp. at 836 (citing <u>Institute For Scientific Information, Inc. v. Gordon an Breach, Science Publishers</u>, 931 F.2d 1002, 1008 (3d Cir. 1991)); <u>Automated Litigation Technologies, Inc. v. Jurist Reporting Service, Inc.</u>, Civ. A. No. 92-3509, 1993 WL 29168, *5 (E.D. Pa. Feb. 4, 1993) (finding that defendant cannot claim fair use defense where plaintiff's "Min-U-Script®" mark was not descriptive).

If the Court does find that the "Red Sonja" mark itself is descriptive, then, for Paradox to prevail on the fair use defense, it must prove that its own use of the phrase "Red Sonja" or "Red Sonya" is to describe a characteristic of its own product, and not as a source identifier. <u>Paccar</u>, 319 F.3d at 255 (no fair use where the marks "Peterbilt" and "Kenworth" were used as trademarks and not to describe defendant's product); <u>Brother Records</u>, 318 F.3d at 907 (finding no fair use where defendant used the trademark "The Beach Boys" as a source identifier to denote "the music band – and its members – that popularized California surfing culture", and not for such phrase's descriptive meaning of "boys who frequent a stretch of sand beside the sea"); <u>Lindy Pen Co., Inc. v. Bic Pen Corp.</u>, 725 F.2d 1240, 1248 (no fair use where Bic was making "a trademark use of the word 'Auditor's') (9th Cir. 1984); <u>Saks & Co. v. Hill</u>, 843 F. Supp. 620, 625 (S.D. Ca. 1993) (no fair use because defendant's store name "Sacks Thrift Avenue" did not describe the geographic origin of the goods or services).

**EXHIBIT 4**

**DEFENDANTS' STATEMENT OF ISSUES OF LAW**
**THAT REMAIN TO BE LITIGATED**

I.  **ISSUES ON WHICH PLAINTIFF BEARS THE BURDEN OF PROOF**

    A.  Trademark Infringement And Unfair Competition.[1]

        Plaintiff bears the burden of proving both trademark infringement and unfair competition. *Freedom Card, Inc. v. JP Morgan Chase & Co.*, 432 F.3d 463, 470 (3d Cir. 2005) ("Of course, the plaintiff bears the burden of proof.") (citations omitted). To meet that burden, a plaintiff must prove that: (1) the mark at issue is valid and legally protectable; (2) it owns the mark; (3) the defendant used the mark in commerce on or in connection with any goods or services or container for goods; and (4) this "use" was likely to cause confusion concerning the origin of the goods or services. *See, e.g., Freedom Card*, 432 F.3d at 470; *Checkpoint Sys. v. Check Point Software Techs. Inc.*, 269 F.3d 270, 279 (3d Cir. 2001).

        The Third Circuit evaluates trademark infringement and unfair competition under identical standards – likelihood of confusion. *A&H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 210 (3d Cir. 2000) ("We measure federal trademark infringement, 15 U.S.C. § 1114, and federal unfair competition, 15 U.S.C. § 1125(a)(1)(A), by identical standards."); *Fisons*, 30 F.3d at 473 ("Likelihood of confusion is also the test for actions brought under section

---

[1]  There is no legal basis for plaintiff's claims of unfair competition based on Paradox filing "applications for trademarks and service marks for the word 'HYBORIA.'" Neither the Lanham Act nor common law protects against a competitor's efforts to gain trademark exclusivity by merely filing a trademark application. *E.g., Heileman Brewing Co. v. Anheuser-Busch, Inc.*, 676 F. Supp. 1436, 1496-97 (E.D. Wis. 1987) (holding efforts to obtain trademark registration in L.A. mark for beer did not violate § 43(a), finding there is "there is no direct precedent for th[at] type of claim[]"); *see also Omega S.A. v. Omega Eng'g, Inc.*, No. 01-2104 (SRU), 2005 U.S. Dist. LEXIS 33480, at *24-26 (D. Conn. Dec. 6, 2005) (holding the filing of trademark applications with the PTO "even if accompanied by a bad faith intent that is 'unfair' to [plaintiff]," did not constitute unfair competition under state law); *Dunn Computer Corp. v. Loudcloud, Inc.*, 133 F. Supp. 2d 823, 831 (E.D. Va. 2001) (dismissing plaintiff's claims based on the filing of trademark applications "because under the Lanham Act, only the registration of a mark causes injury to others").

43(a) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A) for unfair competition to prevent false representations as to source or origin of goods or services by a mark confusingly similar to one already in use."); *Bijur Lubricating Corp. v. Devco Corp.*, 332 F. Supp. 2d 722 , 727 (D.N.J. 2004) ("[I]n the Third Circuit the test for common law infringement and unfair competition is identical to the test for federal infringement and unfair competition.") (citations omitted).

      1.    <u>Establishing Validity And Ownership.</u>

Where a mark has "not achieved incontestability, then validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive." *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 438 (3d Cir. 2000). Secondary meaning exists when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Id.* (citations omitted). The burden of proving secondary meaning is on the proponent of the mark and is usually established through extensive advertising. *Id.*

      2.    <u>Defendant Use Of Mark Was To Identify Goods And Services.</u>

To be actionable under the Lanham Act, a defendant must "use" the plaintiff's mark "on or in connection with any goods or services, or any container for goods." *See* 15 U.S.C. §§ 1114, 1125(a)(1). "The Supreme Court has made it clear that trademark infringement law prevents only unauthorized uses of a trademark in connection with a commercial transaction in which the trademark is being used to confuse potential consumers." *Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 676-77 (2005) (citations omtted); *see also A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 203 (3d Cir. 1999) (en banc) ("The confusion that trademark law seeks to prevent is confusion as to the source of the goods."). So too, has the Supreme Court held, in the context of unfair competition under § 43(a), that "origin of goods … refer[s] to the producer of the tangible goods that are offered for sale, and not to the author of any

idea, concept, or communication embodied in those goods." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 26-27 (2003).

Thus, there is a "preliminary question about whether defendants are using the challenged mark in a way that identifies the source of their goods." *Interactive Prods. Corp. v. A2Z Mobile Office Solutions, Inc.*, 326 F.3d 687, 695 (6th Cir. 2003); *see also 1-800 Contacts, Inc. v. WHENU.com, Inc.*, 414 F.3d 400, 406-07 (2d Cir. 2005) (holding that "'use' must be decided as a threshold matter because, while any number of activities may . . . create a likelihood of confusion, no such activity is actionable under the Lanham Act absent the 'use' of a trademark") (citations omitted). Where a defendant uses a name or term "in a 'non-trademark' way - that is, in a way that ***does not identify the source of a product*** - then trademark infringement and false designation of origin laws do not apply." *Interactive Prods.*, 326 F.3d at 695.[2]

     3.    <u>Likelihood Of Confusion.</u>

To prove likelihood of confusion, plaintiff "must show that consumers viewing the mark would probably assume the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Checkpoint Sys. v. Check Point Software Techs.Inc*, 269 F.3d 270, 278 (3d Cir. 2001) (citation omitted); *A&H Sportswear*, 237 F.3d at 198 ("The relevant inquiry is not whether consumer confusion is a possibility, but

---

[2]    *See also Felix the Cat Prods., Inc. v. New Line Cinema Corp.*, No. 99-9339, 2000 U.S. Dist. LEXIS 21763, at *7-8 (C.D. Cal. 2000) (holding that defendant's use of plaintiff's mark in its movie "d[id] not qualify as use of the mark to 'identify or distinguish' goods 'to indicate their source' as required to fall under the purview of trademark law"); *Hormel Foods Corp. v. Jim Henson Prods.*, No. 95-5473, 1995 U.S. Dist. LEXIS 13886, at *29 (S.D.N.Y. Sept. 25, 1995), *aff'd*, 73 F.3d 497, 504 (2d Cir. 1996) (finding plaintiff's allegations that defendant "falsely represented that it holds valid trademark rights in the name and likeness of [its character] Spa'am" was not actionable under the Lanham Act); *Lucasfilm Ltd., v. High Frontier*, 622 F. Supp. 931, 934 (D.D.C. 1985) (where a defendant has not affixed any trademark to goods or services, it is not engaged in creating confusion).

whether confusion is likely."). And, the test is "likelihood of confusion from the perspective of ordinary consumers, not from the perspective of people in the trade." *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 476 (3d Cir. 1994). "[T]he burden of proving likelihood of confusion rests with the plaintiff." *KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 121 (2004).

The Third Circuit has adopted a non-exhaustive ten factor test, known as the *Lapp* factors, for determining likelihood of confusion. *E.g., Freedom Card*, 432 F.3d at 470. Those factors are:

(1)   The degree of similarity between the owner's mark and the alleged infringing mark;

(2)   The strength of the owner's mark;

(3)   The price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;

(4)   The length of time the defendant has used the mark without evidence of actual confusion arising;

(5)   The intent of the defendant in adopting the mark;

(6)   The evidence of actual confusion;

(7)   Whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

(8)   The extent to which the targets of the parties' sales efforts are the same;

(9)   The relationship of the goods in the minds of consumers because of the similarity of function;

(10)  Other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market or that he is likely to expand into that market.

*Id.* at 471; *Interface Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1229 (3d Cir. 1978). "None of these factors are determinative in a likelihood of confusion analysis, and each factor must be weighed and balanced against the other." *Checkpoint*, 269 F.3d at 280; *A & H Sportswear*, 237 F.3d at 207 (stating that if a district court finds certain *Lapp* factors inapplicable it must "explain its choice not to employ those factors").

Consumer surveys "are the most direct method of showing the likelihood of confusion created by an infringing defendant." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475 (3d Cir. 1990). "Plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable." *Id.*; *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 373 (D.N.J. 2002) (plaintiff's failure to conduct consumer survey justifies an inference "that the plaintiff believes the results of the survey will be unfavorable"); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) (same); *see also Star Indus. v. Bacardi & Co.*, 412 F.3d 373, 388 (2d Cir. 2005) (plaintiff's "failure to present its own consumer survey weighs against a finding of consumer confusion").

(a)    Degree Of Similarity.

"Marks are confusingly similar if ordinary consumers would likely conclude that the two products share a common source, affiliation, connection or sponsorship." *A&H Sportswear*, 237 F.3d at 216. Although mark similarity "may be the most important factor in the *Lapp* analysis," it is "not necessarily determinative of likely confusion." *Checkpoint*, 269 F.3d at 282.

When determining the similarity of the marks, courts look at "'whether the labels create the 'same overall impression' when viewed separately.'" *Fisons*, 30 F.3d at 477 (citation

omitted). "Side-by-side comparison of the two marks is not the proper method for analysis when the products are not usually sold in such a fashion. Instead, an effort must be made to move into the mind of the roving consumer." *A&H Sportswear*, 237 F.3d at 216. "Courts must 'compare the appearance, sound and meaning of the marks' to determine whether the 'average consumer, on encountering one mark in isolated circumstances of marketplace and having only [a] general recollection of the other, would likely confuse or associate the two.'" *Checkpoint*, 269 F.3d at 281 (citations omitted).

(b)    <u>Strength of The Owner's Mark.</u>

Under the Lanham Act, "stronger marks receive greater protection." *A & H Sportwear*, 237 F.3d at 222. The strength of a mark is determined by (1) the distinctiveness or conceptual strength of the mark and (2) the commercial strength or marketplace recognition of the mark. *Fisons,* 30 F.3d at 478-79. The first prong of this test looks to the inherent features of the mark; the second looks to factual evidence of "marketplace recognition." *Id.* at 479.

(i)    Distinctiveness as a Measure of the Strength<br>of The Owner's Mark.

Distinctiveness is measured by classifying the mark within one of four categories based on their levels of inherent distinctiveness. *Checkpoint*, 269 F.3d at 282; *Fisons,* 30 F.3d at 479. These four categories, from weakest to strongest, are: (1) generic marks, which function as the common descriptive name of a product class; (2) descriptive marks, which convey the intended purpose, function or use of the goods, or a desirable characteristic of the goods; (3) suggestive marks, which suggest a quality or ingredient of goods, and require consumer imagination, thought or perception to determine what the product is; and (4) arbitrary or fanciful marks, which use terms that neither describe nor suggest anything about the product, and bear no

logical or suggestive relation to the actual characteristics of the goods. *Checkpoint*, 269 F.3d at 282.

"Although the conceptual strength of a mark is often associated with the particular category of 'distinctiveness' into which a mark falls (*i.e.* arbitrary, suggestive, or descriptive), that is not the only measure of conceptual strength." *A&H Sportswear*, 237 F.3d at 222. "The classification of a mark as arbitrary, suggestive, or descriptive is only secondarily used to determine the degree of protection a mark should receive once protectability has been established," and is not necessarily indicative of its actual strength. *Id.*

Merely descriptive marks, for instance, are "not entitled to strong protection" unless there is showing of secondary meaning. *Checkpoint*, 269 F.3d at 282 n.10. As noted above, secondary meaning exists when the mark "is interpreted by the consuming public to be not only an identification of the product or services, but also a representation of the origin of those products or services." *Commerce*, 214 F.3d at 438 (citation omitted). Secondary meaning, which is generally "established through extensive advertising," is examined under a number of factors, including: "(1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion." *Id.* (citing *Ford Motor Co. v. Summit Motor Prods., Inc.,* 930 F.2d 277, 292 (3d Cir. 1990)).

        (ii)    Commercial   Strength   or   Marketplace
             Recognition of the Mark.

Commercial strength is also used to measure a mark's strength by looking to factual evidence of "marketplace recognition." *A & H Sportswear*, 237 F.3d at 221. Marketplace recognition is assessed by evidence of: (1) the length of time the mark was used by the owner;

(2) the amounts spent on trademark-related advertising; and (3) the steps taken to increase public recognition of the mark. *A & H Sportswear*, 237 F.3d at 224; *Chase Manhattan Bank, USA, N.A. v. Freedom Card, Inc.*, 333 F.Supp.2d 239, 244 (D. Del. 2004), *aff'd* 432 F.3d 463 (3d Cir. 2005) (describing evidence of commercial strength as "the amount of money that [mark owner] spent on advertising, whether [mark owner] took any steps to increase public recognition of [its] mark, and whether the public does, in fact, recognize the [] mark").

Third party usage of similar marks also indicates the weakness of a mark. *Citizens Fin. Group, Inc. v. Citizens Nat. Bank*, 383 F.3d 110, 123 (3d Cir. 2004) ("[A]s a general rule, widespread use of even a distinctive mark may weaken the mark"); *Accu Personnel, Inc. v. Accustaff, Inc.*, 823 F. Supp. 1161, 1166 (D. Del. 1993) ("Where there are numerous similar marks, the mark in question may be found to have been weakened.").

        (c)      Factors Indicative Of The Care And Attention
                  Expected Of Consumers When Making A Purchase.

"When consumers exercise heightened care in evaluating the relevant products before making purchasing decisions, courts have found there is not a strong likelihood of confusion." *Checkpoint*, 269 F.3d at 284. "Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act violations." *Id.*; *see also Ford Motor Co.*, 930 F.2d at 293 ("Professional buyers, or consumers of very expensive goods, will be held to a higher standard of care."). "As a result, customers are more likely to notice what, in other contexts, may be relatively minor differences in names." *Chase Manhattan*, 333 F.Supp.2d at 248. This factor is typically proven utilizing consumer surveys to determine the care and attention the consumers use in making purchases. *Charles Jacquin*, 921 F.2d at 475.

(d)    Length of Time Defendant Has Used The Mark
Without Evidence Of Actual Confusion.

"When parties have used similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products, there is an inference that future consumers will not be confused either." *Fisons*, 30 F.3d at 476; *Pharmacia*, 201 F. Supp. 2d at 372 ("Although evidence of actual confusion is not necessary to prove likelihood of confusion, such concurrent use for a substantial period of time with no confusion may create a 'presumption that there is little likelihood of confusion,' and weighs heavily against a finding of likely confusion.") (citation omitted).

(e)    Intent Of The Defendant In Adopting The Mark.

"Intent is relevant to the extent that it bears on the likelihood of confusion." *A&H Sportswear*, 237 F.3d at 225. "[A] defendant's intent will indicate a likelihood of confusion only if an intent to confuse consumers is demonstrated via purposeful manipulation of the junior mark to resemble the senior's." *Id*. at 225-26 (citation omitted). This inquiry "extends beyond asking whether a defendant purposely chose its mark to promote confusion and appropriate the prior user's good will." *Checkpoint*, 269 F.3d at 286; *Autozone Inc. v. Tri-State Motor Outlet*, No. 04-103-SLR, 2005 U.S. Dist. LEXIS 10924 (D. Del. Jun. 7, 2005) (same). It considers any good faith explanation a defendant has in using a mark. *Scott Paper*, 589 F.2d at 1230 ("Scott's Liquid Gold was named after its originator, Lee Scott . . . This good faith explanation of the origin of the accused mark contrasts with the situation sometimes suggesting in other cases adoption of a mark in order to take advantage of the owner's goodwill." ); *First Keystone*, 923 F. Supp. at 705 (finding factor weighed in favor of defendant in good faith as the evidence "indicates that Defendant chose its mark innocently").

(f)    Evidence Of Actual Confusion.

"Ownership of a trademark does not guarantee total absence of confusion in the marketplace." *A&H Sportswear*, 237 F.3d at 226.  "The Lanham Act only protects against mistaken purchasing decisions and not against confusion generally." *See Checkpoint Sys. Inc. v. Check Point Software Techs., Inc.,* 104 F. Supp. 2d 427, 464 (D.N.J. 2000) (citations omitted), *aff'd,* 269 F.3d 270 (3d Cir. 2001).  Thus, "[g]eneralized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions." *First Keystone Fed. Savs. Bank v. First Keystone Mortgage, Inc.*, 923 F. Supp. 693, 705 (E.D. Pa. 1996); *Pharmacia*, 201 F. Supp. 2d at 374 ("Trademark confusion is limited to consumer confusion in the context of a purchasing decision."); *see also Chase Manhattan*, 333 F.Supp.2d at 249 ("The most relevant evidence of actual confusion is the testimony of a reasonably prudent purchaser who was in fact confused by defendant's trademark.") (citation omitted).

The Third Circuit is reluctant, however, to accept evidence of actual confusion offered by a plaintiff's employees or by people affiliated with the plaintiff and views such evidence "with skepticism." *See, e.g., Citizens Financial,* 383 F.3d at 122 (explaining "'actual confusion' evidence collected by employees of a party in a trademark action must be viewed with skepticism because it tends to be biased or self-serving."); *Checkpoint,* 269 F.3d at (finding that "the District Court properly took into account the potential bias of the [plaintiff's employees who testified (regarding actual confusion)"); *A & H Sportswear,* 237 F.3d at 227 ("The District Court, while not explicitly discrediting this evidence, viewed it with great skepticism, given the interested sources and the inability to cross-examine the supposedly confused individuals."); *Autozone,* 2005 U.S. Dist. LEXIS 10924, at *32 (finding testimony from three of plaintiff's employees regarding initial interest confusion was "not entitled to great weight"); *see also Star Indus.,* 412 F.3d at 377 (discounting confusion evidence that "consisted entirely of testimony by

-10-

several interested witnesses recounting a handful of anecdotes, including a number of hearsay statements by unidentified and unidentifiable declarants").

So too, have "isolated and idiosyncratic" anecdotes of confusion been discounted. *A&H Sportswear*, 237 F.3d at 227 (noting "cases warn against using isolated instances of confusion to buttress a claim.") (citations omitted); *Freedom Card*, 432 F.3d at 479 ("anecdotal evidence [of actual confusion] was *de minimis*"); *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 269 F.3d 114, 124 (2d Cir. 2001) (holding two anecdotes of actual confusion was *de minimis*); *EMSL Analytical, Inc. v. Testamerica Analytical Testing Corp*, No. 05-5259, 2006 U.S. Dist. LEXIS 16672, at *29 (D.N.J. Apr. 4, 2006) (same).

And, "where confusion has little or no meaningful effect in the marketplace, it is of little or no consequence." *Checkpoint*, 269 F.3d at 297; *Nora Beverages*, 269 F.3d at 124 (explaining "[i]nquiries about the relationship between an owner of a mark and an alleged infringer do not amount to actual confusion" but are "premised upon a lack of confusion between the products such as to inspire the inquiry itself"); *Louis Vuitton Malletier S.A. v. Haute Diggity Dog, LLC*, 464 F. Supp. 2d 495, 502 (E.D. Va. 2006) ("Nor are the alleged misspellings of 'Chewy Vuiton' as 'Chewy Vuitton' indicative of customer confusion."); *Hormel*, 1995 U.S. Dist. LEXIS 13886, at *19-20 (holding misspellings and mispronunciations in the media of defendant's character "Spa'am" as plaintiff's trademark "SPAM" was merely proof of "confusion as to the spelling and pronunciation of [defendant's] character's name" but not evidence of consumer confusion).

      (g)    Whether Goods Are Marketed Through The Same Channels Of Trade And Advertised Through The Same Media.

"The greater the similarity in advertising and marketing campaigns, the greater the likelihood of confusion." *Checkpoint*, 269 F.3d at 288-89 (citation omitted).  This "fact

intensive inquiry" requires examining the "the trade exhibitions, publications and other media the parties use in marketing their products as well as the manner in which the parties use their sales forces to sell their products to consumers." *Id.* at 289. "Fine distinctions between the channels in which the products are sold may weigh in favor of diminishing a likelihood of confusion." *A&H Sportswear*, 237 F.3d at 225.

        (h)    Extent The Targets Of The Parties' Sales Efforts
                Are The Same.

"This analysis too is intensely factual." *Checkpoint*, 269 F.3d at 289. Only "when "parties target their sales efforts to the same consumers," and not the same general market, does this factor favor a likelihood of confusion. *Id.*; *Chase Manhattan*, 333 F.Supp.2d at 249 ("Even though the CHASE FREEDOM credit card and the FREEDOM CARD are both used in connection with credit cards and credit card services, the undisputed evidence in this case indicates that they are targeted at different groups of consumers.").

        (i)    Relationship Of The Goods In The Minds Of
                Consumers.

This factor considers "how similar, or closely related, the products are," and "focuses on the nature of the products themselves, asking whether it would be reasonable for consumers to associate them or see them as related." *Kos Pharms. v. Andrx Corp.*, 369 F.3d 700, 723 (3d Cir. 2004). Typically proven utilizing consumer surveys that consumers believe the products have a similar function, *see Charles Jacquin*, 921 F.2d at 475, "[t]he question is whether the consumer might therefore reasonably conclude that one company would offer both of [the] related products." *Fisons*, 30 F.3d at 481.

(j)    Other Factors Suggesting The Consuming Public Might Expect The Prior Owner To Manufacture A Product In The Defendant's Market Or Expand Into That Market.

"Evaluating this factor, courts look to evidence that other companies sell products in both markets, as well as evidence that the products at issue are so closely related that the consuming public might find it natural for one company to do so." *Checkpoint*, 269 F.3d at 290.

B.    Trademark Dilution Under the Lanham Act.

The Trademark Dilution Revision Act of 2006 (the "TDRA"), which became effective on October 6, 2006, clarified and revised federal dilution law.  Among its revisions were: (1) establishing "likelihood of dilution" standard for dilution claims, rather than an "actual dilution" standard; (2) reconfiguring the factors used to determine whether a mark is "famous," including a rejection of dilution claims based on "niche" fame; and (iii) specifying separate causes of action for dilution by blurring and dilution by tarnishment.  *Compare* 15 U.S.C.A. § 1125(c)(5)(2007) *with* 15 U.S.C.A. § 1125(c)(2)(2005); *Century 21 Real Estate LLC v. Century Surety Co.*, No. 03-0053, 2007 WL 433579, at *1 (D. Ariz. Feb. 6, 2007).[3]

1.    The TDRA Applies To Plaintiff's Federal Dilution Claim.

The TDRA makes clear that amended § 1125(c) is retroactive and applicable in this case.  15 U.S.C. § 1125(c)(5) (2007).  Courts interpreting the TDRA have held that, when

---

[3]    Amended 15 U.S.C. § 1125(c), entitled "Dilution by Blurring; Dilution by Tarnishment," provides in pertinent part:

> Subject to the principles of equity, the owner of a famous mark that is distinctive, inherently or through acquired distinctiveness, shall be entitled to an injunction against another person who, at any time after the owner's mark has become famous, commences use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark.

injunctive relief is sought, the TDRA applies even if that claim was brought before October 6, 2006. *See, e.g., Starbucks Corp. v. Wolfe's Borough Coffee*, 477 F.3d 765, 766 (2d Cir. 2007) (holding "to the extent that [the plaintiff] has sought injunctive relief on the issue of dilution" the TDRA prospectively applied to a claim filed before the statute's effective date); *Louis Vuitton*, 464 F. Supp. 2d at 504 (finding that, because plaintiff "pled for injunctive relief on the issue of dilution . . . , the amended statute will apply in this case").[4]

        2.    Proving Dilution Under the TDRA.

      To establish a prima facie claim for dilution under the TDRA, a plaintiff must prove:

     (1)    It owns "a famous mark that is distinctive" in light of all relevant factors, including the four listed in § 1125(c)(2)(A);

     (2)    The defendant is making a "use of a mark . . . in commerce;"

     (3)    Defendant's use began "after the owner's mark has become famous;" and

     (4)    Defendant's use "is likely to cause dilution" by blurring, in light of the totality of the six factors listed in § 1125(c)(2)(B), or "dilution by tarnishment."

15 U.S.C. § 1125(c) (2007); *AutoZone, Inc. v. Strick*, 466 F. Supp. 2d 1034, 1045 (N.D. Ill. 2006) ("[P]laintiffs bear the burden of proof."); *Louis Vuitton*, 464 F. Supp. 2d at 504-06.

---

[4]    Although the TDRA established a relaxed "likelihood of dilution" standard, a plaintiff must still prove "***actual dilution***" for claims of monetary relief as required by the Supreme Court in *Moseley v. v. Secret Catalogue, Inc.*, 537 U.S. 418, 433 (2003), in addition to the willfulness requirement set forth in the TDRA. *Dan-Foam A/S v. Brand Named Beds, LLC*, No. 06-6350, 2007 WL 1346609,*7 (S.D.N.Y. May 4, 2007) ("[A]ctual dilution under *Moseley* still applies when a pre-October 6, 2006 claimant seeks monetary relief."); *Malletier v. Dooney & Bourke, Inc.*, No. 04-2990, 2007 WL 1222589, at *3-4 (S.D.N.Y. Apr. 24, 2007) ("The second sentence of subsection 1125(c)(5), entitling owners of famous marks to dilution damages, contains an unambiguous date restriction that authorizes the application of the "likelihood of dilution" standard as a basis for recovering damages to civil actions where the diluting mark or trade name was first introduced in commerce *after* October 6, 2006 . . . Congress did not intend that the relaxed evidentiary standard would apply retroactively.").

According to the amended statute, "dilution by blurring" is defined as the "association arising from the similarity between a mark or trade name and a famous mark that impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B).  When determining whether a mark or trade name is likely to cause dilution by blurring, a court may consider all relevant factors, including the following:

> (i) the degree of similarity between the mark or trade name and the famous mark;

> (ii) the degree of inherent or acquired distinctiveness of the famous mark;

> (iii) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark;

> (iv) the degree of recognition of the famous mark;

> (v) whether the user of the mark or trade name intended to create an association with the famous mark; and

> (vi) any actual association between the mark or trade name and the famous mark.

*Id.*

Notably, the TDRA provides that certain activities are not actionable.  Those activities include"[a]ny fair use, including a nominative or descriptive fair use," "[a]ll forms of news reporting and news commentary," and "[a]ny noncommercial use of a mark." § 1125(c)(3).

### 3.    Only Famous Marks That Are Distinctive Are Protected Under The TDRA.

To establish fame under the TDRA, a plaintiff must now prove its mark is "*widely recognized by the general consuming public of the United States* as a designation of source of the goods or services of the mark's owner." 15 U.S.C. § 1125(c)(2)(A) (emphasis added).  The Third Circuit has recently explained that "[t]his is a rigorous standard, as it extends protection only to highly distinctive marks that are well-known throughout the country." *Green v.*

*Fornario*, No. 06-2649, 2007 U.S. App. LEXIS 10873, *15, __ F.3d __ (3d Cir. May 8, 2007)

(citing 15 U.S.C. § 1125(c)(2)(A)).    Notably, federal dilution law did not include this rigorous

standard for fame prior to October 2006. *Compare* 15 U.S.C.A. § 1125(c)(5)(2007) *with* 15

U.S.C.A. § 1125(c)(2)(2005).    "Its inclusion in the TDRA was intended to reject dilution claims

based on 'niche' fame, *i.e.* fame limited to a particular channel of trade, segment of industry or

service, or geographic region." *Dan-Foam*, 2007 WL 1346609, at *6 n.90.[5]

      When "determining whether a mark possesses the requisite degree of

recognition," the TDRA sets out four factors that courts may consider: (1) "[t]he duration, extent,

and geographic reach of advertising and publicity of the mark," (1) "[t]he amount, volume, and

geographic extent of sales of goods or services offered under the mark," (3) "[t]he extent of

actual recognition of the mark;" and (4) whether the mark was registered." 15 U.S.C. §

1125(c)(2)(A) (2007).

    C.    <u>State Trademark Dilution.</u>

      The Delaware Trademark Act ("DTA"), which is similar to the TDRA, provides

only for injunctive relief, and does not allow for monetary recovery:

> Likelihood of injury to business reputation or of dilution of the
> distinctive quality of a mark registered under this chapter, or a
> mark valid at common law, ***shall be a ground for injunctive relief***
> notwithstanding the absence of competition between the parties, or
> the absence of confusion as to the source of goods or services.

6 Del. C. § 3313 (emphasis added).

      Dilution is the "blurring of a mark's product identification or the tarnishment of

the affirmative associations a mark has come to convey." *Barnes Group*, 793 F. Supp. at 1304.

---

[5]    The TDRA, therefore, has overruled the Third Circuit precedent holding that "niche fame" is entitled to protection under federal dilution law. *See, e.g.*, *Times Mirror Magazines, Inc. v. Las Vegas Sporting News*, 212 F.3d 157 (3d Cir. 2000) (holding "that a mark not famous to the general public is nevertheless entitled to protection from dilution . . . so long as the plaintiff's mark possesses a high degree of fame in its niche market").

(citing *Mead Data Cent., Inc. v. Toyota Motor Sales, Inc.*, 875 F.2d 1026, 1030 (2d Cir. 1989)).

"[I]f a mark circulates only in a limited market, it is unlikely to be associated generally with the mark for a dissimilar product circulating elsewhere." *See, e.g., Mead Data,* 875 F.2d at 1031 (interpreting New York's antidilution statute, which is identical to Delaware law).

D.    Monetary Damages And Attorneys'' Fees Under the Lanham Act.

The Court has bifurcated damages from the trial of this matter. Thus, Paradox has not included damages in this pretrial order and will address damages if necessary after the Court's ruling on the liability issues.

## II.    ISSUES ON WHICH DEFENDANT BEARS THE BURDEN OF PROOF.

A.    Statutory Fair Use Defense to Trademark Infringement, Unfair Competition, and Trademark Dilution.

Under Section 33 of the Lanham Act, there is no trademark infringement, dilution or unfair competition where "the use of the name, term, or device charged to be an infringement is a use, otherwise than as a mark . . . of a term or device which is descriptive of and used fairly and in good faith only to describe the goods or services of such party." 15 U.S.C. § 1115(b)(4).[6] "The 'fair-use' defense, in essence, forbids a trademark registrant to appropriate a descriptive term for his exclusive use and so prevent others from accurately describing a characteristic of their goods." *New Kids on the Block v. News Am. Pub., Inc.*, 971 F.2d 302, 306 (9th Cir. 1992) (citation omitted).

---

[6]    Although by the terms of the statute "fair use" is a defense to trademark infringement, it extends to claims of unfair competition and dilution as well. *See, e.g., KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 119 (2004) (noting that "the common law of unfair competition also tolerate[s] some degree of confusion from a descriptive use of words contained in another person's trademark"); *Car-Freshner Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d 267, 268 (2d Cir. 1995) (applying the "fair use" defense to claims under sections 32(1) and 43(a)); *New York Mercantile Exchange, Inc. v. Intercontinental Exchange, Inc.*, 389 F.Supp.2d 527, 545 (S.D.N.Y. 2005) ("Both sections 32(1) and 43(a) are subject to a defense of 'fair use.'"); *see also* 15 U.S.C. 1125(c)(3) (excepting descriptive fair use from dilution).

A fair use defense is established if a defendant shows that its use was: (1) other than as a mark; (2) to describe its own goods or services; and (3) "fairly and in good faith." 15 U.S.C. § 1115(b)(4); *KP Permanent*, 543 U.S. at 118; *Inst. for Scientific Info., Inc. v. Gordon & Breach*, 931 F.2d 1002, 1007 (3d Cir. 1991). A party claiming fair use has no obligation to disprove likelihood of confusion. *KP Permanent*, 543 U.S. at 123-24 (finding that, because the "fair use defendant has no free-standing need to show confusion is unlikely, it follows . . . that some possibility of consumer confusion must be compatible with fair use, and so it is.).

1.    Use "Otherwise Than As A Mark."

Whether a name was used other than as a mark turns on whether the mark was used to identify the product itself, and not the source of the products (*i.e.*, use as trademark). *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 639-40 (7th Cir. 2001) (holding "the phrase 'The joy of six' did not identify the source of any of the defendants' memorabilia, and thus, the defendants' use was 'otherwise than as a trademark'"); *Rock & Roll Hall of Fame & Museum, Inc. v. Gentile Prods.*, 134 F.3d 749, 756 (6th Cir. 1998) (holding that use "otherwise than as a trademark" turns on whether consumers see words as an indication that the product originated with or was sponsored by plaintiff).

Where the plaintiff's mark is used in a completely non-prominent position, and the source of the product is clearly designated as the defendant, the defendant is using the name otherwise than as mark. *Cosmetically Sealed Indus., Inc. v. Chesebrough-Pond's USA Co.*, 125 F.3d 28, 30 (2d Cir. 1997) ("The non-trademark use of the challenged phrase and the defendants' good faith are both evidenced by the fact that the source of the defendants' product is clearly identified by the prominent display of the defendants' own trademarks."); *Packman.*, 267 F.3d at 639 (finding "the [defendant's] masthead also prominently appears on one side of the products' tags, plainly indicating the [defendant] as the source."); *Arnold v. ABC, Inc.*, No. 06-1747, 2007

U.S. Dist. LEXIS 5802, at *9 (S.D.N.Y Jan. 29, 2007) (holding defendants' use of plaintiff's mark in advertisements and on their website for television show was a non-trademark use because the advertisements and website identified the show's source as defendant and not plaintiff).

        2.     Defendant Used The Name Descriptively.

"Descriptive terms impart information directly." *Packman,* 267 F.3d at 641 (citation omitted). Using another's trademark, therefore, to describe aspects of one's own goods or services will not subject the user to liability. *Packman,* 267 F.3d at 641 ("A person 'cannot appropriate the English language' and thereby render others inarticulate."); *Arnold,* 2007 U.S. Dist. LEXIS 5802, at *9 ("[W]ords or phrases that do not necessarily describe anything about an alleged infringer's goods might still be used in a 'descriptive sense' for purposes of the 'fair use' defense"); *Car-Freshner Corp. v. S. C. Johnson & Son, Inc.,* 70 F.3d 267, 269 (2d Cir. 1995) (noting importance of "protect[ing] the right of society at large to use words or images in their primary descriptive sense").

        3.     Good Faith.

"Fair use analysis also requires a finding that defendants used the protected mark in good faith." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, *amended opinion at* 2000 U.S. App. LEXIS 30761, at *24 (2d Cir. 2000). But good faith "can be judged only by inquiry into the defendant's subjective purpose in using the [name]," and "mere knowledge of plaintiff's trademark on the phrase is insufficient to establish that the defendant acted in bad faith." *Packman,* 267 F.3d at 642 (citations omitted); *see also Playtex Prods., Inc. v. Georgia-Pacific Corp.,* 390 F.3d 158, 166 (2d Cir. 2005) ("Prior knowledge of a senior user's mark does not, without more, create an inference of bad faith.").

Good faith has been found when a defendant displays its own trademark prominently along with the phrase or name. *Int'l Stamp Art, Inc v. U.S. Postal Service*, 456 F.3d 1270, 1275 (11th Cir. 2006) (finding defendant's placement "its own familiar Eagle trademark . . . thereby identifying them as [defendant's] products rather than the products of anyone else in the marketplace" was evidence of good faith). And, bad faith requires more than just conclusory allegations that defendants intended "to trade on the good will of the trademark holder by creating confusion as to source or sponsorship." *Arnold*, 2007 U.S. Dist. LEXIS 5802, at *12 (citing *EMI Catalogue*, 228 F.3d at 66); *see also Star Indus.*, 412 F.3d at 389 (finding "the implausibility of the notion that a premier international rum manufacturer would seek to conflate its products with those of a regional discount vodka manufacturer" showed lack of bad faith); *Radio Channel Networks, Inc. v.Broadcast.com, Inc.*, No. 98-4799 (RPP), 1999 WL 124455, at *5 (S.D.N.Y. Mar. 8, 1999), *aff'd*, 201 F.3d 432 (2d Cir. 1999) (explaining a defendant using a mark with knowledge of the plaintiff's prior use does not act in bad faith "if it believes it is using the challenged words in their descriptive sense").

B.    <u>Plaintiff's Registration Was Maintained Fraudulently.</u>

Under the Lanham Act, fraud is an affirmative defense to a charge of infringement and a basis for canceling the plaintiff's registration. *See* 15 U.S.C. §§ 1115(b)(1), 1064(3) (permitting cancellation of a registration at any time if the it "was obtained fraudulently"). "Section 37 of the Lanham Act, 15 U.S.C. § 1119, gives federal courts concurrent authority to cancel registered marks when the validity of the mark is called into question in a judicial proceeding." *Marshak v. Treadwell*, 240 F.3d 184, 193 (3d Cir. 2001) (Alito, J.).

Fraud in obtaining or maintaining a trademark registration "occurs when an applicant [or later, registrant] knowingly makes false, material representations of fact in connection with his application," or in connection with a Section 8 and/or 15 declaration or in connection with an application for renewal. *See, e.g., Torres v. Cantine Torresella*, 808 F.2d 46, 48 (Fed. Cir. 1986); *Medinol Ltd. v. Neuro Vasx, Inc.*, 67 U.S.P.Q.2d 1205, 1209 (T.T.A.B. 2003) ("A trademark applicant commits fraud in procuring a registration when it makes material representations of fact in its declaration which it knows or should know to be false or misleading."). Although fraud must be shown by clear and convincing evidence, "[t]he standard for fraud in procuring a trademark registration is less stringent than the standard imposed for fraud in procuring a patent." *Specialized Seating, Inc. v. Greenwich Indus., L.P.*, 472 F. Supp. 2d 999, 1016 (N.D. Ill. 2007).

### 1.    False Or Misleading Statement Of Material Fact.

"The obligation which the Lanham Act imposes on an applicant is that he will not make knowingly inaccurate or knowingly misleading statements in the verified declaration forming a part of the application for registration." *Bart Schwartz Int'l Textiles, Ltd., v. F.T.C.*, 289 F.2d 665, 669 (CCPA 1961).; *Orient Express Trading Co., Ltd. v. Federated Dept. Stores, Inc.*, 842 F.2d 650, 653 (2nd Cir. 1988) (registrant has a duty of "uncompromising candor"). That obligation "applies with equal force to renewal applications." *Torres*, 808 F.2d at 48; *see also Hurley Int'l LLC v. Volta*, 82 U.S.P.Q.2d 1339, 2007 TTAB LEXIS 10, at *18 (T.T.A.B. 2007) ("The timing of the misrepresentation is immaterial."); *Mister Leonard, Inc. v. Jacques Leonard Couture, Inc.*, 23 U.S.P.Q.2d 1064, 1065 (T.T.A.B. 1992) (holding fraud can occur in connection with a Section 8 and/or Section 15 declaration).

A false representation of fact will be considered "material" if it relates to the use of the mark on goods and services. *Hurley*, 82 U.S.P.Q.2d 1339, 2007 TTAB LEXIS 10, at *16 ("Statements regarding the use of the mark on goods and services are certainly material."). Thus, submitting a statement in an affidavit claiming use of a trademark on all of the listed goods, when in fact the mark was not used on all goods, constitutes a fraudulent material misrepresentation of fact.[7]  *See, e.g., Torres*, 808 F.2d at 49 (affirming finding of fraud in renewal application because, among others, "[the applicant] submitted an affidavit stating the mark was in use on wine, vermouth, and champagne when he knew it was in use only on wine"); *J.E.M. Int'l, Inc. v. Happy Rompers Creations Corp.*, 74 U.S.P.Q.2d 1526, 1530 (T.T.A.B. 2005) (finding fraud based on affidavit asserting use of mark on 150 items of clothing when mark had been used on less than 50); *Medinol*, 67 U.S.P.Q.2d 1205, 1208 (granting summary judgment of fraud for signing a statement of use asserting use of the mark on medical catheters and stents when the mark had not been used on stents); *see also Sinclair Oil Corp. v. Sumatra Kendrick*, 2007 TTAB LEXIS 65, at *14 (T.T.A.B. June 6, 2007); *Hurley*, 82 U.S.P.Q.2d 1339, 2007 TTAB LEXIS 10, at *19-20 (same); *Standard Knitting, Ltd. v. Toyota Jidosha Kabushiki Kaisha*, 77 USPQ2d 1917, 2006 TTAB LEXIS 9, at *32 (T.T.A.B 2006) (same).

False affidavits of continuous use filed to maintain trademark registrations as required by § 8 of the Lanham Act and/or to obtain incontestable status under § 15 of the Lanham Act likewise constitute fraud. *See, e.g., Pilates, Inc. v. Current Concepts, Inc.*, 120 F. Supp. 2d 286 (S.D.N.Y. 2000) (holding that, because applicant in 1994 stated that the "Pilates"

---

[7]  As set forth in the Trademark Manual of Examining Procedure, a registrant's "identification of goods or services should set forth common names, using terminology that is generally understood . . . The language used to describe goods or services ***should be understandable to the average person*** and should not require an in-depth knowledge of the relevant field." Trademark Manual of Examining Procedure § 1402.01 (4th ed. 2007) (emphasis added); *see also id.* § 1402.01(a) (stating goods and/or services are described "so that an English speaker could understand what the goods and/or services are").

mark had been continuously in use for five years on exercise equipment, knowing that it had not been used on the goods from 1989 to 1992, "[applicant] thus had absolutely no basis for stating that the equipment mark had been used continuously in commerce"); *Gen. Car and Truck Leasing Sys., Inc. v. Gen. Rent-A-Car, Inc.*, No. 88-6500, 1990 U.S. Dist. LEXIS 12749, *6 (S.D. Fla. 1990) (misstatement in §§ 8 and 15 affidavits regarding continuous use of mark for aircraft and boat leasing constituted fraud); *Mister Leonard*, 23 U.S.P.Q.2d at 1065 (canceling registration because registrant stated untruthfully in his §§ 8 and 15 declarations that the mark LEONARD had been in continuous use on men's bathing costumes for five consecutive years).

So too, have registrations been cancelled where an applicant submits with a renewal application a specimen that is not in use as of the filing date, but states in the renewal application – under penalty of "fine or imprisonment, or both" – that the specimen is currently in use. *See, e.g., Torres*, 808 F.2d at 48 ("If a registrant files a verified renewal application . . . and that the label attached to the application shows the mark as currently used when, in fact, he knows or should know . . . that the label attached to the registration is not currently in use, he has knowingly attempted to mislead the PTO."); *Hurley*, 82 U.S.P.Q.2d at 1342 (holding that, because "the substitute specimen was not in use in U.S. commerce as of the filing date of the involved application," the "applicants knew of or should have known such representations were false, . . . [and] have again, committed fraud").

2.    Knew Or Should Have Known.

As recently set forth by the Trademark Trial and Appeal Board, and recognized by the Third Circuit, "proof of specific intent to commit fraud is not required, rather, fraud occurs when an applicant or registrant makes a false material representation that the applicant or registrant knew or should have known was false." *Standard Knitting*, 77 USPQ2d 1917, 2006 TTAB LEXIS 9, at *37 (citation omitted); *Marshak*, 240 F.3d at 196 n.8 (Alito, J.) (explaining

that "proof that the applicant should have known is ample to prove actual knowledge"); *Torres*, 808 F.2d at 48 (holding that registrant "knew or should have known that the mark as registered and the specimen submitted were not currently in use when he filed his renewal application").[8] "The appropriate inquiry is therefore not into the registrant's subjective intent, but rather into the **objective manifestations** of that intent." *Medinol*, 67 U.S.P.Q.2d at 1209.

A false representation of fact cannot be explained away by claiming mere inadvertence or "honest mistake." *Id.* at 1210. That is, a "President/CEO who signed the document [i]s clearly in a position to know (or to inquire) as to the truth of the statements therein," and such a person's failure to do so amounts to knowingly deceiving the PTO. *Id.* at 1210.[9] "Nor can he hide behind the fact that the documents were prepared by those authorized by the company to prepare those documents." *Marshall Field & Co. v. Mrs. Fields Cookies*, 25 U.S.P.Q.2d 1321, 1330 (T.T.A.B. 1992). A renewal declarant, therefore, cannot hide behind a "mistake" to avoid liability for false statements to the PTO; he has an affirmative duty to inquire about the facts attested to.

---

[8]    As the Trademark Trial and Appeal Board put it in its precedent-setting *Medinol* decision:

> We recognize that it is difficult, if not impossible, to prove what occurs in a person's mind, and that intent must often be inferred from the circumstances and related statement made by that person.

67 U.S.P.Q.2d at 1209 (citation omitted).

[9]    *See also Filipacchi Presse v. Elle Belle, LLC*, 2007 TTAB LEXIS 53, at *16 (T.T.A.B. Apr. 9, 2007) (Applicant's "president's misunderstanding . . . does not now shield [him] from our finding that it knew or should have known that a representation of fact in its application was false" because he "was obligated to confirm the meaning and accuracy of the statements contained in the application before signing the declaration and prior to submission to the USPTO"); *Standard Knitting*, 77 U.S.P.Q.2d 1917, 2006 T.T.A.B. LEXIS 9 at *35 (Applicant's president "is charged with knowing what [he] is signing and by failing to make any appropriate inquiry, [applicant's president] signed the statement of use with a 'reckless disregard for the truth.'"); *see also Pilates*, 120 F. Supp. 2d at 313-14 (declarant who "consciously avoided making any inquiries that would have resulted in evidence showing a lack of use," but made representations of use to the PTO, committed fraud).

3.    Post-Litigation Amendments Do Not Remedy Fraud.

It is a well-settled matter of trademark law that attempts to fix a putative "mistake" are legally insufficient when brought to the attention of the PTO *after* litigation was initiated. *Medinol*, 67 U.S.P.Q.2d at 1208 ("Allowing respondent's amendment would be beside the point; even if [applicant corrected] the registration, the question remains whether or not respondent committed fraud."); *Turbo Sportswear, Inc. v. Marmot Mountain Ltd.*, 77 U.S.P.Q.2d 1152, 1155 (T.T.A.B. 2005) ("As to [registrant's] motion to amend two of its registrations to delete certain goods, . . . because they are contested by applicant, the propriety of the amendments will be deferred until final decision [on fraud]"); *see also Filipacchi Presse v. Belle*, 2007 TTAB LEXIS 53, *18 (T.T.A.B. Apr. 9, 2007) (registrant's amendment, made more than a month after motion for summary judgment for fraud, "given no effect" because the "amendment would not serve to cure the fraud that was committed"); *Mister Leonard*, 1992 T.T.A.B. LEXIS 8 at *8-9 (explaining that, while a registrant has the "duty to correct," "a registration involved in a proceeding may not be amended"). Thus, when a registration would not have been amended but for a defendant's counterclaims raising fraud on the PTO, the threshold question remains whether fraud was indeed committed.

C.    False Advertising Under The Lanham Act.

Section 43(a)(1)(B) of the Lanham Act prohibits, among other things, "false or misleading description of fact, or false or misleading representation of fact" that "in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his . . . goods, services or commercial activities." 15 U.S.C. § 1125(a)(1)(B). This section "prohibits, as false advertising, the use of an author's name in connection with a work in which the author's true participation or contribution is misrepresented." *See, e.g., Columbus Rose Ltd. v. New Millennium Press*, No. 02-2634, 2002 WL 1033560 (S.D.N.Y. May 20, 2002) (citing 4

McCarthy on Trademarks and Unfair Competition § 27:84 (4th Ed. 2002)); *Follett v. New Am. Library. Inc.*, 497 F. Supp. 304, 313 (S.D.N.Y. 1980) (explaining the Lanham Act "protect[s] the public and the artist from misrepresentations of the artist's contribution to a finished work").[10]

False representations about the creation of an artistic work are analyzed like other false advertising claims. *See, Dastar,* 539 U.S at 38. The Third Circuit has explained that, under § 43(a)(1)(B), "[l]iability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir. 2002). A "literally false" claim "may be either explicit or 'conveyed by necessary implication when, considering the advertisement in its entirety, the audience would recognize the claim as readily as if it had been explicitly stated.'" *Id.* at 586-587 (quoting *Clorox Co. v. Proctor & Gamble Commercial Co.*, 228 F.3d 24, 34 (1st Cir. 2000)). Where the challenged advertising is literally false, "the plaintiff does not have to prove actual consumer deception." *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 171 (3d Cir. 2001); *see also Novartis*, 290 F.2d at 586 ("If a plaintiff proves that the challenged commercial claims are 'literally false,' a court may grant relief without considering whether the buying public was actually misled.").

The use of a more popular author's name in a manner that misidentifies that person as a creator of a particular work has been held to be literally false. *See, King v. Innovation Books*, 976 F.2d 824, 828-29 (2d Cir. 1992) (holding that prominent use of well known writer's name was false on its face where the author neither had been involved in nor had

---

[10] The Supreme Court, in *Dastar*, explicitly left open the possibility that some false authorship claims could be vindicated as false advertising under § 43(a)(1)(B). 539 U.S. at 38 (stating that plaintiff would "have a cause of action -- not for reverse passing off under the 'confusion . . . as to the origin' provision of § 43(a)(1)(A), but for misrepresentation under the 'misrepresents the nature, characteristics [or] qualities' provision of § 43(a)(1)(B)").

given approval to a screenplay and movie loosely derived from his short story); *Columbus Rose Ltd. v. New Millennium Press,* No. 02-2634, 2002 WL 1033560 at *3-9 (S.D.N.Y. May 20, 2002) (holding defendant was attempting to deceive the public by false attributing its book as the work of a well-known author when in fact it included numerous stories by other authors); *PPX Enters., Inc. v. Audiofidelity Enters., Inc.,* 818 F.2d 266, 268-69 (2d Cir.1987) (finding album covers were falsely represented as those of a famous musician because he was merely a background or session player in the recordings).  Substantially changing an artist's work and crediting the original artist for it has likewise been held to be a false representation. *Gilliam v. Am. Broadcasting Cos.,* 538 F.2d 14 (2d Cir. 1976) (granting preliminary injunction for attribution of a substantially altered work to its original creator); *Follett,* 497 F.Supp. at 313 (enjoining the exaggeration of famous author's role in creating work).

Absent a literally false statement, liability also exists for using an author's name that misrepresents "the nature, characteristics, [or] qualities" of goods in commercial advertising or promotion. 15 U.S.C. § 1125(a)(1)(B).  That is established by the following five elements by a preponderance of evidence:

(1)    plaintiff made false or misleading statements about its own product;

(2)    there is actual deception or a tendency to deceive a substantial portion of the intended audience;

(3)    the deception is material in that it is likely to influence purchasing decisions;

(4)    the advertised goods traveled in interstate commerce; and

(5)    there is a likelihood of injury to the Paradox.

*Novartis*, 290 F.2d at 590; *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 171 (3d Cir. 2001). [11]

The Lanham Act authorizes courts to grant injunctions "according to the principles of equity and upon such terms as the court may deem reasonable, . . . to prevent a violation of subsection (a), (c) or (d) of section 43." 15 U.S.C. § 1116(a). The Third Circuit has held that an injunction against false advertising may be granted upon a showing of likelihood of injury, whether or not any damage has yet occurred. *Warner-Lambert Co. v. BreathAsure, Inc.*, 204 F.3d 87, 92 (3rd Cir. 2000). A showing of reasonable belief of injury will usually be sufficient to establish a likelihood of injury where a claimant "has a reasonable basis for believing that it is likely to suffer injury, and that a causal nexus between the injury and the false name or advertisement." *Id.* at 93.

D.     Abuse Of Process.

Abuse of process occurs where a party has "an ulterior purpose" and commits "a willful act in the use of the process not proper in the regular conduct of the proceedings." *Trueposition, Inc. v. Allen Telecom*, No. 01-823 GMS, 2003 U.S. Dist. LEXIS 881, at *21 (D. Del. Jan. 21, 2003); *see also Feinman v. Bank of Delaware*, 728 F. Supp. 1105, 1115 (D. Del.), *aff'd*, 909 F.2d 1475 (3d Cir. 1990). "There must be some definite act or threat not authorized by

---

[11]   The representation that a work is "based upon" an author's work is misleading when it exaggerates any relationship with the author's original work. "That is, if the final production so departs from the author's work that even if there had been no grant of rights by the author the resulting production would not constitute copyright infringement for lack of substantial similarity, then the production should not be regarded as 'based upon' the author's work." 2 Nimmer On Copyright, § 8D.03[A][3] (2007); *see also King*, 976 F.2d at 830 (explaining that a "based upon" credit for a movie is improper if the movie differs "quantitatively and qualitatively" from a literary work); *Geisel v. Poynter Prods., Inc.*, 295 F. Supp. 331, 353 (S.D.N.Y. 1968) (holding dolls described as "from the wonderful world of Dr. Seuss" and "from original illustrations by Dr. Seuss" violated section 43(a) of the Lanham Act because, among other reasons, they constituted a "false description of fact").

the process or aimed at an objective not legitimate in the use of process." *See, e.g., Bayer AG v. Sony Elecs., Inc.*, 229 F. Supp. 2d 332 (D. Del. 2002). That act "is usually to obtain a collateral advantage." *Toll Bros., Inc. v. Gen. Acc. Ins. Co.*, No. 98C-08-203, 1999 WL 744426, at *5 (Del. Super. Aug. 4, 1999); *see also T.D. Proprietary Corp. v. Sposato Builders, Inc.*, No. 94-6745, 1996 U.S. Dist. LEXIS 17335, at *9-12 (E.D.Pa. No. 22, 1996) (upholding jury verdict for abuse of process because there was evidence that plaintiffs had an "unlawful or ulterior goal not only in initiating but pursuing" Copyright and Lanham Act litigation "by making threats and forcing [defendant] to incur sizeable legal defense fees" and by "trying to eliminate or hamper a competitor").

  E. <u>Attorneys' Fees.</u>

    Section 35 of the Lanham Act provides, in relevant part, that a "court in exceptional cases may award reasonable attorney fees to the prevailing party." 15 U.S.C. § 1117(a). The award of attorneys' fees is a discretionary decision, and it "turns on whether a court believes that the case is, in the words of the Lanham Act, exceptional." *Green v. Fornario*, No. 06-2649, 2007 U.S. App. LEXIS 10873, *1, __ F.3d __ (3d Cir. May 8, 2007); *Loughner v. Univ. of Pittsburgh*, 260 F.3d 173, 177 (3d Cir.2001) (awarding attorneys' fees is a question of law). To determine whether a case is exceptional, the Third Circuit requires culpable conduct based on the totality of the circumstances. *Green*, 2007 U.S. App. LEXIS 10873, *11.

    Attorneys' fees are available to a prevailing defendant under the Lanham Act. *See, e.g., Retail Servs., Inc. v. Freebies Publ'g*, 364 F.3d 535, 551 (4th Cir. 2004) (holding that a prevailing defendant "can qualify for an award of attorney fees upon a showing of something less than bad faith by the plaintiff," such as "economic coercion, groundless arguments, and failure to cite controlling law") (citations omitted); *Noxell Corp. v. Firehouse No. 1 Bar-B-Que*

*Rest.*, 771 F.2d, 521, 526 n.2 (D.C. Cir. 1985) (same); *see also Scotch Whisky Ass'n v. Majestic*

*Distilling Co.*, 958 F.2d 594, 596-600 (4th Cir. 1992), *cert. denied*, 506 U.S. 862 (1992) (finding

the Lanham Act "malicious, fraudulent, deliberate and willful" language appears only in

reference to awarding fees to prevailing plaintiffs, defendants need not show bad faith).

   Courts have often awarded fees to a prevailing defendant where a plaintiff's case

is frivolous, groundless or pursued in bad faith. *See, e.g., Cairns v. Franklin Mint Co.*, 292 F.3d

1139, 1156 (9th Cir. 2002) (affirming fee award when trademark claim was "groundless and

unreasonable because it had no legal basis, having been based on the 'absurd' and 'just short of

frivolous' contentions"); *New Sensor Corp. v. CE Distrib. LLC*, 367 F. Supp. 2d 283, 288 (E.D.

N.Y. 2005) (finding plaintiff's failure to conduct a survey to establish consumer confusion

supported conclusion that plaintiff pursued a patently frivolous claim); *Yankee Candle Co. v.*

*Bridgewater Candle Co.*, 140 F.Supp.2d 111, 121-22 (D. Mass. 2001) (considering plaintiff's

"aggressive pursuit of unfounded claims" in awarding fees); *Universal City Studios, Inc. v.*

*Nintendo Co.*, 615 F.Supp. 838, 864 (S.D.N.Y. 1985), *aff'd*, 797 F.2d 70 (2d Cir. 1986)

(awarding fees because plaintiff initiated the Lanham Act lawsuit "for reasons other than a

sincere belief in the merits of the underlying claims" but "to serve ulterior business motives");

*Viola Sportswear, Inc. v. Mimun*, 574 F. Supp. 619, 621 (E.D.N.Y. 1983) (finding bad faith by

plaintiff in bringing lawsuit and awarding fees to defendant because, among other reasons, none

of the defendants had manufactured, sold, or offered for sale the plaintiff's jeans).

**Exhibit 5- Red Sonja v. Paradox**
**Paradox's Trial Exhibit List**

| DTX | Deposition Exhibit No. | Date | Bates Nos. | Description | Objections[1] |
|---|---|---|---|---|---|
| 1 | | 03/07/77 | RS 04999 - RS 05000 | Letter from R. Thomas to J. Baum | 802 |
| 2 | | 03/25/80 | RS 04998 | Letter Agreement between the Estate of Robert E. Howard and Roy Thomas | 901 |
| 3 | | 07/21/81 | RS 00437 - RS 00438 | United States Patent and Trademark Office Information for Red Sonja | 901, 902 |
| 4 | | 07/27/82 | RS 02628 | Letter from A. Lieberman to D. DeLaurentiis | |
| 5 | | 00/00/82 | RS 00332 - RS 00333 | Red Sonja Licensing Advertisement | |
| 6 | | 02/07/86 | RS 00719 - RS 00722 | Letter from A. Lieberman to G. Lord et al. | |
| 7 | | 07/30/86 | RS 00718 | Memo re: U.S. Trademark Registrations for "Red Sonja" and "Kull" | |
| 8 | | 05/29/90 | RS 00638 | Letter from M. Golan to A. Lieberman re: "Red Sonja" | 802 |
| 9 | A. Lieberman 30 | 05/31/90 | RS 00640 - RS 00643 | Letter from A. Lieberman to L. Jones re: Raye Hollitt Article | |
| 10 | | 03/08/91 | RS 02768 | Letter from A. Lieberman to G. Lord | |
| 11 | A. Lieberman 2 | 04/01/93 | RS 01738 - RS 01741 | Letter from K. Sutak to A. Lieberman re: Red Sonja | |
| 12 | A. Lieberman 18 | 11/11/94 | RS 00976 - RS 00977 | Corporation, Kull Productions, Inc., Solomon Kane Corporation | 802 |
| 13 | | 05/03/96 | RS 04430 - RS 04431 | Letter from A. Lieberman to P. Nipper re: Red Sonja | |
| 14 | A. Lieberman 31 | 09/26/96 | RS00796 | Letter from C. Thomas to A. Lieberman enclosing 1st Quarter 1996 Royalty Report | |
| 15 | | 11/14/96 | RS 04432 - RS 04433 | Letter from A. Lieberman to J. Burski | |
| 16 | | 04/01/97 | RS 00328 - RS 00329 | Letter from C. Thomas to A. Lieberman enclosing 3rd Quarter 1996 Royalty Report | |
| 17 | | 06/19/97 | RS 00154 - RS 00155 | Letter from C. Thomas to A. Lieberman enclosing 1st Quarter 1997 Royalty Report | |
| 18 | | 10/17/97 | RS 00120 - RS 00121 | Letter from C. Thomas to A. Lieberman enclosing 2nd Quarter 1997 Royalty Report | |
| 19 | | 11/23/98 | RS 00058 - RS 00059 | Letter from C. Thomas to A. Lieberman enclosing 3rd Quarter 1997 Royalty Report | |
| 20 | | 01/05/99 | RS 05753 - RS 05754 | Letter from C. Thomas to A. Lieberman enclosing 3rd Quarter 1998 Royalty Report | |
| | | | | Red Sonja Agreement between Red Sonja Corporation and Cross Plains Comics Inc. | |

[1] All numbers in the objections refer to the Federal Rules of Evidence. The abbreviation "PTO" means that Plaintiff objects to the admissibility of that exhibit as such exhibit was precluded under the Court's June 12, 2007 Order.

| DTX | Deposition Exhibit No. | Date | Bates Nos. | Description | Objections[1] |
|---|---|---|---|---|---|
| 21 | | 02/23/99 | RS 04564 - RS 04565 | Letter from C. Thomas to A. Lieberman enclosing 4th Quarter 1998 Royalty Report | |
| 22 | | 02/09/00 | RS 04092 - RS 04093 | Letter from D. Rudenko to Conan Design Team re: Infringement of United States Registered Trademark Nos. 1,213,252, 1,242,975, 1,254,593, 1,374,714, 1,835,249, 2,193,489 and others | PTO, 802, 402 |
| 23 | A. Lieberman 7 | 11/22/02 | RS 02191-RS 02194 | Certificate of Merger of Red Sonja Corporation and Red Sonja LLC | 901 |
| 24 | | 11/00/02 | RS 04506 | Agreement of Merger between Red Sonja Corporation and Red Sonja LLC | |
| 25 | | 01/01/03 | RS 04996 | Agreement between Red Sonja Corporation and Luke Lieberman | 402 |
| 26 | | 06/24/04 | RS 05258 - RS 05273 | Schedule A - Licensing Agreement Summary | |
| 27 | | 11/11/04 | RS 04313 - RS 04323 | Facsimile from N. Barrucci to A. Lieberman attaching "A Red Sonja Comics Chronology" by F. Blosser | 802 |
| 28 | | 09/06/05 | RS 05006 - RS 05008 | Red Sonja Information from http://en.wikipedia.org/wiki/Red_Sonja | 802 |
| 29 | | 09/12/05 | RS 04880 | Email from L. Lieberman to A. Lieberman re: Sonja Contract | |
| 30 | | 10/25/05 | RS 05240 - RS 05255 | Facsimile from N. Barrucci to A. Lieberman re: Licensing Agreement | |
| 31 | A. Lieberman 29 | 12/15/05 | RS 00875 - RS 00919 | Option/Acquisition Agreement between Emmett Furla Films Production Corporation and Red Sonja LLC | |
| 32 | | 01/12/06 | RS 05280 - RS 05281 | Email from J. Baum et al. to A. Lieberman re: Sonya/Sonja Differentiation | |
| 33 | | 01/27/06 | RS 02200 - RS 02203 | Email from P. Sederowsky to A. Lieberman re: Thulsa Doom License | 802 |
| 34 | | 02/07/06 | RS 05486 | Combined Declaration of Use in Commerce/Application for Renewal of Mark Under §§ 8 and 9 for Red Sonja Trademark | 802 |
| 35 | | 02/08/06 | RS 05480 - RS 05481 | Email from P. Sederowsky to A. Lieberman re: Thulsa Doom License | 802 |
| 36 | | 04/28/06 | RS 05580 - RS 05582 | Email from L. Lieberman to D. Walton re: Paradox: Matter of Clarification | 802 |
| 37 | | 05/03/06 | RS 05576 - RS 05577 | Email from L. Lieberman to A. Lieberman re: Hyboria Questions | 802 |

| DTX | Deposition Exhibit No. | Date | Bates Nos. | Description | Objections[1] |
|---|---|---|---|---|---|
| 38 | | 05/04/06 | RS 05515 - RS 05516 | Hyboria | 802 |
| 39 | | 06/11/06 | RS 02182 - RS 02199 | USPTO Confirmation Receipt for Trademark Assignment | 901, 902 |
| 40 | | 06/11/06 | RS 02170 - RS 02181 | Email from L. Lieberman to A. Lieberman re: Questions about Red Sonja Trademark Status from http://tarr.uspto.gov/servlet/tarr?regser+serial&entry=76654482 | 901, 902 |
| 41 | | 06/14/06 | RS 05722 - RS 05726 | USPTO Assignments on the Web | 901, 902 |
| 42 | | 08/17/06 | RS 05756 - RS 05759 | Response to Office Action for Red Sonja Mark | 901, 902 |
| 43 | | 10/19/06 | RS 02165 - RS 02166 | USPTO Notice of Acceptance and Notice of Renewal for Red Sonja Mark | 901, 902 |
| 44 | | | RS 00358 | "Who Is Red Sonja" | 802 |
| 45 | | | RS 01223 - RS 01242 | Collection of Marvel Comics "Red Sonja" Covers | 901, 902 |
| 46 | | | RS 05771 - RS 05785 | Collection of Marvel Comics and Dynamite Entertainment "Red Sonja" Covers | |
| 47 | | 07/17/02 | DEF00275 - DEF00306 | Unit Purchase Agreement between Paradox Entertainment AB, Alla Ray Morris Generation Skipping Exemption Trust, Voting Trust and Arthur Lieberman | PTO, 901 |
| 48 | A. Lieberman 28 | 09/25/02 | DEF00307 - DEF00314 | Omnibus Amendment No. 1 between Conan Sales Company, LLC, Paradox Entertainment AB, Alla Ray Morris Generation Skipping Exemption Trust, Voting Trust and Arthur Lieberman | PTO, 901, 402 |
| 49 | | 09/26/04 | DEF00413 | Email from A. Nelson to Dark Horse re: Sonja Copyright | 802 |
| 50 | | 06/30/05 | DEF00222 | Email from P. Collins to P. Sederowsky | PTO |
| 51 | | 07/12/05 | DEF00213 - DEF00218 | Email from A. Lieberman to P. Sederowsky re: §3.1 | 402 |
| 52 | | 07/13/05 | DEF00662 - DEF00670 | Letter of Intent between Paradox Entertainment, Inc. and Alla Ray Morris Generation Skipping Exemption Trust | 802 |
| 53 | | 07/28/05 | DEF00219 | Email from A. Lieberman to P. Sederowsky | |
| 54 | | 01/31/06 | DEF00671 - DEF00694 | Membership Interest Purchase Agreement between Paradox Entertainment, AB and Alla Ray Morris Generation Skipping Exemption Trust | 901 |
| 55 | | 02/06/06 | DEF00210 - DEF00212 | Email re: Hyborian Update, 02/06/2006 | 802 |
| 56 | | 02/11/06 | DEF00023 - DEF00024 | Email from A. Lieberman to P. Sederowsky re: Khulan Gath and Thulsa Doom | |
| 57 | | 02/28/06 | DEF00031 - DEF00035 | Email from L. Stone re: Meeting | |
| 58 | | 03/01/06 | DEF00036 | Email from F. Malmberg to L. Stone re: Hello from Paradox | 802 |

| DTX | Deposition Exhibit No. | Date | Bates Nos. | Description | Objections[1] |
|---|---|---|---|---|---|
| 59 | | 04/14/06 | DEF00492 - DEF00497 | Email from L. Ramati to F. Malmberg et al. re: Revised "Conan" Deal Terms Proposal | PTO, 402, 802 |
| 60 | | 04/20/06 | DEF00048 | Email from T. Wojciechowski to B. Saliba re: here ya go | 802 |
| 61 | | 04/22/06 | DEF00025 - DEF00027 | Email from P. Sederowsky to E. Fällström et al. re: Press Release | 402 |
| 62 | | 04/27/06 | DEF0002230 | Letter from L. Stone to Conan and Robert E. Howard Fans and Licensees | 802 |
| 63 | | 04/28/06 | DEF00224 - DEF00225 | Email from L. Stone re: Matter of Clarification | 802 |
| 64 | | 05/02/06 | DEF00007 - DEF00009 | *Millennium Films and Emmett/Furla Go into Battle with "Red Sonja"* from Business Wire | |
| 65 | | 05/17/06 | DEF00658 - DEF00661 | Facsimile from A. White to F. Fierst et al. re: Red Sonja/Red Sonja Comparison | 802 |
| 66 | | 06/20/06 | DEF00220 - DEF00221 | Email from F. Malmberg to R. Kayanan | PTO, 402, 802 |
| 67 | | 06/26/06 | DEF00039 - DEF00040 | Email from L. Kreiter to L. Stone re: Sensitive Matter | 802 |
| 68 | | 09/27/06 | DEF00398 - DEF00403 | Email from F. Malmberg to M. Dryer re: Dynamic Copycatting | 802 |
| 69 | | 00/00/06 | DEF00767 - DEF00802 | Dynamic Entertainment Issue No. 3 of Red Sonja vs. Thulsa Doom | |
| 70 | | 00/00/06 | DEF00731 - DEF00766 | Dynamic Entertainment Issue No. 8 of Red Sonja | |
| 71 | | 00/00/06 | DEF00695 - DEF00703 | Dynamic Entertainment Issue No. 9 of Red Sonja | |
| 72 | | 06/17/07 | DEF00803 - DEF00808 | Red Sonja Overview from http://www.dynamicforces.com/htmlfiles/infordatabase.html?inf odatabase=NS032307933001 | 802, 901 |
| 73 | | 12/13/04 | DF 0001 - DF 0025 | Conan Properties International LLC Merchandise License Agreement between Conan Properties International LLC and Dynamic Forces, Inc. | PTO |
| 74 | | 07/26/05 | DF 0077 | Royalty Report for Period Covered 1/1/05 to 6/30/05 | 901 |
| 75 | Collado 7 | 04/28/06 | DF 0047 - DF 0048 | Emil from L. Stone to Fans and Licensees re: Ownership/origins of Red Sonya (with a "y") and Red Sonja (with a "j") | 802 |
| 76 | | | DF 0026 | Letter from L. Lieberman | |
| 77 | | 01/14/04 | DH 001376 | Email from A. Nelson re: Red Sonja | 802, PTO |
| 78 | | 07/01/04 | DH 001475 - DH 001476 | Email from F. Malmberg to A. Nelson re: Red Sonja Appearances in Chronicles of Conan | 802, PTO |
| 79 | | 06/12/061 | DH 000373 - DH 000375 | Email from L. Stone to F. Malmberg et al. re: Just Saw This Article on CNN.com ("The Man Who Created 'Conan'") | 802, PTO |

| DTX | Deposition Exhibit No. | Date | Bates Nos. | Description | Objections[1] |
|---|---|---|---|---|---|
| 80 | | 06/15/06 | DH 000356 | Email from F. Malmberg re: Hyborian Update 06/15/06 | 802, PTO |
| 81 | Ramati 10 | 12/27/05 | | Email from D. Walton to L. Ramati re: "Red Sonja" Chain of Title Comments | 802 |
| 82 | Ramati 11 | 12/27/05 | | Email from D. Angel to L. Ramati re: "Red Sonja" Chain of Title Comments | 802 |
| 83 | Ramati 16 | 01/30/06 | | Assignment Agreement between Emmett Furla Film Productions Corporation and M7 Productions, Inc. | 901 |
| 84 | | 02/06/06 | | *Paradox Entertainment Acquires Rights to Robert E. Howard's Library*, BWR Public Relations Press Release | 802 |
| 85 | Gatta 4 | 05/02/06 | | Email from D. Walton to A. Lieberman re:  Red Sonja - Final Draft Press Release for Variety | 802 |
| 86 | | 05/02/06 | | Email from D. Walton to L. Lieberman re: Red Sonja - Final Draft Press Release for Variety | |
| 87 | | 05/15/06 | | TARR System Results for Registration No. 1397608 (Red Sonja) | 901, 902 |
| 88 | | 05/15/06 | | TARR System Results for Registration No. 1161847 (Red Sonja) | 901, 902 |
| 89 | A. Lieberman 27 | 06/14/06 | | Facsimile from A. Lieberman to Patent & Trademark Office attaching Request to File Substitute Specimen for Application for Renewal | |
| 90 | Ramati 7 | 11/27/06 | | "Red Sonja" Chain of Title Review Status as of November 27, 2006 | 802 |
| 91 | | | | Email from L. Ramati re: "Red Sonja"/Option Agreement/Definition of Sequel | 802 |
| 92 | | 07/10/06 | | Plaintiff's Initial Disclosures Pursuant to Rule 26(a)(1) | |
| 93 | | 07/10/06 | | Initial Disclosures of Defendant/Counterclaim Plaintiff Paradox Entertainment, Inc. Pursuant to Fed. R. Civ. P. 26(a)(1) | |
| 94 | | 07/28/06 | | Defendant's Response to Plaintiff's First and Second Set of Interrogatories | |
| 95 | | 02/02/07 | | Plaintiff's Response to Defendant's First Set of Interrogatories | |

Plaintiff reserves the right to supplement or amend its objections after receiving marked copies of Defendant's trial exhibits and as otherwise appropriate.

## EXHIBIT 6
## PLAINTIFF'S EXHIBIT LIST AND DEFENDANT'S OBJECTIONS

Plaintiff reserves its right to supplement this list as necessary including, but not limited to, the documents called for at the deposition of Fred Fierst, Esq., held on June 22, 2007.

| Ex. # | Type of Document | Bates | Objection |
|---|---|---|---|
| PX-1 | Contract to give Lieberman Red Sonja in exchange for interest in other characters | Def01-Def06 | A, H, R |
| PX-2 | Article re: Red Sonja film | Def07-08 | A, H |
| PX-3 | Web Posting re: Confusion | Def09 | A, H, I, R, IL |
| PX-4 | E-mail from Malmberg, 4/21/06 re: Red Sonja v. Red Sonya | Def022 | A, H, R, F |
| PX-5 | E-mail from Malmberg. 6/23/06 re: Passing on note that someone wants to illustrate "REH's Red Sonja, written by Roy Thomas" | Def028 | A, H, R, F |
| PX-6 | E-mail from Zetterberg, 4/26/06 asking that all mention of Red Sonja be removed from Paradox site | Def029 | A, F, H |
| PX-7 | E-mail from Zetterberg 4/27/06 asking that Red Sonya be put back on Paradox website with clarifications | Def030 | A, F, H |
| PX-8 | Deal memo for Paradox to License out Red Sonya | Def033 | A, H, I, R |
| PX-9 | E-mail from Leigh Stone re: offering properties for licensing but "not sure that we want to walk oh-so-delicate Sonya line at this time" | Def036 | A, H |
| PX-10 | E-mail from Stone 3/23/06 re: claiming that they own Robert E. Howard catalogue including the "well known" Red Sonja | Def037 | A, F, H, I, R |

| Ex. # | Type of Document | Bates | Objection |
|---|---|---|---|
| PX-11 | Leigh Stone e-mail dated 6/26/06 trying to separate Red Sonja and Conan and asking a magazine not to publish Red Sonja ads. | Def039-Def040 | A, F, H, |
| PX-12 | Wojciechowski e-mail re: stating can't mention Red Sonya with Conan but claiming always two separate characters | Def044 | A, F, H |
| PX-13 | Wojciechowski e-mail 4/26/06 forwarding email with draft press release claiming Paradox owns Hyboria trademark | Def045-046 | A, F, H, I, R |
| PX-13A | Wojciechowski e-mail 4/24/06 re: Roy Thomas ripped off Robert E. Howard | Def047 | A, F, H, I |
| PX-14 | Wojciechowski e-mail 4/20/06 stating that Red Sonja was "essentially stolen" from REH | Def048 | A, F, H, I, W |
| PX-15 | Wojciechowski e-mail 4/14/06 re: not including Red Sonja in Conan book but that Paradox has "plans for Red Sonya" | Def049 | A, F, H, I |
| PX-16 | Paradox Press Release "clarifying" Red Sonja and Red Sonya | Def0223 | A, H |
| PX-17 | Email from Jack Baum 11/14/05 stating that Red Sonja, owned by Red Sonja LLC was "a character created by Robert E. Howard" | Def0238-0239 | A, F, H, I, R |
| PX-18 | CPI, Inc. Schedule of Copyrights suggests that CPI owns a "Conan: Red Sonya" copyright | Def0369-372 | A, H, I, R |
| PX-19 | Malmberg e-mail 9/27/06 forwarding email from Dark Horse listing instances of Red Sonja copying Conan in marketing etc. | Def0398-Def399 | A, H |
| PX-20 | Allie e-mail 9/20/06 setting forth purported instances of Red Sonja copying Conan | Def0402-403 | A, H |
| PX-21 | Malmberg e-mail 10/20/05 saying that his "more sinister self" says CPI should launch the "Real Red Sonya of Rogatine" | Def0427 | A, F, H, I, R |

| Ex. # | Type of Document | Bates | Objection |
|-------|------------------|-------|-----------|
| PX-22 | Comicimages e-mail 5/19/05 saying that Red Sonja has nothing to do with REH | Def0502 | A, F, H, I, R |
| PX-23 | Stone e-mail 4/21/06 forwarding e-mail from Wojciechowski re: licensing show directory descriptions, describes Red Sonya | Def0552-0554 | A, F, H, R |
| PX-24 | Allie e-mail 4/28/05  Darkhorse editor says no to Red Sonya one shot because it would be trying to cash in on Red Sonja's success | DH 000013 | A, F, H, I, R |
| PX-25 | Allie e-mail 5/6/05  DH editor refers to "the @$&! At Red Sonja productions" | DH 000018 | A, F, H, I, R |
| PX-26 | Malmberg e-mail 8/20/05  talks about "sinister" urge to destroy Red Sonja by launching Red Sonya | DH 000027 | A, F, H, I, R |
| PX-27 | Allie e-mail 1/19/06  DH editor says "%&#@ Dynamite" | DH000030 | A, F, H, I, R |
| PX-28 | Allie e-mail  4/26/06  DH editor declares intention to hire Red Sonja writer Oeming once "that book goes away. | DH 000047 | A, F, H, I, R |
| PX-29 | Land e-mail 9/19/06  David Land suggests Dynamite staff kills themselves. | DH 000187 | A, F, H, I, R |
| PX-30 | Malmberg/Nelson e-mails 7/6/04   Malmberg and DH discussing Red Sonja reprint rights. | DH 001331 | A, F, H, I, R |
| PX-31 | Malmberg/Nelson e-mail  7/8/04  further discussion of Red Sonja reprint rights. | DH 001332 | A, F, H, I, R |
| PX-32 | Lieberman/Nelson e-mails 6/28/04 more discussion of Sonja reprint rights. | DH 001364 | A, F, H, I, R |
| PX-33 | Allie e-mail 6/25/04  DH editor believes they have Red Sonja rights through Roy Thomas | DH 001369 | A, F, H, I, R |

| Ex. # | Type of Document | Bates | Objection |
|-------|-----------------|-------|-----------|
| PX-34 | Nelson e-mail 1/18/04  Nelson asks DH publisher if he wants to go after Red Sonja rights. | DH 001377 | A, F, H, I, R |
| PX-35 | Malmberg e-mail 9/24/04  Malmberg demonstrates knowledge of Red Sonja and its registration. | DH 001464 | A, H, I |
| PX-36 | Malmberg e-mail 7/1/04  Malmberg discusses Red Sonja rights | DH 001475 | A, H, I |
| PX-37 | Barlow e-mail 6/29/04 refers to "shadow of a Vulture" in Conan #23 | DH 001479 | A, F, H, I |
| PX-38 | Thomas e-mail  12/8/05  Thomas talks about Red Sonja with DH | DH 001853 | A, F, H, I, R |
| PX-39 | Thomas e-mail 12/8/05  Thomas tells DH he evolved Red Sonya into Red Sonja | DH 001854 | A, F, H, I, R |
| PX-40 | Barlow e-mail 11/18/04  DH talks to Malmberg about Red Sonja reprint rights | DH 001781 | A, F, H, I, R |
| PX-41 | Malmberg e-mail 11/29/04 Malmberg asks to personally inspect Red Sonja reprints | DH 001783 | A, F, H, I, R |
| PX-42 | Scroggy e-mail 4/15/04  internal DH doc – new chacter "not unlike Red Sonja" | DH 001754 | A, F, H, I, R |
| PX-43 | Stone letter  9/28/06  Stone tells Malmberg to work through DH legal department | DH 001958 | A, H, I, R, W |
| PX-44 | Allie e-mail  6/1/04   Allie tells Conan artists they new character Janissa is meant to "replace Red Sonja" | DH 001982 | A, F, H, I, R |
| PX-45 | Allie e-mail  3/10/04   DH editor tells Malmberg new character Janissa will be "not unlike Red Sonja" | DH 002109 | A, F, H, IL, R |

4

| Ex. # | Type of Document | Bates | Objection |
|-------|------------------|-------|-----------|
| PX-46 | Richardson e-mail 3/12/04 DH publisher expresses interest in licensing Red Sonja and refers to her as a Howard character | DH 000998 | A, F, H, I, R |
| PX-47 | Paradox Press Release 2/6/06 | DH 001003 | A, H |
| PX-48 | Richardson 7/19/05 DH publisher repeatedly curses Dynamite publisher and declares intention to publish Red Sonya as act of revenge | DH 001019 | A, F, H, I, R |
| PX-49 | Stone e-mail 6/26/06 Paradox instructs DH to ask mutual Conan/ Red Sonja licensee to tell public in advertising that Conan and Red Sonja are unrelated | DH 001033 | A, H |
| PX-50 | Draft Press Release "clarifications regarding the character Red Sonya" | DH 001034 | A, H |
| PX-51 | Kreiter e-mail informs Paradox that mutual licensee will take out all Sonja stuff | DH 001043 | A, H |
| PX-52 | Dark Horse Conan #23 letter to editor enquiring about Red Sonya with response whe would be coming soon | | A, F, H, NP, R |
| PX-53 | Dark Horse: Chronicles of Conan Volume #4 "Shadow of a Vulture" by Roy Thomas and Barry Smith | | A, F, H, NP, R |
| PX-54 | Dark Horse: Chronicles of Conan Volume #4 "Red Sonja and Red Nails" by Roy Thomas | | A, F, H, NP, R |
| PX-55 | Dark Horse: Chronicles of Conan Volume #7 "The Road Winds on" by Roy Thomas | | A, F, H, NP, R |
| PX-56 | Licensing Agreement between Paradox and Dark Horse 6/9/06 | DH 001644 | A, H, I |
| PX-57 | Emmet/Furla Licensing Agreement | | A, H, I, W |
| PX-58 | Emmet Furla assignment of rights to Nu Image | | A, H, W |

| Ex. # | Type of Document | Bates | Objection |
|---|---|---|---|
| PX-59 | Exhibit A to Complaint "A Fond look back at Big Red" by Roy Thomas" | | A, H |
| PX-60 | Exhibit B to Complaint "Conan the Barbarian #24" | | A, B, H, I, IL, R |
| PX-61 | Exhibit C of Complaint "She-devil with a sword!" article about Red Sonja | | A, H, IL |
| PX-62 | Part of Exhibit D to Complaint Marvel Feature #4 cover, | | A, B, H, I, IL |
| PX-63 | Exhibit E of Complaint - "Eyes of Gorgan" story opening | | A, H, I, IL |
| PX-64 | Part of Exhibit D to Complaint - Red Sonja Vol. 1 cover and inside jacket, | | A, H, I |
| PX-65 | Part of Exhibit D to Complaint - Roy Thomas and Dick Giordano story opening, | | A, H, I, NP, W |
| PX-66 | Part of Exhibit D to Complaint "Blood of the Hunter" story opening | | A, B, H, I, NP, W |
| PX-67 | Part of Exhibit D to Complaint "Balek Lives" story opening | | A, B, H, I, NP, R, W |
| PX-68 | Part of Exhibit D to Complaint "Beware the Sacred Sons of Set" story opening | | A, B, H, I, NP, R, W |
| PX-69 | Part of Exhibit D to Complaint Ron Martz Red Sonja inside jacket | | A, B, H, I, NP, R, W |
| PX-70 | Part of Exhibit D to Complaint "The Battle of the…" story opening | | A, B, H, I, NP, W |
| PX-71 | Part of Exhibit D to Complaint "Red Sonja/Thulsa Doom" inside jacket | | A, B, H, I, NP, W |
| PX-72 | Part of Exhibit E to Complaint Crossplain's Red Sonja cover | | A, B, H, I, NP, W |

| Ex. # | Type of Document | Bates | Objection |
|---|---|---|---|
| PX-73 | Exhibit F to Complaint Dynamite's Red Sonja #0 cover and inside jacket | | A, B, H, I, NP |
| PX-74 | Exhibit G to Complaint Marvel's Red Sonja #1 cover | | A, B, H, I, IL, W |
| PX-75 | Exhibit H to Complaint – Cover of Red Sonja/Thulsa Doom #1 | | A, B, H |
| PX-76 | Exhibit I to Complaint – Cover of Comic Buyer's Guide | | A, B, H, IL, R |
| PX-77 | Part of Exhibit J to Complaint – "The Ring of Ikribu" | | A, B, H, IL, NP, R, W |
| PX-78 | Part of Exhibit J to Complaint – "Demon Night" | | A, B, H, IL, NP, W |
| PX-79 | Part of Exhibit J to Complaint – "When Hell Laughs" | | A, B, H, I, IL, NP, W |
| PX-80 | Part of Exhibit J to Complaint – "Endithor's Daughter" | | A, B, H, IL, NP, W |
| PX-81 | Part of Exhibit J to Complaint -"Against the Prince of Hell" | | A, B, H, IL, NP, W |
| PX-82 | Part of Exhibit J to Complaint – "Star of Doom" | | A, B, H, IL, NP, W |
| PX-83 | Exhibits K & M to Complaint Red Sonja Chain of Title | | A, B, H, IL, MD, W |
| PX-84 | Exhibit O to Complaint Alla Ray Morris assignment | | A, B, F, H, IL, W |
| PX-85 | Exhibit P to Complaint  assignment of copyright registrations | | A, B, F, H, IL, R |
| PX-86 | Exhibit Q to Complaint  Red Sonja Trademark #1,161,847 | | A, B, R |
| PX-87 | Exhibit R tp Complaint  Red Sonja Trademark # 1,397,608 | | A, B |

| Ex. # | Type of Document | Bates | Objection |
|---|---|---|---|
| PX-88 | Exhibit S to Complaint  Variety article of Paradox's Howard library purchase | | A |
| PX-89 | Exhibit T to Complaint  Variety and Hollywood Reporter article about Paradox purchase of Howard Library | | A |
| PX-90 | Exhibit U to Complaint capture of Paradox website with Hollywood reporter article | | A |
| PX-91 | Exhibit V to Complaint  ICV2.com article about Paradox's purchase of Howard's library | | A, H |
| PX-92 | Exhibit W to Complaint  Newsrama.com article about Paradox's purchase of Howard library | | A, B, H, IL |
| PX-93 | Exhibit Y to Complaint – capture of Paradox website main page "we build brands… Red Sonya" | | A, H |
| PX-94 | Exhibit Z to Complaint  Yahoo Finance article displaying Red Sonya with illegal registration mark | | A, B, H |
| PX-95 | Exhibit AA to Complaint  "Hyboria" trademark applications | | A, B, H, MD, R |
| PX-96 | De Laurentiis Red Sonja Movie Announcement | RS 00500 | A, B, H, I, IL, R, W |
| PX-97 | Approx 30 pages of Red Sonja Press and articles | RS 00344 | A, H, I, R, W |
| PX-98 | Red Sonja licensing advertisement | RS 00331 | A, H, I, W |
| PX-99 | Jack Baum 3/12/98 letter to Arthur concerning Red Sonja from Robert E Howard properties | RS 00109 | A, B, H, IL, R |
| PX-100 | Sederowsky e-mail to Arthur Lieberman  1/9/06 | RS 05501 | A, H |
| PX-101 | Sederowsky e-mail to Arthur Lieberman  2/7/06 | RS 05486 | A, H |
| PX-102 | Trademark registration for Red Sonja #3,226,477 | RS 05792 | A, H, NP, R, W |

| Ex. # | Type of Document | Bates | Objection |
|-------|------------------|-------|-----------|
| PX-103 | Blockbuster Video rental case for Red Sonja | RS 05106 | A, B, H, IL, R, W |
| PX-104 | Red Sonja Approx 16 Red Sonja covers and the books they represent | RS05768 | A, B, H, IL, W |
| PX-105 | Dark Horse Conan #6 | RS 05784 | A, B, H, IL, R, W |
| PX-106 | Dark Horse Conan #7 | RS 05785 | A, B, H, IL, R, W |
| PX-107 | Delaware State certification of Red Sonja Merger | RS 05106 | A, H, R |
| PX-108 | Red Sonja LLC 2002 Merger Papers | RS 4483 | A, H, R, W |
| PX-109 | Universal Studios Florida agreement | RS 2771 | A, H, R |
| PX-110 | Approximately 60 more pages of Red Sonja Press | RS 02363 | A, F, H, MD, R, W |
| PX-111 | Newsarama artcle, interview with Scott Allie concerning Janissa: The Widowmaker | | A, F, H, NP, R |
| PX-112 | Agreement between Marvel and the Heirs and Estate of Robert E. Howard | RS3979 | A, B, H, R, W |
| PX-113 | E-mail to Malmberg, 4/26/06 re: Red Sonya | Def00650 | A, H, W, F (attorney-client privileged) |
| PX-114 | USPTO Request to file substitute specimen for application of renewal | RS 02167 | A, H |
| PX-115 | USPTO Certificate of Registration | RS05790 | A, H, W |
| PX-116 | Paradox advertisement distributed at NYC comic convention | | A, H, W, NP, R |

Defendant sets forth above its objections to the trial exhibits identified by plaintiff according to the codes in list set forth below. Defendant reserves the right to supplement or amend its objections after receiving marked copies of plaintiff's trial exhibits and as otherwise appropriate.    The letter codes have the following meanings:

| | | |
|---|---|---|
| A | = | Requires authentication before admission into evidence F.R. Evid. 104 and 901 |
| B | = | Not the best evidence.  Not an accurate duplicate of the original F.R. Evid. 901, 1002, 1003, and 1005 |
| F | = | No foundation F.R. Evid. 602, 901, 1002, 1003, and 1006 |
| H | = | Hearsay if offered for the truth of the matter asserted F.R. Evid. 801, 803 |
| I | = | Incomplete document F.R. Evid. 106, 403 and 1003 |
| IL | = | Objection on the ground that the exhibit is wholly or partially illegible |
| MD | = | Proposed exhibit contains multiple documents |
| NP | = | Objection on the grounds that the exhibit was not produced during fact discovery or in accordance with the Scheduling Order in this case |
| R | = | Not relevant F.R. Evid. 401, 402, and 403 |
| W | = | Wrong document identified or incorrectly described |

<u>**Exhibit 7**</u>

<u>**List Of Witnesses Plaintiff Expects To Call At Trial**</u>

**1. Fact Witnesses.**

Luke Lieberman
4722 Berryman Ave
Culver City, CA 90230

Arthur Lieberman
6467 Enclave Way
Boca Raton, FL   33496

Nick Barrucci
C/o Dynamic Forces
155 E. 9th Ave, STE B
Runnemede, NJ  08078

Juan Collado
C/o Dynamic Forces
155 E. 9th Ave, STE B
Runnemede, NJ  08078

Scott Allie
C/o Dark Horse Comics, Inc.
10956 SE Main Street
Milwaukie, OR   97222

Mike Richardson
C/o Dark Horse Comics, Inc.
10956 SE Main Street
Milwaukie, OR   97222

Joe Gatta
C/o Nu Image
6423 Wilshire Blvd
Los Angeles, CA   90048

Roy Thomas
32 Bluebird Trail
Saint Matthews, SC   29135

Jack Baum
126 Hurst Creed Rd
Austin, TX   78734

**2.  Expert witness.**

Pursuant to the Order, dated June 12, 2007, this trial is now bifurcated and neither Plaintiff nor Defendant will be calling any expert witnesses during the liability phase of this trial.

**3.  Cross-Examination.**

Listed below are the witnesses Plaintiff expects to call by deposition and/or to conduct cross-examination of if called "live" by Defendants.  Plaintiff further reserves the right to question every witness called by Defendant consistent with Federal Rule of Evidence 611(b).

Peter Sederowsky
Fred Malmberg
Scott Allie
Fred Fierst, Esq.

## EXHIBIT 8

## DEFENDANT'S LIST OF WITNESSES

Paradox identifies the following witnesses whom it may call live or by deposition at trial. This list is not indicative of the order in which the witnesses may be called at trial, nor is it a commitment that Paradox will call any particular witness at trial or a representation that any of the witnesses listed are available or will appear for trial. If any of plaintiff's witnesses fail to appear at trial, Paradox reserves the right to use their deposition testimony. Paradox also reserves the right to call any witness called by plaintiff.

**I.     WITNESSES WHO MAY BE CALLED IN PERSON.**

Paradox identifies the following potential witnesses who may be called at trial in person:

Fredrik Malmberg
Paradox Entertainment, Inc.
8484 Wilshire Blvd.
Suite 870
Beverly Hills, CA 90211

Leigh Stone
Paradox Entertainment, Inc.
8484 Wilshire Blvd.
Suite 870
Beverly Hills, CA 90211

Mike Richardson
Dark Horse Comics
10956 SE Main Street
Milwaukie, OR 97222

Fred Fierst
Fierst, Pucci & Kane LLP
64 Gothic Street
Northampton, MA 01060

## II.    WITNESSES WHO MAY BE CALLED IN PERSON OR BY DEPOSITION.

Paradox identifies the following potential witnesses who may be called at trial in

person or by deposition:

Luke Lieberman
4722 Berrymann Ave.
Culver City, CA 91230

Lonnie Ramati
Nu Image Films
6423 Wilshire Blvd.
2nd Floor
Los Angeles, CA 90046

Juan Collado
Dynamic Forces, Inc.
155 Ninth Ave, Suite E
Runnemede, NJ 08078


Paradox reserve the right to identify additional witnesses based on plaintiff's

submissions.  The parties have agreed to exchange deposition designations at a later date.

**Exhibit 9**

**Plaintiff's Statement of Intended Proof**

Having recently acquired all of the literary assets of the estate of Robert E. Howard but one – Plaintiff's Red Sonja character – Paradox determined to acquire indirectly what it could not buy directly (rights had been offered to Defendant and its licensee in 2003). Indeed, Paradox's former CEO, Peter Sederowsky, who is further described below, once told Plaintiff's principal that he will "get Red Sonja."

To that end, Paradox fostered purposeful confusion in the marketplace with it's newly acquired literary story, and has sought to interfere with Plaintiff's established contracts wherever it can find them.

This case represents an egregious example of unfair competition and trademark infringement.  For more than 30 years, the Red Sonja character: the fierce, red-headed female warrior of the mythical Hyborian Age, has been a leading comic book fantasy character.  From her first comic book appearance in 1973 to the present, Red Sonja has appeared in a substantial number of products including comic books, a major motion picture, novels, toy figurines, trading cards, posters, lithographs and other media products.

Beginning in the 1930s, Robert E. Howard became among the most prolific American pulp writers, and is generally considered a father of the "Sword and Sorcery" genre.  Of the hundreds of characters he created, the most famous, "Conan the Barbarian," became Arnold Schwarzenegger's entry into major motion pictures.  Conan the Cimmerian, so-called from the name of his homeland Cimmeria, lived during the Age of Hyboria, a fictional era created by Howard.  The Age of Hyboria began after "the

oceans drank Atlantis and ended before the rise of the ancient civilizations." Roy Thomas, while writing the Conan series for Marvel Comics in 1973, decided to introduce a female character from an obscure Howard short story[1] into the Conan Hyborian Age. She was a red-headed, sword-wielding female warrior named Red Sonya, whom, for the purposes of the Conan series, he called Red Sonja. Thomas explained the change in spelling this way: "I felt that, if she were to become a continuing character in Conan, it might be best to make her a bit more of a 'new' character by changing the spelling of her name ever so slightly."[2]

The conversion was an instant success – so much so that Marvel elected to spin off three separate comic book series for Red Sonja, and the Heirs of the Howard Estate spun her out into a separate corporation, Red Sonja Corp., which later merged into Red Sonja LLC. The Red Sonya from "Shadow of a Vulture" was relegated to obscurity where it has remained for 70 years, until Paradox hatched its plan to steal Plaintiff's property.

In 1999, Paradox purchased the Conan character from the Heirs of the Howard Estate, excluding all other Howard characters. In 2005, the Heirs sold their majority interest in Red Sonja to Plaintiff's predecessor. In 2006, the Heirs then sold the remaining Howard library to Paradox, including hundreds of stories and short stories, containing hundreds of characters, one of which is Red Sonya, a passing mention in the literary property "Shadow of the Vulture."

---

[1]    Red Sonya originally appeared in the Howard story, "Shadow of a Vulture" in 1934. Howard is also the creator of numerous other characters, the most famous of which, in addition to Conan the Barbarian, are Kull the Conqueror, Solomon Kane, and Bran Mak Morn.

[2]    Despite the spelling change, from her first comic book appearance and continuously since that time, Red Sonja has been acknowledged by the fans and the Estate of Robert E. Howard to be based upon Howard's original heroine.

Paradox's former CEO and president, Peter Sederowsky, who was fired from Paradox after his deposition in this case relating to serious – even criminal – conduct as the head of Paradox,[3] had been for years trying to acquire from Red Sonja Corp., the predecessor to Plaintiff, the Red Sonja character and trademark for Paradox.  No such agreement was ever reached because the price was more than Paradox was willing to pay. See Declaration of Arthur M. Lieberman dated May 31, 2007, at ¶ 3 ("Lieberman Decl.").

After unsuccessfully trying to obtain Red Sonja legally, and on the eve of Paradox's acquisition of all the remaining characters of Robert E. Howard with the noted exception of Plaintiff's Red Sonja, Mr. Sederowsky informed Arthur Lieberman, Red Sonja Corp.'s president, that Paradox was acquiring a literary story that contained the character Red Sonya and that Paradox intended to license it and no longer needed to acquire Red Sonja.  Mr. Lieberman advised Mr. Sederowsky (an attorney) that Paradox could not do that because a mere mention in a single story does not convey trademark rights in such character (and, indeed, it is insufficient to even register with the United States Patent and Trademark Office), and that he well knew that having been in this field a long time.  Mr. Sederowsky responded "we will see" and terminated the conversation. See Lieberman Decl., at ¶¶ 4 – 6.

---

[3]     Pursuant to the Court's Order of June 12, 2007, Plaintiff took a limited deposition of Paradox on this issue.  The Rule 30(b)(6) witness designated by Paradox, however, was Frederick Fierst, Esq., a long-time lawyer for Paradox who has also appeared as counsel in this case.  Despite designating Mr. Fierst as the Rule 30(b)(6) witness, Paradox directed him not to answer numerous questions relating to his qualification and knowledge as a Rule 30(b)(6) witness by asserting that conversations Mr. Fierst had with Paradox personnel were protected from disclosure by the attorney-client privilege.  Paradox's conduct and tactics in this regard were the subject of a conference call between counsel and the Court held on June 22, 2007 and a determination by the Court is anticipated.

It is in this light that the Court needs to view the wrongful conduct of Defendant. Defendant first issued a false press release (highlighting Conan) that announced its purchase of "all" or the "entire[ty]" of Robert E. Howard's Library. Then, Paradox's own home page, boasted:

> ... WE BUILD BRANDS, ... Paradox Entertainment, Inc. controls a vast library of entertainment properties and brings these in all aspects to the market. Our portfolio consists of such **successful brands** as ... Red Sonya [sic]... (emphasis added)

This highlighting an obscure character named Red Sonya, from among the hundreds that Paradox acquired, was an intentional effort to create confusion with the long commercialized Red Sonja. The homepage then solicited Red Sonya's availability for licensing. (Complaint, Exh. Y).

The only inference to be drawn from Paradox's inclusion of Red Sonya in its press release and on its website other than that Peter Sederowsky was acting on his promise to steal Red Sonja through the promotion of Red Sonya.

Paradox then sat silent as the entertainment press understandably ran with the confusion Paradox had sown. The <u>Hollywood Reporter</u>, the industry's most prominent daily magazine, as well as various other online sources, reiterated Paradox's home page and misreported that Paradox had acquired the Red Sonja character. Not content to leave such misreporting to stand on its own, Paradox then republished the incorrect <u>Hollywood Reporter</u> article, *without correction*, on its website – the same site where Paradox was simultaneously soliciting licenses for its characters. Paradox's efforts to sow confusion and undermine Plaintiff's Red Sonja, now had the imprimatur of the press of record.

The intended confusion caused by Paradox's so-called innocent posting on its website "of an errant article written by a third party about the REH Library acquisition"

no doubt led Plaintiff's licensee, the producer of the upcoming Red Sonja movie, to be confused as to owner of Red Sonja and its relationship with Red Sonya.

Paradox's malicious and unfairly competitive conduct if further manifested in its attempt to "unhook" Plaintiff's contract with its producer/licensee Emmet/Furla Films and Nu Image by offering its Conan property as leverage in an attempt to force Plaintiff's licensee to halt or delay the production of the upcoming Red Sonja movie and thus to interfere with Plaintiff's commercialization of its mark.    Simply put, Paradox told Emmet/Furla Films and Nu Image that if it abandoned the contract with Plaintiff for a Red Sonja film, Emmet/Furla Films and Nu Image could have access to a Conan license.

Joseph Gatta, a representative of Millennium/New Image, a licensee of Red Sonja from Plaintiff, testified:

> A.    And Fred [Malmberg, the now President of Paradox] knew that [Millennium/New Image] controlled it and we could, you know, that we were going to make the [Red Sonja] movie. And made a comment about how he wished Red Sonja never happened here.
> …
> But I'm sure through his comment, you know, there was that suggestion of, you know, you know, hey, you know, let's not make that happen so quickly or let's not make that happen, and then, you know.
>
> Q.    Is that – how do you know though that that's what he meant?
>
> A.    Well, when someone says I wish Red Sonja never happened, I know what he means.
>
> Q.    Well, you just used the past tense there as if he just – as if he was saying he regretted that you guys had struck a deal already. Isn't that what you were saying?
>
> A.    No. We had already struck the deal. I mean it was about making the movie. Because I guess I had knowledge at the time that he had Red Sonya with a "Y," so again, there was

> not only the conflict between Peter [Sederowsky] and
> Arthur [Lieberman], but there was the potential, you know,
> Red Sonja conflict.

(Joseph Gatta Tr. at p. 47, lns. 7 – 10 and p. 62, lns. 1 - 18).

Further, Paradox, which actively polices its comic book licensee, Dark Horse Comics, had published a response to a purported letter to the editor in a Conan comic, which advised the public that it would be bringing Conan's love interest Red Sonya[4] (with a "y") back into the comic book series (although such a character never existed in the Conan series to begin with). (Complaint, Exh. X). Such letter to the editor was no doubt fabricated. But, whether it was fabricated or not, Paraodox's publishing of a response that was so clearly false further establishes its intentional and malicious confusion campaign.

Tellingly, neither Paradox nor Dark Horse has ever produced this purported letter to the editor in discovery – the clear inference being that it never existed. But the maliciously manipulative response to this "letter" to the editor certainly did fulfill Paradox's Chief Operating Officer's August 20, 2005 e-mail to Dark Horse which stated:

> My more sinister self, whispers that we should deliver a more
> serious blow – disarming them forever by launching the real RED
> SONYA of Rogantine, as a start of the "Commemorating 100
> years of ROBERT E. HOWARD". Great art (she can have red
> hair!!) a super story, and a really clever marketing campaign.
> Maybe even launch that title into a "Heroines of REH" series
> alternating comics of Agnes of Swordswoman, Black Vulnea, Red
> Sonja. etc.

(August 20, 2005 e-mail from Fred Malmberg to Dark Horse Comics)

---

[4]     Red Sonja, not Red Sonya, was Conan's love interest.

In another press release Defendant attached the registration symbol ® on its unregistered Red Sonya mark, in a further effort to its obscure Red Sonya with Plaintiff's commercially established and viable Red Sonja (Complaint, Exh. Z.) There is, however, no such federal registration for Red Sonya, and thus the use of the ® symbol is clear violation of the federal trademark laws.

Paradox's conduct is not the "stuff" of unintentional, harmless errors. It evidences a clear intent to usurp the Red Sonja mark and to financially damage Plaintiff in the public marketplace. It is clear that Paradox's publicity as to its purchase of the Red Sonya character, a character that had only appeared briefly in **one** story approximately **70** years ago, was done with the intent to cause confusion and to piggy-back on the popularity of Plaintiff's Red Sonja character in order to steal Plaintiff's position in the marketplace. Nor are Paradox's actions something correctable through a simple dissemination of a press release stating to the effect: we are sorry to those who were confused. Such a retraction is completely insufficient to overcome the amount of publicity Defendant had derived through its public disclosures. Here, however, even Paradox's purported "corrective" release further sowed confusion and sought to undermine Plaintiff's Red Sonja by falsely asserting that Red Sonja and Red Sonya are separate and distinct characters when, in fact, Roy Thomas simply adapted Red Sonya and placed her in the Hyborean Age.

Since immediately before its acquisition of this library, once the terms were agreed, Paradox has intentionally sowed confusion in the marketplace in an attempt to establish Red Sonya, join her with Conan (although she never previously appeared with Conan and did not live in the Hyborian Age), and compete directly with Plaintiff's Red

Sonja character.  Paradox seeks thereby to profit by stealing goodwill, renown, and notoriety generated by the Red Sonja franchise over the last 30 years.

Paradox has also attempted to infringe on Red Sonja LLC's licenses for its Red Sonja character.  Nowhere is Defendant's infringement and competitive impropriety more salient than in Paradox's false public announcement of its intent to license its "successful brand" Red Sonya.  Red Sonya is neither successful nor a brand, having never been marketed or sold since 1934 when the Howard story in which she was passingly mentioned was published.

In addition, Paradox has acted purposefully and in concert to interfere with Plaintiff's rights in its trademark and character.  Even before its acquisition was completed, Paradox sought to register the word "HYBORIA" as a trademark and service mark in multiple classes of goods and services, including every area in which Plaintiff has granted licenses, as well as for virtually every type of goods and services in which such a character could ever possibly appear.  Paradox's filings were done with full knowledge that the "Age of Hyboria" and the word "HYBORIA" are equally identified with the Red Sonja character, a character it does not own, as with Conan, a property owned by Defendant.  Defendant cannot arrogate to itself, to the exclusion of Plaintiff, the word "HYBORIA," which is an integral aspect of Red Sonja's character.  Defendant's attempt to do so is a blatant example of fraud on the USPTO by filing a false trademark oath to interfere with Plaintiff's rights to market, promote and sell its Red Sonja products in the marketplace.

Defendant's campaign of confusion and duplicity has been comprehensive.  Since announcing the acquisition, Defendant and its licensees have:

- Created a Press Release claiming ownership by Paradox of all of Howard's characters mentioning the three "most famous" by name including the obscure Red Sonya (with a "y") and then sat complicit as this was misinterpreted by various newspaper, magazine and online sources as the purchase of plaintiff's RED SONJA. Defendant issued no corrections and sat mute, enjoying the confusion;

- Fabricated and published, along with Conan licensee Dark Horse Comics, a letter to the editor in which they advised the public that they would be bringing Conan's love interest Red Sonya (with a "y") back into the comic book series (although such a character never existed in the Conan series);[5]

- Continuously and purposely confused Red Sonja and Red Sonya, claiming ownership of either or both, depending on the publication;

- Attempted to interfere with Plaintiff's contracts and potential contracts with third parties by using its control over Conan contracts and potential contracts as leverage;

- When the Hollywood Reporter understandably interpreted the Paradox press release to include a claimed ownership of Red Sonja, Paradox then inserted the Hollywood Reporter article (without correction) on its own website where it solicits licenses, thereby citing that publication as proof of ownership of Red Sonja, closing the loop and completing the theft; and

- Paradox displayed a false and fraudulent registration symbol on an unregistered mark, so that Red Sonya appears in its press releases bearing a ® symbol when, in fact, there is no such federal registration.

Paradox attempts to characterize its admitted infringement and dilution of and unfair competition with Plaintiff's Red Sonja character by asserting that this case is based on nothing more than a "harmless" or "innocent" mistake on Defendant's part, and that Paradox mitigated all damages when, *after* being sued by Plaintiff, it agreed to not commercialize its Red Sonya character. Such simple disclaimer, however, does not immunize Paradox from what shall demonstrate is its intentional infringement and

---

[5]    Neither Paradox nor Dark Horse produced this purported letter to the editor in discovery.

dilution of Plaintiff's character and the damage it has caused to Plaintiff. In short, Paradox is not sorry for its attempted theft of the position and value of Plaintiff's Red Sonya in the marketplace. Like most thieves, Paradox is simply sorry it got caught and was unsuccessful.

**EXHIBIT 10**

**DEFENDANT'S STATEMENT OF PROOF**

1.  Paradox intends to introduce evidence, to the extent necessary, to rebut plaintiffs' claims that the name Red Sonya infringes plaintiff's mark.

2.  Paradox intends to introduce evidence, to the extent necessary, to rebut plaintiff's claims that the name Red Sonya constitutes unfair competition.

3.  Paradox intends to introduce evidence, to the extent necessary, to rebut plaintiffs' claims that the name Red Sonya dilutes plaintiff's mark.

4.  Paradox intends to introduce evidence, to the extent necessary, to introduce evidence to prove that Paradox's use of Red Sonya constitutes a statutory fair use.

5.  Paradox further intends, to the extent necessary, to introduce evidence to prove that plaintiff has committed fraud on the U.S. Patent and Trademark Office in procuring and maintaining Registration No. 1,397,608.

6.  Paradox further intends, to the extent necessary, to introduce evidence to prove that plaintiff has falsely misrepresented Robert E. Howard's name in commercial advertising and promotion of its products featuring the Roy Thomas Red Sonja character.

7.  Paradox further intends, to the extent necessary, to introduce evidence to prove that plaintiff has initiated and pursued this litigation for a purpose for which the legal process was not designed.

**Exhibit 11**

**Plaintiff's Statement Of Other Matters**

1.      The length of trial.  Plaintiff estimates the trail should not exceed six days.

2.      Plaintiff may call rebuttal witness, depending on the need, without prior notice.

3.      Any documents not produced by Plaintiff during discovery were recently acquired and will be included in the Plaintiff's binder of exhibits.  In addition, each of the complained of exhibits are comic books that are publicly available at any comic store.  To the extent that Defendant has included any exhibits on its exhibit list that were not previously produced, such exhibits should be precluded as Defendant has made no showing whatsoever as to why they were not previously produced.

4.      Plaintiff will stipulate not to raise the allegedly "new" allegations set forth in Defendant's Exhibit 12, if Defendant will agree not to assert its claim for unfair competition based on false advertising, that was raised for the first time in its submission for this Pre-Trial Order.   Otherwise, Plaintiff will ask the Court to preclude this Defendant's newfound theory.  In the event that the Court will not preclude this theory, Red Sonja would ask the Court to order Paradox to produce all documents relating to this claim and for the production of a Rule 30(b)(6) witness who can testify to the underlying facts that allegedly may support this claim.

5.      Plaintiff intends to use documents related to Conan to the extent that such documents were produced during discovery as Red Sonja was adapted from the Robert E. Howard story "Shadow of a Vulture" by Roy Thomas to appear with Conan.  The Court

precluded the Defendant from using Conan-related evidence on its affirmative case as a sanction for its dilatory discovery tactics.

      6.     Plaintiff filed a Motion in Limine on May 23, 2007. The Motion in Limine requested relief with respect to five issues:

      (i)     Defendant should be precluded from introducing any documents or testimony related to its Conan character as Defendant steadfastly refused to produce such documents during discovery;[1]

      (ii)     Defendant should be precluded from introducing any evidence related to its purported damages on its counterclaims as it has failed to produce any damages evidence during discovery;

      (iii)     Paradox should be precluded from introducing Dark Horse's documents or its testimony at trial and the Dark Horse documents to be utilized at trial by Plaintiff should be deemed authentic business records;

      (iv)     The Court should sanction Paradox for its failure to produce documents and witnesses by precluding from using the discovery it produced on its Counterclaims at the trial of this matter; and

      (v)     Paradox should be precluded from testifying about anything that its witnesses claimed they could not remember at the depositions.

      Pursuant to the Court's Order, dated June 12, 2007 (the "Order"), the Court decided Plaintiff's motion in limine as follows:

      Plaintiff's motion in limine (D.I. 86) is granted to the following extent.

      Points I, III and V. Consistent with the court's practices, if a party has failed to cooperate in discovery, e.g, by failing to produce evidence during discovery that was legitimately requested during discovery, e.g., by failing to produce evidence during discovery that was legitimately requested during discovery, that party is precluded from affirmatively using that

---

[1]     Similarly, Defendant has raised for the first time in its Pre-Trial Order submission a new theory of false advertising. Red Sonja will request at the pre-trial conference that Paradox be precluded from asserting this theory as it was never previously raised.

evidence at trial. For example, because the court has denied plaintiff's motion to compel responses to its document requests 2, 10 and 25, such information cannot be used affirmatively by Defendant at trial.

Plaintiff's document request cited by the Court state:

Request No. 2: All documents concerning any communication between Paradox and Dark Horse Comics relating to Conan the Barbarian and cross-overs.

Request No. 10: All documents concerning the word "famous," as that word is used in relation to intellectual property rights or purported rights including, but not limited to, how that concept applied, applies or might apply to Conan the Barbarian.

Request No. 25: All documents concerning the value of the marks Conan the Barbarian, Red Sonja, and/or Red Sonya as distinct characters.

Accordingly, the Defendant may not offer or elicit evidence or testimony as to: (i) any communication between Paradox and Dark Horse comics relating to Conan the Barbarian and cross-overs; (ii) anything concerning the word "famous," as that word is used in relation to intellectual property rights or purported rights including, but not limited to, how that concept applies, applied, or might apply to Conan the Barbarian; and (iii) anything concerning the value of the marks Conan the Barbarian, Red Sonja, and/or Red Sonya as distinct characters.

As the Court granted Point III of Plaintiff's motion in limine, Paradox is precluded from introducing Dark Horse's documents or its testimony at trial and the Dark Horse documents to be utilized at trial by Plaintiff should be deemed authentic business records.

As the Court granted Point V of Plaintiff's motion in limine, Paradox is precluded from testifying about anything that its witnesses claimed they could not remember at their depositions.

With respect to Point IV, whereby plaintiff asked the Court to sanction Paradox for its failure to produce documents and witnesses by precluding from using the discovery it produced on its Counterclaims at the trial of this matter; and seeking to preclude Paradox from introducing any evidence on its Counterclaims, the Court reserved decision on this branch of the motion in limine and ordered that it be discussed at the pre-trial conference.

The Court denied as moot Point II of the motion in limine, as the Court has directed that the trial shall be bifurcated.

The Court denied as moot Defendant's sole motion in limine, seeking to strike the expert report of Plaintiff's expert.

## EXHIBIT 12

## DEFENDANT'S STATEMENT OF OTHER MATTERS

1. The length of trial. Defendant estimates the trial should not exceed two days.

2. Plaintiff's assertion that it can call rebuttal witnesses without prior notice.

3. Plaintiff's attempt to rely on documents not produced in discovery. As the Court made clear in its June 12, 2007 Order, consistent with the Court's practices, when a party has failed to produce evidence legitimately requested during discovery, that party is precluded from affirmatively using that evidence at trial. During discovery, Paradox requested, among others, "a copy of each different comic sold bearing the RED SONJA mark, or at a minimum a copy of the cover and the first five pages" (#21), as well as "copies of all advertising and promotional materials for all magazines (#26), and for "all novels" (#27). Plaintiff did not produce those documents during discovery, but has listed on its trial exhibit list parts of comic books and news articles as exhibits. Plaintiff should be precluded from affirmatively using any evidence that Paradox requested but did not receive during discovery.

4. Plaintiff's attempt to rely on new allegations that are neither mentioned in the Complaint nor raised in this litigation, such as:

    A. Plaintiff's identification of Registration No. 3,226,477 given that Paradox's use of the name Red Sonya predates plaintiff's federal registration (April 10, 2007), and that plaintiff's federal registration is not included in the complaint and is not part of this litigation.

    B. "Defendant offered a third-party an exclusive license to use the 'Age of Hyboria'"

5. Plaintiff's exhibits relating to Conan. In its June 12, 2006 Order, the Court held that, because this dispute was "a narrow one, stemming from defendant's purchase, in February 2006, of the rights to all of the literary characters created by Howard," information related to Conan the Barbarian is irrelevant to the liability issues at trial. Plaintiff, however, has identified as trial exhibits Conan related documents, including emails and comic books. Because Conan is irrelevant to liability, plaintiff should be precluded from offering these exhibits at trial.

6. Plaintiff's characterization of the Court's June 12, 2007 Order. For instance, in its pretrial submissions, plaintiff states: "[a]s the Court granted Point III of Plaintiff's motion in limine, Paradox is precluded from introducing Dark Horse's documents or its testimony at trial and the Dark Horse documents to be utilized at trial by Plaintiff should be deemed authentic business records." The Court never deemed authentic the Dark Horse documents to be utilized at trial by Plaintiff. Nor did the Court "grant[] Point V of Plaintiff's motion in limine" and preclude Paradox "from testifying about anything that its witnesses claimed they could not remember at their depositions."